## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SPORTCO HOLDINGS, INC., *et al.*,[1] | ) | Case No. 19-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF BRADLEY P. JOHNSON IN SUPPORT OF
## THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Bradley P. Johnson, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.     Since October 3, 2011, I have served as Chief Executive Officer of SportCo Holdings, Inc. ("SportCo" and, together with each of its wholly-owned direct and indirect subsidiaries that are debtors and debtors in possession in these chapter 11 cases, the "Debtors" or "USC").  In this capacity, I am generally familiar with the Debtors' day-to-day operations, businesses, and financial affairs.

2.     On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief (collectively, the "Petitions") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court"), and filed the motions described herein requesting certain relief (the "First Day Pleadings").  I submit this declaration on behalf of the Debtors in support of the Petitions and the First Day Pleadings.

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are:  Bonitz Brothers, Inc. (4441); Ellett Brothers, LLC (7069); Evans Sports, Inc. (2654); Jerry's Sports, Inc. (4289); Outdoor Sports Headquarters, Inc. (4548); Quality Boxes, Inc. (0287); Simmons Guns Specialties, Inc. (4364); SportCo Holdings, Inc. (0355); and United Sporting Companies, Inc. (5758).  The location of the Debtors' corporate headquarters and the service address for all Debtors is 267 Columbia Ave., Chapin, SC 29036.

3.      The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. Contemporaneously with the filing of this declaration, the Debtors have requested procedural consolidation and joint administration of the above-captioned chapter 11 cases (the "Chapter 11 Cases").

4.      The First Day Pleadings seek, among other things, to meet the Debtors' goals of: (a) continuing their operations as debtors in possession with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of the Debtors' employees, customers, vendors, and other key constituencies during these Chapter 11 Cases; and (c) establishing procedures for the smooth and efficient administration of these Chapter 11 Cases. Gaining and maintaining the support of the Debtors' employees, customers, vendors, and other key constituencies, as well as maintaining the day-to-day operations of the Debtors' businesses with minimal disruption, will be critical to a successful sale or restructuring in these Chapter 11 Cases.

5.      Except as otherwise indicated herein, all of the facts set forth in this declaration are based upon my personal knowledge, information supplied to me by other members of USC's management or professionals, information learned from my review of the relevant documents, or my experience and knowledge of the Debtors' operations and financial condition and the shooting sports industry, generally.  If called as a witness, I could and would testify to the facts set forth in this declaration.  I am authorized to submit this declaration on behalf of the Debtors.

6.      Parts I through III of this declaration describe USC's business operations, organizational structure, and capital structure.  Part IV of this declaration describes the events

leading to these Chapter 11 Cases.  Part V of this declaration sets forth the relevant facts in support of the First Day Pleadings.

## I.    BACKGROUND AND BUSINESS OPERATIONS

7.    USC was founded in 1933 under the name Ellett Brothers, Inc. before merging with Jerry's Sports, Inc. in 2009 and formally changing its name to United Sporting Companies, Inc. on July 16, 2010.  Headquartered in Chapin, South Carolina, USC is a marketer and distributor of a broad line of products and accessories for hunting and shooting sports, marine, camping, archery, and other outdoor activities.  USC's product line of over 55,000 SKUs includes firearms, reloading, marine electronics, trolling motors, optics, cutlery, archery equipment, ammunition, leather goods, camping equipment, sportsman gifts, and a variety of other outdoor sporting goods products.  USC carries the major brands in the outdoor sports industry, including Remington, Ruger, Browning, Winchester, Smith & Wesson, Glock, Bushnell, Sig Sauer, Springfield Armory, Hornaday, Henry, Magpul, Armscor, MotorGuide, Minn Kota, Lowrance, Federal, CCI, Taurus, and Leupold.  USC's customer base consists of 20,000 independent retailers covering all 50 states.

8.    USC employs approximately 321 full-time, part-time, and temporary employees. The Chapin facility includes a 154,000 square foot distribution center and a 40,000 square foot sales office.  USC owns and operates two additional distribution centers—a 128,000 square foot facility in Newberry, South Carolina and a 192,000 square foot distribution facility in Bellefontaine, Ohio.[2]  USC also leases a 198,000 square foot distribution and office facility in

---

[2] The distribution facility located in Bellefontaine, Ohio was shut down prior to the Petition Date.

Pittston, Pennsylvania, a 30,000 square foot distribution facility in Salt Lake City, Utah, and additional sales offices in Pennsylvania, California, Minnesota, and Texas.[3]

9.      In 2018, USC's net sales across all distribution channels were approximately $557.0 million, with $531.1 million in net sales for 2017.  Despite USC's strong sales volume, these figures are well below USC's $885.3 million in average net sales from 2012 through 2016.

10.      In line with USC's decreased sales, its adjusted EBITDA has dropped from an average of $55.8 million from 2012 through 2016 to $4.0 million in 2018.

## II.      ORGANIZATIONAL STRUCTURE

11.      SportCo, a Delaware corporation, is a holding company with no business operations. As of the Petition Date, 94.30% of SportCo's fully-diluted shares were held by three investor groups:  Wellspring Capital Partners IV, L.P. (60.58%), Prospect Capital Corporation and certain affiliates (21.16%), and Summit Partners Credit Fund, L.P. and certain affiliates (12.55%).  The remaining 5.70% of SportCo's fully-diluted shares are held by certain individuals, including current and former members of USC's management team or reserved for issuance under the Debtors' management incentive plan.  United Sporting Companies, Inc., a Delaware corporation ("United Sporting Cos."), is an intermediate holding company and wholly-owned subsidiary of SportCo.  Like SportCo, United Sporting Cos. has no business operations.

12.      USC operates its business primarily through Ellett Brothers, LLC, a South Carolina limited liability company and wholly-owned subsidiary of United Sporting Cos. ("Ellett"), and four of Ellett's six wholly-owned subsidiaries:  Evans Sports, Inc., a South Carolina corporation ("Evans"); Jerry's Sports, Inc., a Delaware corporation ("Jerry's"), Outdoor Sports Headquarters, Inc., a Delaware corporation ("Outdoor Sports"); and Simmons Gun

---

[3] Except for certain sales personnel located at USC's Downingtown, Pennsylvania and Dallas, Texas offices, USC's operations at each of the leased facilities were shut down prior to the Petition Date.

Specialties, Inc., a Delaware corporation ("Simmons" and, together with Evans, Jerry's, and Outdoor Sports, the "Operating Subsidiaries").    Ellett's two remaining wholly-owned subsidiaries, Bonitz Brothers, Inc., a Delaware corporation ("Bonitz") and Quality Boxes, Inc., a South Carolina corporation ("Quality Boxes" and, together with Bonitz, the "Non-Operating Subsidiaries"), ceased operations prior to the Petition Date.

13.    The organizational chart attached hereto as Exhibit A illustrates the foregoing.

### III.    CAPITAL STRUCTURE

14.    In September 2012, Ellett, each Operating Subsidiary, and Bonitz (collectively, the "Prepetition Borrowers") entered into that certain Third Amended and Restated Loan and Security Agreement (as amended and restated from time to time, the "Prepetition ABL Agreement"), dated September 28, 2012, between the Prepetition Borrowers, various lender parties thereto (the "Prepetition ABL Lenders"), and Bank of America, N.A., as administrative and collateral agent on behalf of the Prepetition ABL Lenders ("Prepetition ABL Agent" and collectively with the Prepetition ABL Lenders and the other "Secured Parties" as defined in the Prepetition ABL Agreement, the "Prepetition ABL Parties").    As of the Petition Date, the Prepetition ABL Lenders are Bank of America, N.A., Wells Fargo Bank, N.A., and Regions Bank.

15.    Pursuant to the Prepetition ABL Agreement, the Revolving Lenders agreed to extend to the Prepetition Borrowers revolving loans in an aggregate principal amount not to exceed $175 million (the "Prepetition ABL Facility").    As of February 15, 2019, the maximum revolver commitment under the Prepetition ABL Facility was reduced to $110.0 million.

16.    The Prepetition ABL Facility is secured by a first priority lien over substantially all of the Prepetition Borrowers' assets, including the Prepetition Borrowers' accounts

receivable, inventory, cash collateral, and real estate, all as set forth in greater detail in the Prepetition ABL Agreement and related documents (collectively, the "Prepetition ABL Documents").   The Prepetition ABL Facility is also guaranteed by SportCo and USC (collectively, the "Prepetition Guarantors") pursuant to those certain Second Amended and Restated Guaranties, dated September 28, 2012.

17.     As of the Petition Date, the aggregate principal amount outstanding under the Prepetition ABL Facility is approximately $23,056,470.93 (the "Prepetition ABL Obligations").

18.     In September 2012, the Prepetition Borrowers also entered into that certain Second Lien Loan and Security Agreement (as amended from time to time, the "Prepetition Term Loan Agreement"), dated September 28, 2012, between the Prepetition Borrowers, various lenders party thereto (the "Prepetition Term Loan Lenders" and, together with the Prepetition ABL Lenders, the "Prepetition Lenders"), and Prospect Capital Corporation, as administrative and collateral agent on behalf of the Prepetition Term Loan Lenders (the "Prepetition Term Loan Agent", together with the Revolving Agent, the "Prepetition Agents" and, together with the Prepetition Lenders, collectively, the "Prepetition Secured Parties").  As of the Petition Date, the Prepetition Term Loan Lenders are:  (i) Prospect Capital Corporation; (ii) Summit Partners Credit Fund, L.P.; (iii) Summit Partners Credit Fund A-1, L.P.; (iv) Summit Investors I, LLC; (v) Summit Investors I (UK), L.P.; and (vi) Summit Partners Credit Offshore Intermediate Fund, L.P.

19.     Pursuant to the Prepetition Term Loan Agreement, the Prepetition Term Loan Lenders agreed to extend to the Prepetition Borrowers term loans in the aggregate principal amount of $230 million (the "Prepetition Term Loan Facility").

69055642.2

20.     The Prepetition Term Loan Facility is secured by a second priority lien over substantially all of the Prepetition Borrowers' assets, including the Prepetition Borrowers' accounts receivable, inventory, cash collateral, and real estate, all as set forth in greater detail in the Prepetition Term Loan Agreement and related documents (together with the Prepetition ABL Documents, the "Prepetition Documents").  The Prepetition Term Loan Facility is guaranteed by the Prepetition Guarantors pursuant to those certain Guaranties, dated September 28, 2012.

21.     As of the Petition Date, the aggregate principal amount outstanding under the Term Loan Commitment is approximately $249,800,405.00 (the "Prepetition Term Loan Obligations" and, together with the Prepetition ABL Obligations, the "Prepetition Secured Obligations"), including capitalized interest through March 31, 2019.

22.     In addition to the Prepetition Secured Obligations, as of the Petition Date, the Debtors estimate that they have approximately $40.9 million of outstanding unsecured debt, which is comprised mostly of professional services, trade debt, and employee severance.

### IV.     EVENTS LEADING TO THESE CHAPTER 11 CASES

23.     Since 2015, the Debtors have faced economic headwinds and operational challenges that significantly and adversely impacted the operating performance of the Debtors' businesses, including:

- *Industry-Wide Decline Due to an Uncertain Political Climate.* In the lead up to the 2016 presidential election, the Debtors anticipated an uptick in firearms sales historically attributable to the election of a Democratic presidential nominee. The Debtors increased their inventory to account for anticipated sales increases. In the aftermath of the unexpected Republican victory, the Debtors realized lower than expected sales figures for the 2017 and 2018 fiscal years, with higher than expected carrying costs due to the Debtors' increased inventory. These factors contributed to the Debtors tightening liquidity and an industry-wide glut of inventory.

- *Excess Inventory Led to Discounting, Which Eroded the Debtors' Margins.* An over-supply of firearms following the 2016 presidential election and the financial distress of certain market participants led to industry-wide sales

discounts.  The Debtors were forced to lower prices to remain competitive and maintain sales figures, which further eroded the Debtors' slim margins and contributed to the Debtors' tightening liquidity.

- • *The Debtors' Over-Leveraged Capital Structure Further Eroded the Debtors' Margins.*  The Debtors' high fixed costs under the prepetition credit facilities adversely affected the Debtors' financial liquidity and required the Debtors' to stretch accounts payable beyond the Debtors' customary payment terms.  The resulting management of accounts payable resulted in the Debtors foregoing customary discount terms and volume rebates offered by the Debtors' top vendors.

- • *Significant Disruptions in the Industry Eroded the Debtors' Channel Sales.*  Many of the Debtors' vendors and manufacturers suffered heavy losses as a result of the Cabela's-Bass Pro Shop merger, Dick's Sporting Good's pull back from the market, and the recent Gander Mountain and AcuSport bankruptcies.[4]  Those losses adversely impacted the terms and conditions on which such vendors and manufacturers were willing to extend credit to the Debtors.  With respect to the Gander Mountain and AcuSport bankruptcies, the dumping of excess product into the marketplace pushed prices—and margins—even lower.  The resulting tightening of credit terms eroded the Debtors' sales and further contributed to the Debtors' tightening liquidity.

- • *Disruptions Caused by Natural Disasters.* The recent spate of disastrous hurricanes in the Southeastern United States resulted in decreased demand for firearms and other sporting goods where the Debtors' sales are disproportionately focused.  The reduction in demand caused additional losses for the Debtors and contributed to the Debtors' tightening liquidity.

24.    In June 2018, the Debtors acquired certain assets from competitor AcuSport Corporation, including the Debtors' distribution facility in Bellefontaine, Ohio (the "AcuSport Assets"), in an asset sale approved by the United States Bankruptcy Court for the District of Ohio pursuant to Bankruptcy Code section 363 (the "AcuSport Transaction").  The Debtors consummated the AcuSport Transaction to realize certain supply chain synergies attributable to the integration of the AcuSport Assets and expand the Debtors' sales footprint.  However, as of the Petition Date, the Debtors have been unable to realize the operational savings and increased sales anticipated from the AcuSport Transaction due to higher than anticipated costs of

---

[4] Case Nos. 17-30673 (MER) (Bankr. D. Minn. Mar. 10, 2017) and 18-52736 (Bankr. S.D. Ohio May 1, 2018), respectively.

integrating the AcuSport Assets with the Debtors' existing distribution infrastructure and maintaining such assets post-integration, as well as lower than anticipated incremental sales.

25.    The lower than anticipated increase in customer base following the AcuSport Transaction magnified the adverse effects of the market factors discussed above and resulted in a faster than expected tightening of the Debtors' liquidity and overall deterioration of the Debtors' financial condition.

26.    Given the Debtors' tight liquidity position in the lead up to these Chapter 11 Cases, the Debtors approached the Prepetition Agents on several occasions seeking amendments to the Prepetition Documents to, among other things, decrease the Debtors' leverage and improve the Debtors' financial condition.

27.    Despite the Debtors' efforts, the Debtors' Prepetition Lenders were unwilling to extend additional credit.  The Debtors' tightening liquidity resulted in certain trade creditors refusing to continue to provide the Debtors with inventory to sell in the ordinary course of the Debtors' businesses and, ultimately, the loss of credit insurance for a majority of the Debtors' vendors as of January 1, 2019.

28.    In light of the foregoing, SportCo's board of directors determined that it would be in the best interests of the Debtors to explore various strategic alternatives.  After discussions with the Debtors' Prepetition Lenders and major equity holders, SportCo's board of directors determined that pursuing a sale of the Debtors as a going-concern would be in the best interests of the Debtors as well as their creditors and equityholders.  In January 2019, the Debtors retained Houlihan Lokey Capital, Inc. ("Houlihan") and, with Houlihan's expertise and support, commenced the work necessary to run a successful sale process.

29.     In the first week of February 2019, Houlihan provided an initial information package to fifty-five (55) potential buyers, which highlighted USC's financial and operational strengths.  The package included a form confidentiality agreement and an invitation to meet with Houlihan to discuss USC in greater detail.  Of the fifty-five (55) potential buyers contacted by Houlihan, seventeen (17) parties signed confidentiality agreements and sixteen (16) parties obtained access to confidential information describing USC's operations as well as historical and projected financial performance.

30.     Houlihan's marketing efforts resulted in significant interest in a transaction from at least four (4) interested parties.  Despite this level of interest in a transaction, none of the interested parties ultimately presented an offer that Sportco's board of directors considered to be value-maximizing after considering all relevant factors.   In June 2019, Sportco's board of directors made a determination that filing these Chapter 11 Cases to pursue an orderly liquidation of the Debtors' assets was in the best interest of all stakeholders.

31.     Mounting prepetition lawsuits against the Debtors (as well as their directors and officers) detrimentally affected their ability market a sale of the company and otherwise buy and sell inventory in the ordinary course of business.  The automatic stay imposed upon the filing of these Chapter 11 Cases will provide a necessary reprieve from litigation to allow the Debtors to focus on maximizing value for all creditors.

32.     Importantly, absent a bankruptcy filing, the Debtor would not have the working capital necessary to implement the contemplated wind-down plan because the Debtors' Prepetition ABL Facility was otherwise scheduled to mature on June 7, 2019 following a short-term extension to allow the Debtors to continue their pursuit of a going-concern sale.

33.     Finally, these Chapter 11 Cases will allow the Debtors to continue marketing certain business lines and parcels of real property that drew interest during the Debtors' prepetition marketing process and pursue bulk inventory sales to maximize the value of the Debtors' remaining assets.

## V.     FACTS RELEVANT TO FIRST DAY PLEADINGS[5]

34.     Together with the filing of these Chapter 11 Cases, the Debtors filed certain First Day Pleadings that request various types of relief.  I have reviewed each First Day Pleading (including the exhibits thereto) and, to the best of my knowledge, information and belief, the facts recited therein with respect to the Debtors are true and correct and are hereby incorporated by reference.  I believe that the relief sought in each First Day Pleading is essential to the Debtors' ability to achieve a successful reorganization.

    *i.*     *Debtors' Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases* (the "Joint Administration Motion")

35.     In the Joint Administration Motion, the Debtors seek entry of an order directing the joint administration of these Chapter 11 Cases and the consolidation thereof for procedural purposes only.  Many of the motions, applications, hearings, and orders that will arise in these Chapter 11 Cases will affect most, if not all, of the Debtors jointly.

36.     The Debtors further seek entry of an order directing the Clerk of the Court to maintain one file and one docket for all of these Chapter 11 Cases under the case of SportCo.

37.     Joint administration of these Chapter 11 Cases will ease the administrative burden on this Court and all parties in interest.  Joint administration of these Chapter 11 Cases will not prejudice creditors or other parties in interest because joint administration is purely procedural and will not impact the parties' substantive rights.

---

[5] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the relevant First Day Pleadings.

69055642.2

38.      I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

ii.      *Debtors' Application for an Order Appointing BMC Group, Inc. as Claims and Noticing Agent for the Debtors* Nunc Pro Tunc *to the Petition Date* (the "BMC Group Retention Application")

39.      The BMC Group Retention Application is made pursuant to 28 U.S.C. § 156(c), section 105(a) of the Bankruptcy Code, and Rule 2002-1(f) of the Local Rules for the United States Bankruptcy Court for the District of Delaware for an order appointing BMC Group, Inc. (the "Claims Agent") as the claims and noticing agent in order to assume full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' Chapter 11 Cases.

40.      Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be in excess of 500 entities to be noticed. In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the Debtors submit that the appointment of a claims and noticing agent is both necessary and in the best interests of the Debtors' estates and their creditors.

41.      I believe that the relief requested in the BMC Group Retention Application is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the Chapter 11 Cases without disruption.

iii.      *Debtors' Motion for Interim and Final Orders Authorizing Debtors to Continue Using Existing Bank Accounts, Business Forms, and Cash Management System* (the "Cash Management Motion")

42.      The Debtors use a centralized cash management system to collect funds from, and to pay expenses incurred by, their operations (the "Cash Management System").   The Cash

Management System includes twelve (12) Debtor bank accounts, a list of which is attached as Exhibit C to the Cash Management Motion (the "Bank Accounts"). The Debtors' Bank Accounts are held at Bank of America, N.A., Wells Fargo Bank, N.A., and Regions Bank (collectively, the "Banks").

43. The Cash Management System is integral to the operation and administration of the Debtors' businesses. In this regard, the Cash Management System allows the Debtors to efficiently (a) collect outstanding receivables, (b) identify cash requirements, and (c) transfer cash as needed to respond to these requirements.

44. The principal components of the Cash Management System and the flow of funds through that system are as follows:

    (i)    Cash Collection and Concentration. The Debtors maintain four collection accounts (the "Collection Accounts"), two in the name of Ellett and two in the name of Jerry's. All the Debtors' electronic receipts are deposited in the Collection Accounts and, together with the Debtors' check receipts, ultimately flow into the Debtors' two concentration accounts (the "Concentration Accounts") and five operating accounts (the "Operating Accounts")  The Debtors' procedures for cash collections and disbursements are described in further detail below.

    (1)    The Debtors' electronic collections are deposited into the Collection Accounts.

    (2)    The Debtors' check receipts are received at the Debtors' South Carolina facility and scanned for deposit into an account maintained by the Prepetition ABL Agent.

    (3)    Each day, checks received by the Debtors and amounts held in the Collection Accounts described above are deposited or transferred into an account maintained by the Prepetition ABL Agent to be used to pay down the Prepetition ABL Obligations.

    (4)    The next day, the Prepetition ABL Agent returns funds, on an as-needed basis, to the Debtors' Operating Accounts to fund operations in the ordinary course of business.

    (ii)    Disbursement Accounts. In order to fund payroll, the Debtors transfer funds from the Ellett Operating Account into the payroll account held by Regions Bank (the "Payroll Account"). All payments used to fund the Debtors' non-payroll operations (including for payments made with debit

cards, cashiers' checks, and bank wires) are paid directly from the Operating Accounts.

45.     The Debtors seek a waiver of the U.S. Trustee operating guidelines for debtors in possession to the extent they require that the Debtors close the Bank Accounts and open new post-petition bank accounts.  If enforced in these Chapter 11 Cases, such requirements would disrupt the Debtors' businesses, causing delays in payments to vendors, suppliers, subcontractors, administrative creditors, employees, and others, thereby impeding the Debtors' efforts to maximize the value of their estates.

46.     The Debtors request the authority to continue to use the Bank Accounts with the same account numbers, styles, and business forms as the Debtors used prepetition.  The Debtors also seek authority to open new accounts whenever needed, provided that the Debtors give the U.S. Trustee and the Prepetition Lenders adequate notice of such newly-opened accounts.  The Debtors represent that if the relief requested in this Motion is granted, they will not pay, and will direct each of the Banks not to pay, any debts incurred before the Petition Date, other than as authorized by this Court.

47.     In connection with continuing the use of the Bank Accounts, the Debtors request the authority to pay prepetition account-related Bank fees and charges to the extent of the amount of the Debtors' cash held by such Bank.  The Debtors seek authority to pay the prepetition account-related Bank fees and charges to the extent the Debtors determine, in their good faith business judgment, that the Banks have valid setoff claims pursuant to section 553 of the Bankruptcy Code (but only to the extent of such claims).  This will save the Debtors the time and expense of responding to such lift stay requests and/or negotiating stipulated orders to allow the Banks to exercise setoff rights.  The Debtors further submit that such relief requested would not prejudice the interests of any other creditors or other parties-in-interest.

48.     The Debtors should be granted further relief from the U.S. Trustee operating guidelines to the extent that they require the Debtors to make all disbursements by check. Preventing the Debtors from conducting transactions by debit, wire, and other similar methods would unnecessarily disrupt the Debtors' business operations and create additional and unnecessary costs.

49.     Compelling the Debtors to adopt a new cash management system would be expensive and create unnecessary administrative problems, impeding the Debtors' ability to reorganize. Consequently, the Debtors' ability to continue using its Cash Management System is essential and is in the best interests of the Debtors, their estates, and their stakeholders.

50.     To minimize expenses to their estates, the Debtors also request authorization to continue using all correspondence and business forms (including, but not limited to, letterheads, purchase orders, invoices, multi-copy checks, envelopes, promotional materials, and check stock (collectively, the "Business Forms")) existing immediately prior to the Petition Date without reference to the Debtors' status as debtors in possession.

51.     The Debtors seek the further authority to, as needed, re-order new Business Forms without such legends during these Chapter 11 Cases because changing Business Forms in the middle of these Chapter 11 Cases would be needlessly expensive and burdensome to the Debtors' estates and disruptive to their business operations.  Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession due to the Debtors providing notice of the commencement of these Chapter 11 Cases and information circulating within the Debtors' industry.  Accordingly, adding the required legend would have little practical effect and is inappropriate under the circumstances.

52. Requiring the Debtors to strictly comply with the requirements of section 345(b) of the Bankruptcy Code would be inconsistent with section 345(a), which permits a debtor in possession to make such investments of money of the estate "as will yield the maximum reasonable net return on such money." The Debtors believe that any funds held in the Bank Accounts in excess of the amounts insured by the FDIC are secure, and obtaining bonds to immediately secure these funds, as required by section 345(b), is unnecessary in light of the facts and circumstances of these Chapter 11 Cases. Only two of the Bank Accounts, one held with Bank of America, N.A. and one held with Wells Fargo Bank, N.A., regularly exceed FDIC insurance limits, and such banks are highly rated and subject to supervision by banking regulators.

53. I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the Chapter 11 Cases without disruption.

    *iv.*    *Debtors' Motion for Entry of Interim and Final Orders Authorizing Payment of Certain Prepetition Employee Wages, Benefits, and Related Items* (the "Wage Motion")

54. To minimize the personal hardships the Debtors' employees (the "Employees") will suffer if prepetition employment-related obligations are not paid when due or as expected, as well as to maintain morale during this critical time, the Debtors seek entry of an order authorizing, but not directing, the Debtors to pay: (i) all prepetition wages, salaries, and other accrued compensation to employees; (ii) all reimbursable prepetition employee business expenses; (iii) all payments for which prepetition payroll deductions, withholdings or matching employer contributions were made; (iv) all contributions to prepetition employee benefit programs (and authorization to continue such programs in the ordinary course of business);

16

(v) all vacation and other paid leave benefits in the ordinary course of business; (vi) certain paid leave benefits outside of the ordinary course of business; (vii) all workers' compensation program obligations; and (viii) all processing costs and administrative expenses relating to the foregoing payments and contributions, including any payments to third-party administrators or other administrative service providers.

55.    To assist in implementing the relief requested, the Debtors further request that the Court authorize their banks and other financial institutions to receive, honor, process and pay, at the Debtors' request and to the extent of funds on deposit: (i) prepetition payroll checks or electronic transfers and (ii) all other checks or electronic transfers issued for payments approved by this Motion, regardless of whether such checks or electronic transfers were drawn or issued prior to the Petition Date.  The Debtors also seek authorization to reissue prepetition checks or electronic transfers for payments approved by this Motion that are dishonored notwithstanding the foregoing direction.

### A.    Wages, Salaries, and Other Compensation

56.    USC has approximately 321 Employees,[6] including full-time, part-time, and temporary Employees, and the average aggregate monthly compensation paid to such Employees for wages and salaries ("Wages") is approximately $892,266.88, exclusive of the deductions and exclusions detailed below.  Certain Employees receive compensation in the form of commissions ("Commissions"), and the average aggregate Commissions on a gross monthly basis are approximately $430,000, exclusive of the deductions and exclusions detailed below.

57.    Hourly Employees and salaried Employees are paid on a bi-weekly schedule in arrears by the Debtors, with Ultimate Software Group, Inc. ("Ultimate Software") providing

---

[6] Ellett employs approximately 280 Employees, Jerry's employs approximately 18 Employees, Evans employs approximately 15 Employees, Outdoor Sports employs approximately 4 Employees, and Simmons employs approximately 4 Employees.

certain payroll management and administrative services related thereto.  The Debtors' payroll is funded through direct deposit and reloadable debit cards.

58.     Due to the timing of these Chapter 11 Cases, some Employees have not received compensation for time worked prior to the Petition Date.  Moreover, some payroll checks issued to Employees prior to the Petition Date may not have been presented for payment or cleared the banking system prior to the Petition Date and, accordingly, may not have been honored and paid as of the Petition Date.

59.     The Debtors estimate that the aggregate amount of accrued Wages and Commissions that remains unpaid to the Employees as of the Petition Date is approximately $307,732.09 (the "Unpaid Employee Compensation").   The Debtors have identified one employee whose prepetition compensation and benefits claims exceed $13,650.  For such Employees, the Debtors seek authority to pay Prepetition Compensation claims up to $13,650 (the "Prepetition Compensation Cap").

**B.     Reimbursement of Prepetition Employee Business Expenses**

60.     The Debtors frequently require Employees to incur business expenses in connection with sales efforts.   In the ordinary course of business, the Debtors reimburse Employees for certain expenses incurred in the scope of their employment on the Debtors' behalf, for travel or other purposes (the "Reimbursable Expenses").  The Reimbursable Expenses are generally incurred using personal credit cards for which Employees are solely liable.  The Debtors estimate that, as of the Petition Date, approximately $35,000.00 of Reimbursable Expenses will be unpaid.

61.     In the Wage Motion, the Debtors seek authorization, but not direction, to honor and pay all Reimbursable Expenses as of the Petition Date, up to $35,000.00, and to continue to pay all Reimbursable Expenses as they become due in the ordinary course of business.

### C.     Prepetition Deductions and Withholdings

62.     During each applicable pay period, the Debtors routinely deduct certain amounts from the paychecks of Employees (collectively, the "Deductions"), including, without limitation: (i) garnishments for child support and similar deductions required by law; (ii) pre-tax contributions to flexible health spending accounts; (iii) pre-tax contributions to health, dental, and vision plans, and (iv) other pre-tax and after-tax deductions payable pursuant to certain benefit plans discussed herein and other miscellaneous deductions.   The Deductions total approximately $194,549.14 in the aggregate per month.

63.     The Debtors also are required by law to (i) withhold from the wages of Employees amounts related to, among other things, federal, state, and local income taxes, social security, and Medicare taxes (collectively, the "Withheld Amounts") for remittance to the appropriate taxing authorities and (ii) make correlated payments for social security and Medicare taxes and pay additional amounts, based upon a percentage of gross payroll, for state and federal unemployment insurance (together with the Withheld Amounts, the "Payroll Taxes").   In the aggregate, the Debtors withhold and pay approximately $425,922.68 per month on account of Payroll Taxes.

64.     The Debtors estimate that, as of the Petition Date, approximately $172,060.32 in Deductions and Payroll Taxes (collectively, "Withholding Obligations") are outstanding with respect to Unpaid Employee Compensation, exclusive of deductions, exclusions, and applicable

taxes relating to that portion of Unpaid Employee Compensation attributable to Commissions, if any.

65.     In the Wage Motion, the Debtors seek authorization, but not direction, pursuant to the Order, to honor and pay all Withholding Obligations as they otherwise become due in the ordinary course of business during these Chapter 11 Cases.

**D.     Prepetition Employee Benefits**

66.     The Debtors also offer or provide eligible Employees (and their dependents) with a variety of benefits.  These benefits include, but are not limited to: (i) healthcare, dental, and other related coverage; (ii) certain leave benefits; (iii) a 401(k) plan in which eligible Employees can participate; (iv) COBRA medical coverage; (v) a flexible spending plan; and (vi) other miscellaneous benefits described in the Wage Motion (all such benefits, collectively, the "Employee Benefits").  The Debtors believe that as of the Petition Date, the total amount owed or accrued in connection with the Employee Benefits due to Employees is approximately $60,247.69, for an average of approximately $187.69 per Employee.

**E.     Third-Party Administrative Costs**

67.     In the ordinary course of business, the Debtors utilize the services of numerous third-party administrators to whom the Debtors outsource tasks associated with the payment of compensation and benefits to Employees, including (a) administering or assisting in the administration of the Debtors' payroll processes, benefit plans, and workers' compensation obligations; (b) facilitating the administration and maintenance of their books and records; (c) assisting with legal compliance issues; and (d) conducting special administrative and legal compliance projects in respect of Employee benefit plans and programs (the costs associated therewith, the "Third-Party Administrative Costs" and, together with the Reimbursable

Expenses, Unpaid Compensation, and the Employee Benefits, the "Employee Wages and Benefits"). The ordinary course services provided by these third-parties ensure that the Debtors' obligations with respect to Employees continue to be administered in the most cost-efficient manner and comply with all applicable laws.

68. Keeping the Debtors' workforce intact is crucial to preserving the Debtors' going concern value. Without a compensated, intact, and motivated workforce, is it highly unlikely that the Debtors will be able to maximize the value of their remaining assets.

69. It is essential that the Debtors continue to honor their Employee Wages and Benefits obligations to ensure the continued operation of the Debtors' business and to maintain the morale of the Employees. Any depletion of the Debtors' workforce would diminish the Debtors' prospects for a successful reorganization or sale.

70. The Deductions and Payroll Taxes principally represent the Employees' earnings that governments (in the case of taxes), Employees (in the case of voluntarily withheld amounts), and judicial authorities (in the case of involuntarily withheld amounts) have designated for deduction from the Employees' paychecks. If the Debtors do not remit those amounts, the Employees may face legal action and the Debtors may be burdened by inquiries and disputes concerning their failure to submit legally required payments. Most, if not all, of the unremitted Deductions and Payroll Taxes constitute moneys held in trust and are not property of the Debtors' bankruptcy estates.

71. The Employee Wages and Benefits represent a competitive but reasonably limited set of policies and are necessary to retain the skilled and motivated workforce necessary to operate the Debtors' business profitably.

69055642.2

72.     Therefore, I believe that the relief requested in the Wage Motion is necessary and appropriate and is in the best interests of the Debtors' estates, creditors, and other parties in interest.

> v.    *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "<u>DIP Motion</u>")

73.     In the DIP Motion, the Debtors seek an order (a) authorizing the Debtors to obtain post-petition financing on a senior secured, priming, superpriority basis; (b) authorizing the Debtors to use Cash Collateral (as defined below); (c) granting adequate protection to the Prepetition Lenders for the priming of the Prepetition Liens (as defined below) and the Debtors' use of the Cash Collateral; and (d) scheduling a Final Hearing on the DIP Motion.

74.     The Debtors' Prepetition Secured Obligations total approximately $272,856,875.93. The Prepetition Secured Obligations are secured by liens (the "<u>Prepetition Liens</u>") on substantially all of the Debtors' assets (the, "<u>Prepetition Collateral</u>"), including the Debtors' "cash collateral" (as defined in section 363(a) of the Bankruptcy Code, the "<u>Cash Collateral</u>") pursuant to the Prepetition Documents. The Prepetition Secured Parties filed: (a) UCC-1 Financing Statements regarding the Prepetition Collateral against the Debtors in the applicable state and/or county filing offices; and (b) notices of security interest regarding the Prepetition Collateral consisting of intellectual property in the applicable filing offices, as applicable. All of the Debtors' cash, including the cash in their deposit accounts, wherever located, whether as original Prepetition Collateral or proceeds of other Prepetition Collateral, constitute the Prepetition Collateral of the Prepetition Lenders.

75.     Without access to the Cash Collateral and the proposed secured debtor in possession financing facility (the "DIP Facility") described herein and in the DIP Motion, the Debtors will not have sufficient liquidity to operate their business during these Chapter 11 Cases. Indeed, without immediate access to the Cash Collateral and the DIP Facility, the Debtors would face imminent shut-down and liquidation, which would destroy millions of dollars of the Debtors' value as a going concern and put the Debtors' Employees out of work.

76.     In the DIP Motion, the Debtors request entry of interim and final order (the "DIP Orders") authorizing the Debtors to borrow under the DIP Facility—which consists of revolving loan commitments in an aggregate principal amount of up to $30 million—pursuant to that certain *Debtor-in-Possession Loan and Security Agreement*, in substantially the form attached as Exhibit A to the DIP Motion (the "DIP Agreement" and, together with all related DIP Facility documents, the "DIP Documents"), between the Debtors, certain lenders party thereto (the "DIP Lenders"), and Bank of America, N.A., as administrative and collateral agent to the DIP Lenders (solely in its capacity as such, the "DIP Agent" and collectively with the DIP Lenders and the other "Secured Parties" as defined in the DIP Agreement, the "DIP Secured Parties"), on the terms set forth in the interim DIP Order or final DIP Order, as applicable.

77.     The following is a concise statement and summary of the proposed material terms of the DIP Documents.  Each of these terms is justified by the absence of alternative financing on superior terms, and because the DIP Secured Parties insisted upon the inclusion of such terms as a condition to extending the financing discussed herein.

(i)     Maturity: The DIP Facility matures on the earliest to occur of:

(1)     the date the Debtors have sufficient cash to repay the Obligations (as defined in the DIP Agreement) in full; and

(2)     August 31, 2019.

(ii)    <u>Interest Rate</u>: A variable interest rate, for any day, equal to the sum of (A) the greater of (I) the Prime Rate (as defined in the DIP Agreement) for such day or (II) (x) the Federal Funds Rate (as defined in the DIP Agreement) for such day plus (y) 0.50%, and (B) 3.25%.

(iii)    <u>Commitments</u>:

    (1)    Interim Borrowing Limit: The lesser of $15,000,000 and the amount authorized to be lent by the DIP Lenders to the Debtors under the Interim DIP Order.

    (2)    Final Borrowing Limit: $30,000,000 (less the amount already drawn pursuant to the Interim Borrowing Limit).

(iv)    <u>Events of Default</u>: Customary events of default for a debtor in possession financing facility

(v)    <u>DIP Budget</u>: The DIP Agreement and the interim DIP Order impose restrictions on the Debtors' operations by requiring the Debtors to comply with a detailed budget (the "<u>DIP Budget</u>"), subject to certain permitted variances.

(vi)    <u>DIP Liens and Superpriority Claims</u>: As security for the obligations under the DIP Agreement, the DIP Agent (for the benefit of the DIP Secured Parties) will receive the following liens and claims:

    (1)    Priming senior security interest in and lien upon or pledge of (subject to the Carve-Out) all pre- and post-petition encumbered property of the Debtors (the "<u>DIP Priming Liens</u>"); and

    (2)    First priority senior security interest and lien upon or pledge of all unencumbered property and assets of the Debtors, including claims and causes of actions ("<u>Avoidance Actions</u>") arising under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code (together with the DIP Priming Liens, the "<u>DIP Liens</u>").

(vii)    <u>Adequate Protection for the Prepetition Lenders</u>: As adequate protection for any diminution in value of the Prepetition Liens, the Prepetition Secured Parties will receive replacement security interests in and Liens upon all pre- and post-petition encumbered property of the Debtors, excluding Avoidance Actions (the "<u>Adequate Protection Liens</u>"), which shall be junior only to the Carve-Out, the DIP Facility, and the Prior Permitted Liens (as defined in the DIP Orders) specifically designated as senior in priority.  The Prepetition ABL Lenders shall also receive cash payments in the form of interest due on the Prepetition ABL Obligations and fees and expenses payable under the Prepetition ABL Documents from and after the Petition Date.

(viii)    <u>Carve-Out</u>: The DIP Obligations (as defined in the DIP Facility), Prepetition Secured Obligations, the DIP Superpriority Claims, and Adequate Protection Liens are subject to a carve out (the "<u>Carve-Out</u>") for:

(1)     the unpaid fees of the U.S. Trustee or the Clerk of the Bankruptcy Court pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c), as applicable;

(2)     all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code;

(3)     all accrued and unpaid fees, disbursements, costs and expenses incurred by Case Professionals (as defined in the Interim Order) allowed by the Court and incurred prior to the delivery of the Carve Out Trigger Notice (as defined in the Interim Order); and

(4)     all accrued and unpaid fees, disbursements, costs and expenses incurred by Case Professionals allowed by the Court and incurred after the delivery of the Carve Out Trigger Notice in an amount not to exceed $300,000 in the aggregate.

(ix)    <u>Stipulations</u>: The Interim DIP Order contains stipulations related to the Prepetition Documents by the Debtors, on behalf of all parties and entities, including stipulations that:

(1)     As of the Petition Date, the Debtors were indebted and liable to the Prepetition Lenders under the Prepetition Documents.

(2)     The Debtors have represented that the Prepetition Secured Obligations (i) constitute legal, valid, and binding obligations of the Debtors, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (ii) no portion of the Prepetition Secured Obligations is subject to avoidance, recharacterization, recovery, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (iii) is secured by valid, binding, perfected, enforceable, first-priority liens and security interests over substantially all of the assets of the Debtors. The Debtors have waived any right to challenge the Prepetition Secured Obligations and the Prepetition Liens on any grounds, including those set forth above.

(x)    <u>Relief from Automatic Stay</u>: The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agent to exercise, upon three (3) days' notice to the Debtors and counsel to any Committee (as defined in the Interim Order) formed of the occurrence of an Event of Default, all rights and remedies, including, without limitation, against the DIP Collateral, without the need for obtaining a further order of this Court. Notwithstanding the foregoing, the Debtors may continue to use Cash Collateral to satisfy payroll obligations and other essential expenses in accordance with the DIP Budget until three (3) days after notice of the occurrence of an Event of Default from the DIP Agent to the Debtors and counsel to any Committee formed.

78.     The Debtors submit that this Court should approve their entry into the DIP Facility and execution of the DIP Documents as an exercise of their sound business judgment. Prior to the Petition Date, the Debtors and their advisors undertook an analysis of the Debtors' projected financing needs during the pendency of these Chapter 11 Cases and determined that the Debtors would require post-petition financing to support their operational and restructuring activities.  Without the financing to be provided by the DIP Facility, the Debtors would almost immediately lack sufficient liquidity to continue operations, to the detriment of the Debtors, their employees, and other stakeholders.

79.     Because the Prepetition Lenders have liens on substantially all of the Debtors' assets, there is no possibility of the Debtors being able to secure DIP financing on an unsecured or junior basis.  Also, the Debtors do not have sufficient unencumbered assets to serve as collateral for senior secured DIP financing.

80.     The Prepetition Lenders have consented to the use of Cash Collateral and the priming liens provided under the DIP Facility in exchange for the various forms of adequate protection described herein and in the Interim DIP Order.

81.     The DIP Facility is the result of arm's-length and good faith negotiations between the Debtors and the DIP Secured Parties. The Debtors submit that the terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Documents other than as described in the DIP Motion.

82.     I believe that the relief requested in the DIP Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the Chapter 11 Cases without disruption.

vi.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, Including Broker Fees and (B) Renew, Supplement, or Purchase Insurance Policies, (C) Honor Prepetition Insurance Premium Financing Agreement, and (D) Renew Insurance Premium Financing Agreement in the Ordinary Course of Business;(II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief (the "Insurance Motion")*

83.    In the Insurance Motion, the Debtors seek entry of the Order (a) authorizing, but not directing, the Debtors to (i) continue insurance coverage entered into prepetition (the "Insurance Policies") and satisfy prepetition obligations related thereto including broker fees (ii) renew, supplement, or purchase insurance policies in the ordinary course of business, (iii) honor prepetition insurance premium financing agreement, and (iv) renew insurance premium financing agreements in the ordinary course of business; (b) authorizing banks and other financial institutions to honor and process check and electronic transfer requests related to the foregoing; and (c) granting related relief.

84.    In the ordinary course of business, the Debtors pay some Premiums through monthly payments to the Insurers, Insurance Broker, or Insurance Lender, as applicable.  These installment arrangements benefit the Debtors by spreading out the cost of the Premiums over the terms of the respective coverage period.

85.    In connection with the Insurance Policies, the Debtors are party to certain insurance brokerage agreements (collectively, the "Brokerage Agreements") under which the Debtors obtain services from a third-party insurance broker, Hub International Insurance Services, Inc. (the "Insurance Broker").

86.    The Debtors maintain approximately seven (7) active Insurance Policies, which provide coverage for, among other things, general liability insurance, directors and officers liability insurance, workers' compensation liability insurance, property insurance, and various

27

other general liabilities, through their Insurers (as defined below).  The Debtors are required to pay insurance premiums, taxes, and fees (the "Premiums") under the Insurance Policies based on a rate established and billed by each insurance carrier (the "Insurers"), with approximately $757,025.60 of the Premiums financed through First Insurance Funding, a division of Lake Forest Bank & Trust Company, N.A. (the "Insurance Lender").  The Premiums total approximately $1,004,282.00 on an annual basis, excluding financing fees, taxes, surcharges, and commissions earned by the Insurance Broker and Insurance Lender.

87.    As of the Petition Date, the Debtors pay the below six (6) Insurance Policies through installment payments:

| Insurance Carrier | Coverage | Policy Term | Premium |
|---|---|---|---|
| Granite State Insurance Co. | CGL, Property, and Crime | 3/1/2019 to 3/1/2020 | $512,914.00 |
| Navigators Insurance Company | Excess Liability | 3/1/2019 to 3/1/2020 | $43,621.00 |
| National Union Fire Insurance Company | Umbrella | 3/1/2019 to 3/1/2020 | $65,743.00 |
| National Union Fire Insurance Company | Automobile | 3/1/2019 to 3/1/2020 | $22,541.00 |
| Granite State Insurance Co. | Workers' Compensation | 3/1/2019 to 3/1/2020 | $298,095.00 |
| American International Group, Inc. | Workers' Compensation | 3/1/2019 to 3/1/2020 | $3,368.00 |

88.    The Debtors were obligated to make a down payment in the amount of $192,173.14 on account of the Installment Payment Policies and were thereafter obligated to make certain subsequent installment payments in the amount of $85,610.49, due on a monthly basis, including a payment of $85,610.49 due on July 1, 2019.

89.    As of the Petition Date, the total prepetition amount outstanding on account of the Installment Payment Policies is approximately $513,662.94.

28

69055642.2

90.     If the Debtors were forced to obtain replacement insurance on an expedited basis, it could come at a tremendous cost to their estates.

91.     I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the Chapter 11 Cases without disruption.

I declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, that the foregoing is true and correct to the best of my knowledge, information, and belief.   Accordingly, I respectfully request that the Court grant all relief requested in the First Day Pleadings and such other and further relief as may be just.

Dated: June 10, 2019

By:     *Bradley P. Johnson*
        Bradley P. Johnson
        Chief Executive Officer
        SportCo Holdings, Inc.