# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SPORTCO HOLDINGS, INC., *et al.*,[1] | Case No. 19-11299 (LSS) |
| Debtors. | (Jointly Administered) |

### MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER (A) AUTHORIZING THE COMMITTEE'S FINANCIAL ADVISORS TO RUN A GOING CONCERN SALE PROCESS AND SOLICIT ALTERNATIVE PROPOSALS USING, *INTER ALIA*, THE DEBTORS' CONFIDENTIAL INFORMATION, (B) DIRECTING THE DEBTORS TO COOPERATE IN SUCH EFFORTS, AND (C) GRANTING RECONSIDERATION OF THE INTERIM DIP ORDER

The Official Committee of Unsecured Creditors (the "Committee") in the above-captioned Chapter 11 bankruptcy cases (the "Chapter 11 Cases") of SportCo Holdings, Inc., and certain of its affiliates (collectively, the "Debtors"), by and through its undersigned proposed counsel, hereby moves (the "Motion") for entry of an *Order (A) Authorizing the Committee's Financial Advisors to Run a Going Concern Sale Process and Solicit Alternative Proposals using, inter alia, the Debtors' Confidential Information, (B) Directing the Debtors to Cooperate in Such Efforts, and (C) Granting Reconsideration of the Interim DIP Order.* In support of the Motion, the Committee respectfully represents as follows:[2]

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number are: Bonitz Brothers, Inc. (4441); Ellett Brothers, LLC (7069); Evans Sports, Inc. (2654); Jerry's Sports, Inc. (4289); Outdoor Sports Headquarters, Inc. (4548); Quality Boxes, Inc. (0287); Simmons Guns Specialties, Inc. (4364); SportCo Holdings, Inc. (0355), and United Sporting Companies, Inc. (5758). The location of the Debtors' corporate headquarters and the service address for all Debtors is 267 Columbia Ave., Chapin, SC 29036.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Debtors' DIP Motion [Docket No. 8].

## PRELIMINARY STATEMENT

1.     The Committee was appointed a week ago and ordinarily would provide a debtor's management with deference to select a process that it deems appropriate in its reasonable business judgment.   The Committee, however, is already very concerned about the trajectory of these Chapter 11 Cases.  Most significantly, the Committee is concerned about the Debtors' unexplained pivot from a going concern sale process to a self-liquidation.  As the Debtors disclosed in the *Declaration of Bradley P. Johnson in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") they retained Houlihan Lokey Capital, Inc. ("Houlihan") in January 2019 to run a going concern sale process.  Despite soliciting fifty-three (53) potential purchasers and receiving four (4) offers to consummate a transaction, for reasons still unbeknownst to the Committee, the Debtors' board of directors decided to terminate the sale process prior to the Petition Date.

2.     During informal phone call(s) with bankers formerly involved in the sale process, the Committee's financial advisor, Emerald Capital Advisors ("Emerald"), learned that Houlihan believed it had located a fully financed stalking horse purchaser that would have purchased substantially all of the Debtors' assets, saved 350 jobs, and preserved a customer for the Debtors' trade vendors.  Significantly, as conveyed to Emerald, this offer would have provided a greater valuation and higher recoveries than the current self-liquidation.  For some reason, however, the reference to a fully financed stalking horse purchaser never made its way into the First Day Declaration.  Instead, the Debtors focused their attention on a complaint (the "Complaint") filed on May 23, 2019 by Prospect Capital Corporation ("Prospect") against certain of the Debtors' officers, directors, and equity investors as the reason for the pivot to a self-liquidation.

3.       Emerald has only been engaged by the Committee for approximately a week.  Since this time, however, its initial inquiries to potential going-concern buyers appear to confirm Houlihan's recollection of events.  A few themes have emerged from Emerald's limited diligence that should cause the Court to question the Debtors' chosen path for these Chapter 11 Cases.  First, Emerald's follow up on the list of fifty-three (53) potential purchasers contacted by Houlihan suggests the proper contact person at certain of the potential purchasers may not have been properly engaged.  Instead, certain of the representative(s) of the potential purchasers with whom Emerald spoke were not even aware of the opportunity but, after Emerald's inquiry, were in fact interested in learning more about a going concern sale process for the Debtors.  Second, certain potential bidders that decided not to make a bid during Houlihan's pre-petition process, not surprisingly, would have considered, and still would consider, making a bid after the bankruptcy filings, because the Debtors' assets could be purchased free and clear through the bankruptcy process.  Finally, Emerald reached out to other potential bidders that Houlihan did not contact, which potential bidders expressed an interest in a potential going concern transaction.

4.       If the Debtors' version of events leading up to the bankruptcy filings is accurate – it begs the questions – what are they trying to accomplish and for whose benefit?  Upon information and belief, the Debtors are selling inventory in greater quantities and to non-traditional customers (competitors and manufacturers, and not to their traditional 20,000 retail customers) (the "Bulk Sales"), which renders such transactions outside the Debtors' ordinary course of business and should require this Court's approval.  Of course, the Debtors believe such sales are in the ordinary course of business and, therefore, do not need Court approval.  This is not dissimilar from the Debtors' representations during the first day hearing (the "First Day Hearing") that they thought it was unnecessary to obtain this Court's approval to make severance payments because

they are ordinary course payments.[3]  This lack of transparency and accountability violates several basic tenets of the Bankruptcy Code that serve as the main impetus for the filing of this Motion.

5.      There is little to no reason not to pause the Debtors' proposed process to allow Emerald to explore a sale.  The inventory of firearms is not, upon information and belief, losing value while an alternative sale process is considered.  The Debtors will suffer no prejudice, while the Committee and the estates stand to suffer greatly as the value of the assets will dissipate through a self-liquidation.   Accordingly, since waiting for the final DIP hearing to address the defects in the sale process (or lack thereof) will be too little and too late, the Committee submits now that it should be given the authority to run a going concern sale process with the Debtors' full cooperation.

6.      With respect to the DIP Financing, in support of their self-liquidation and in order to garner the support of the Prepetition ABL Lenders and DIP Lenders, the Debtors filed the DIP Motion.  While the relief requested in the DIP Motion may have been appropriate if the Debtors were running a value maximizing going concern sale process, the proposed DIP Facility is unnecessary in the context of a full-blown self-liquidation without any parallel and competitive marketing process and further extracts the limited value of the estates away from stakeholders, including the unsecured creditors.

7.      As the Court aptly noted at the First Day Hearing, the DIP Facility may not be necessary as the Debtors have been (and are projected to be) cash flow positive.[4]  The DIP facility may likewise be unnecessary if, among other things, the sole chosen path is self-liquidation through the Bulk Sales without court approval.  Additional reasons the DIP Facility should not be

---

[3] *See* Tr. at 24:23 – 25:10, *In re SportCo Holdings, Inc., et al.,* Case No. 19-11299 (Bankr. D.Del. June 11, 2019) (the "First Day Transcript").
[4] First Day Transcript at 38:24 – 40:13.

approved, include, but are not limited to:  (a) the "creeping roll -up," (b) the adequate protection package being provided to the Prepetition ABL Lenders, including the payment of professional fees, (c) the exorbitant DIP Facility fees, including the $500,000 closing fee and unused line charge, which, as for the latter fee, will certainly be due and owing as the Debtors are cash flow positive and likely will not need to draw on the DIP Facility, (d) certain budget line items including severance payments and "retention" payments, and (e) disparate treatment of professionals in the line items for professional fees, which are generally more common and necessary in a going concern sale process than a wholesale self-liquidation.

8.      Accordingly, the Committee respectfully requests that the Court reconsider its decision to enter the Interim DIP Order.  While the Court did not approve the $3 million roll up during the First Day Hearing, it did, however, approve the "creeping roll up."  The Court also scheduled the Second Day Hearing for July 16, 2019.  Based on the Debtors' DIP budget annexed as Exhibit A to the Interim DIP Order, the Prepetition ABL Lenders will be paid off in full by the week ending August 2, 2019.  Thus, if the Committee waited until the Final DIP Hearing to express its concerns, it will be mostly impossible to "unring the bell",[5] as the Prepetition ABL Lenders and DIP Lenders would be substantially paid off and any objections raised by the Committee would be moot.

## RELEVANT BACKGROUND

### A.  The Chapter 11 Cases

9.      On June 10, 2019 (the "<u>Petition Date</u>"), the Debtors filed their voluntary petitions for relief under title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and commenced these

---

[5] The Committee is not seeking injunctive relief at this time to stop the Bulk Sales or any of the Debtors' other actions. However, from the date of the filing of this Motion through the date of the hearing, the Committee expects that the Debtors will exercise restraint and not take any other actions, including, but not limited to, the Bulk Sales, that could further decrease the value of the Debtors' enterprise to the detriment of all the Debtors' stakeholders.

cases (the "Chapter 11 Cases").  Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors continue to operate their business and maintain their property as debtors-in-possession. No trustee or examiner has been appointed in these Chapter 11 Cases.

10.    On the Petition Date, the Debtors filed their *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Motion") [Docket No. 8].

11.    The DIP Motion included a detailed description of the terms and conditions of the proposed DIP financing and DIP facility (the "DIP Facility") to be provided to the Debtors by Bank of America, N.A., Wells Fargo Bank, N.A., and Regions Bank (collectively, the "DIP Lenders") and a copy of the proposed debtor-in-possession loan and security agreement (the "DIP Credit Agreement").[6]

12.    On June 13, 2019, the Court entered a modified order approving the DIP Motion on an interim basis (the "Interim DIP Order") after raising several *sua sponte* concerns and addressing arguments presented by parties in interest, including Prospect and the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") [Docket No. 51].  A hearing on final approval of the DIP Motion is scheduled for July 16, 2019.

13.    On June 17, 2019, the U.S. Trustee appointed the Committee pursuant to section 1102(a)(1) of the Bankruptcy Code [Docket No. 58].  The Committee is comprised of the following seven (7) members: (i) Vista Outdoor Sales, LLC; (ii) Magpul Industries Corporation; (iii)

---

[6] The DIP Credit Agreement was attached to the DIP Motion as Exhibit A.  [Docket No. 8-1].

American Outdoor Brands Corporation and subsidiaries; (iv) Garmin USA, Inc.; (v) Fiocchi of America, Inc.; (vi) FN America, LLC; and (vii) Remington Arms Company, LLC.  That same day, the Committee selected the law firm of Lowenstein Sandler LLP as its lead counsel, Morris James LLP as its Delaware counsel, and Emerald as its financial advisors.

**B.  The Debtors' Pre-Petition Capital Structure**

14.     On September 28, 2012, Ellet Brothers, LLC ("Ellet") and Evans Sports, Inc. ("Evans"); Jerry's Sports, Inc. ("Jerry's"), Outdoor Sports Headquarters, Inc. ("Outdoor Sports"); and Simmons Specialties, Inc. ("Simmons" and, together with Evans, Jerry's, and Outdoor Sports, the "Operating Subsidiaries"), and Bonitz Brothers, Inc. ("Bonitz," and together with the Operating Subsidiaries, the "Prepetition Borrowers") entered into that certain Third Amended and Restated Loan and Security Agreement (as amended and restated from time to time, the "Prepetition ABL Agreement") and the facility provided under the agreement (the "Prepetition ABL Facility," dated September 28, 2012, between the Prepetition Borrowers, various lender parties thereto (the "Prepetition ABL Lenders"), and Bank of America, N.A., as administrative and collateral agent on behalf of the Prepetition ABL Lenders.  As of the Petition Date, the Prepetition ABL Lenders are the same as the DIP Lenders.

15.     The Prepetition ABL Facility purportedly is secured by a first priority lien over substantially all of the Prepetition Borrowers' assets, including the Prepetition Borrowers' accounts receivable, inventory, cash collateral, and real estate, all as set forth in greater detail in the Prepetition ABL Agreement and related documents.  According to the Debtors, the as of the Petition Date, the aggregate principal amount outstanding under the Prepetition ABL Facility is approximately $23,056,470.93.

16.     On September 28, 2012, the Prepetition Borrowers also entered into that certain Second Lien Loan and Security Agreement (as amended from time to time, the "Prepetition Term Loan Agreement," and the facility provided under the agreement, the "Prepetition Term Loan Facility"), dated September 28, 2012, between the Prepetition Borrowers, various lenders party thereto (the "Prepetition Term Loan Lenders"), and Prospect, as administrative and collateral agent on behalf of the Prepetition Term Loan Lenders.  As of the Petition Date, the Prepetition Term Loan Lenders are:  (i) Prospect; (ii) Summit Partners Credit Fund, L.P.; (iii) Summit Partners Credit Fund A-1, L.P.; (iv) Summit Investors I, LLC; (v) Summit Investors I (UK), L.P.; and (vi) Summit Partners Credit Offshore Intermediate Fund, L.P.

17.     The Prepetition Term Loan Facility is purportedly secured by a second priority lien over substantially all of the Prepetition Borrowers' assets, including the Prepetition Borrowers' accounts receivable, inventory, cash collateral, and real estate, all as set forth in greater detail in the Prepetition Term Loan Agreement and related documents. According to the Debtors, as of the Petition Date, the aggregate principal amount outstanding under the Prepetition Term Loan Facility is approximately $249,800,405.00, including capitalized interest through March 31, 2019.

**C.  The Debtors' Pre-Petition Marketing Efforts and Sales Process**

18.     On the evening of June 20, 2019, Debtors' counsel provided Emerald with data room access, which included a portion of the documents requested through the Committee's first diligence request list.  The Committee, through its professionals, including its financial advisor Emerald, has requested copies of the four (4) letters of intent received by the Debtors before the Petition Date, access to the data room, a list of all the parties contacted by Houlihan and the related call log.[7]  As of the date hereof, the Committee has received two (2) of the four (4) letters of intent

---

[7] *See* ¶ 4 of *The Declaration of John P. Madden in Support of the Motion of the Official Committee of Unsecured Creditors for an Order (A) Authorizing the Committee's Financial Advisors to run a Going Concern Sale Process and*

received before the Petition Date.[8]  Additionally, the Committee has received access to certain of the data room files believed to have been used in connection with the pre-petition sale process, which the Committee's professionals have just begun to review.[9]  The Committee has also received a high-level bidder log that lists the 53 parties contacted by Houlihan.[10]

19.     In an effort to obtain additional information about the pre-petition sale process, on June 20, 2019, certain Emerald professionals reached out to Houlihan and requested a call with the team retained to run the pre-petition sale process.[11]  Emerald spoke to Houlihan on June 24, 2019.[12]  It was clear from Emerald's conversation with Houlihan that, upon information and belief, one of the parties that submitted a letter of intent had performed very thorough due diligence, even going so far as to prove committed financing to close on a potential section 363 sale transaction.[13] It is the Committee's understanding, based on discussions with various parties, that the only reason the Debtors ended the pre-petition sale process was due to the filing of the Complaint.[14]  It is this Complaint which the Committee believes led directly to the Debtors abandoning the going concern sale process (which the Committee contends would maximize value) and instead transitioning into a full-scale self-liquidation in an effort to gain leverage against Prospect.[15]

20.     In order to spot check the comprehensiveness of Houlihan's efforts to canvas the market and find a buyer, Emerald, on an informal basis – reached out to 10 parties that, based on their 20 years of experience in the firearms industry, may be interested in a going concern purchase

---

*Solicit Alternative Proposals using, inter alia, the Debtors' Confidential Information, (B) Directing the Debtors to Cooperate in Such Efforts, and (C) Reconsideration of the Interim DIP Order* (the "Madden Declaration"), attached hereto as **Exhibit A**.

[8] *Id.*
[9] *Id*.
[10] *Id.*
[11] *Id.* at ¶ 6.
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*

of the Debtors' assets.[16]  Based on Emerald's initial conversations and their understanding of the

firearms industry, Emerald believes there is substantial interest for the Debtors to be sold as a

going concern and that such a sale could create value in excess of the Debtors' proposed liquidation

strategy, both in terms of proceeds in the Debtors' Estate, and the potential preservation of jobs

for the Debtors' 300-plus employees.[17]  Emerald's conversations were with senior-level executives

at companies that were contacted by Houlihan, as well as with other potentially interested parties

not included in the bidder log.[18]  Certain potential bidders which decided not to bid during

Houlihan's initial pre-petition sale process indicated to Emerald that they would have considered,

and still would consider, making a going concern sale bid.[19]  Moreover, other potential bidders,

including certain executives not originally contacted by Houlihan and who were unaware of the

opportunity, said they would be interested in hearing more about pursuing a going concern sale.[20]

### D.  The Debtors' Unexpected Post-Petition Pivot to a Full Blown Liquidation

21.    Without providing any additional details, the Debtors' disclose in the First Day

Declaration that:

> Despite this level of interest in a transaction, none of the interested
> parties ultimately presented an offer that Sportco's board of
> directors considered to be value-maximizing after considering all
> relevant factors. In June 2019, Sportco's board of directors made a
> determination that filing these Chapter 11 Cases to pursue an orderly
> liquidation of the Debtors' assets was in the best interest of all
> stakeholders.

*See* First Day Declaration at ¶ 30.

---

[16] *Id.* at ¶ 5.
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*

22.     The Debtors have not provided the Committee with any additional insights aside from what was included in the First Day Declaration and a blanket, and unsubstantiated statement, that there are no going concern buyers, which does not appear to be accurate based on Emerald's conversations with Houlihan and discussions with various potential buyers. [21]

23.     According to statements made by Debtors' counsel during the Committee formation meeting on Monday, June 17, 2019, and statements made during Emerald's diligence call with the Debtors' chief restructuring officer (the "CRO") on June 18, 2019, the Debtors had approximately $50 million of inventory (at cost) on the Petition date.[22]  During one of the first conversations that Emerald had with the Debtors' CRO, the CRO indicated that it was the Debtors' intent – without Court approval – to enter into the Bulk Sales of inventory to unidentified parties (competitors and manufacturers) in the immediate future.[23]  Given Emerald's understanding of the Debtors' business, these Bulk Sales are clearly not in the ordinary course, both in terms of selling product to competitors at a discount and selling product back to manufacturers.[24]  The Debtors' pre-petition business was to sell product to a retail network of over 20,000 stores.[25]  In addition, during the discussions, the actual terms of the sales were not made clear, and the Debtors' CRO indicated that pricing was based on internet searches, which is head scratching as wholesale prices are generally not located on the internet.[26]  Upon information and belief, these Bulk Sales, which initially consisted of separate $18 million and $7 million transactions, and now, according to the CRO, will purportedly consist of a series of deals ranging from $500,000 to $3.0 million and will constitute approximately 50% of the Debtors' remaining inventory.[27]   Given these moving

---

[21] *Id.* at ¶ 7.

[22] *Id.*  at ¶ 8.

[23] *Id.*

[24] *Id.* at ¶ 9.

[25] *Id.*

[26] *Id.*

[27] *Id.* at ¶ 8-9.

proposed sale terms, it is unclear what the Bulk Sales transactions contemplated by the Debtors will actually look like. Nonetheless, these types of sales are clearly not ordinary course transactions in the Debtors' industry and immediately raised red flags in the Committee's advisors' minds necessitating the filing of this Motion.[28]

## JURISDICTION AND STATUTORY PREDICATES

24.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

25.     The statutory predicates for the relief requested herein are sections 105, 363, and 1107 of the Bankruptcy Code, Rules 2002, 6004, 9014, and 9024 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 60(b) of the Federal Rules of Civil Procedure (the "Federal Rules"), and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure for the District of Delaware (the "Local Rules").

26.     Pursuant to Local Rule 9013-1(f), the Committee consents to the entry of a final order by the Court in connection with this Motion to the extent it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## REQUESTED RELIEF

27.     The Committee requests that the Court enter an Order: (a) authorizing its financial advisors to run a going concern sale process with the Debtors and solicit alternative proposals using, *inter alia*, the Debtors' confidential information, (b) directing the Debtors to cooperate with

---

[28] *Id.* at ¶ 10.

the Committee's efforts, (c) granting relief from the Interim DIP Order and denying the Debtors'

DIP Motion, and (d) granting such other and further relief as the Court deems just and proper.

28.    The relief requested by this Motion is:  (i) appropriate to provide much-needed

judicial oversight that the Debtors have heretofore actively sought to avoid, (ii) necessary to protect

the Debtors' stakeholders against the potential harm which would be caused if the Debtors proceed

with the Bulk Sales and obtain a final order approving the DIP Facility, and (iii) warranted under

each of sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code and under Rule 60(b) of the

Federal Rules.  *See Myers v. Martin (In re Martin),* 91 F.3d 389, 395 (3d Cir. 1996) (noting that

section 363 prohibits a debtor-in-possession "from acting unilaterally"); *In re Lionel Corp.,* 722

F.2d 1063 (2d Cir. 1983) (appeasement of major creditors, including a debtor's secured creditor,

by quickly selling a profitable asset, is not a sound business reason for conducting a sale); *In re

Gaslight Club, Inc.,* 782 F.2d 767, 770 (7th Cir. 1986) (noting, after citing section 1107(a), that

"[t]he case law demonstrates that the court has considerable authority to interfere with the

management of a debtor corporation in order to protect the creditors' interests."); *Mgmt. Tech.

Corp. v. Pardo (In re Mgmt. Tech. Corp.),* 56 B.R. 337, 339 (Bankr. D.N.J. 1985) (noting that

injunctive relief necessary to protect the estate and ensure its orderly administration is available

under section 105(a) of the Bankruptcy Code); *ABS Brokerage Servs. V. Penson Fin. Servs., Inc.,*

2010 WL 3257992, at *6 (D.N.J. 2010) (noting that a bankruptcy court is permitted to overturn a

previous order which, if not addressed, would result in manifest injustice).

## LEGAL ARGUMENT

### A.  The Bulk Sales are Outside of the Ordinary Course under Section 363(b) of the Bankruptcy Code

29.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor "after notice and

a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate[.]"  As explained by the Third Circuit Court of Appeals: "[t]he import of Section 363 is that a trustee [or a debtor-in-possession] is prohibited from acting unilaterally."  *In re Martin,* 91 F.3d at 395.  "This schema of notice, a hearing, and approval is intended to protect both debtors and creditors (as well as trustees) by subjecting a trustee's [or debtor-in-possession's] actions to complete disclosure and review by the creditors of the estate and by the bankruptcy court." *Northview Motors, Inc. v. Chrysler Motors Corp.,* 186 F.3d 346, 351 (3d Cir. 1999) (internal quotations omitted).

30.    The Committee submits that the Debtors' contemplated Bulk Sales, consisting of a series of deals constituting approximately 50% of the Debtors' inventory and either ranging from (a) separate $18 million and $7 million transactions, or (b) a series of $500,000 to $3.0 million transactions, are not in the ordinary course and necessitate notice and an opportunity for parties-in-interest to present arguments at a hearing before the Court.  The Debtors should not be permitted to execute an end around the mandatory requirements of the Bankruptcy Code.

**B. Delaware Law Requires that a *Bona Fide* Sale Process be Conducted**

31.    It is well established under Delaware law that the board of directors of a corporation has a duty to maximize a company's value at a sale for the shareholders' benefit.  *Revlon Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173 (Del. 1986).[29]  Under *Revlon,* when the sale of a company is "inevitable," a duty to auction arises the company and secure the maximum value for its assets, and to deal fairly with all bidders.  In exercising its *Revlon* duty, a company's board of directors is charged with conducting the auction on a level playing field.  *Id.* at 184.  This means that the board must deal fairly and non-preferentially with competing bidders and cannot "[play]

---

[29] SportCo Holdings, Inc. was incorporated on November 26, 2008, under the provisions of the Delaware General Corporation Law.

favorites with the contending factions." *Id.* Instead, "market forces must be allowed to operate freely." *Id.*

32.     When a company is operating in the zone of insolvency,[30] as the Debtors acknowledge at a minimum is the case here,[31] directors' fiduciary duties expand to include the corporation's creditors, as well as its shareholders.  *See N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla,* 930 A.2d 92, 101 (Del. 2007) ("When a solvent corporation is navigating in the zone of insolvency, the focus for Delaware directors does not change: directors must continue to discharge their fiduciary duties to the corporation and its shareholders by exercising their business judgment in the best interests of the corporation for the benefit of its shareholder owners [.]  When a corporation is solvent, those duties may be enforced by its shareholders who have standing to bring derivative actions on behalf of the corporation because they are the ultimate beneficiaries of the corporation's growth and increased value.  *When a corporation is insolvent, however, its creditors take the place of the shareholders as the residual beneficiaries of any increase in value.*")  (emphasis added); *Prod. Res. Grp., LLC v. NCT Grp., Inc.,* 863 A.2d 772, 790-91 (Del. Ch. 2004) ("When a firm has reached the point of insolvency, it is settled that under Delaware law, the firm's directors are said to owe fiduciary duties to the company's creditors.") (citing *Geyer v. Ingersoll Publ'ns Co.,* 621 A.2d 784, 787 (Del. Ch. 1992)). This rule is consistent with a debtor-in-possession's fiduciary duty to maximize the value of the estate for all of its creditors.  *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 355 (1985) (in bankruptcy, "the interests of shareholders become subordinated to the interests of

---

[30] While there are no precise definitions as to when a solvent company enters the zone of insolvency, fiduciaries should assume that they are operating in the zone of insolvency if the failure of a proposed transaction is reasonably likely to cause a company to become insolvent, or if it is reasonably foreseeable that the company will have ongoing trouble paying its creditors.  *See, e.g. In re Healthco Intern., Inc.,* 208 B.R. 288, 301-02 (Bankr. D.Mass. 1997).

[31] "[A]bsent a bankruptcy filing, *the Debtor would not have the working capital necessary* to implement the contemplated wind-down plan[.]" First Day Declaration at ¶ 32 (emphasis added).

creditors"); *In re Integrated Res., Inc.,* 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992) *aff'd* 147 B.R. 650 (S.D.N.Y. 1992) (when a debtor desires to sell an asset, its main responsibility, and the primary concern of the bankruptcy court, is the maximization of the value of the asset sold.").

33.    The Debtors are undoubtedly insolvent.  During the First Day Hearing, the Term Loan Lenders represented to the Court that they only expected a 4% to 5% recovery on their claim.[32]  As such, in conjunction with the sale of the Debtors' assets, the Debtors' obligation as of the Petition Date was to maximize value for the benefit of all of the Debtors' creditors, including general unsecured creditors.

34.    The Debtors are not trying to maximize value for all of their creditors under their current chosen path.  This is evidenced by the efforts the Debtors have taken since the Petition Date to obfuscate how they are marketing and selling their assets.  Initially, aside from a few paragraphs in the First Day Declaration providing a high level overview of the Debtors' prepetition going concern sales process run by Houlihan, the Debtors still have not publically disclosed, or even told the Committee, exactly why they abandoned this sales process.  Significantly, upon information and belief, prior to the Debtors' pivot to a self-liquidation, Houlihan believed they located a fully financed stalking horse bidder, which bid would have provided more consideration to the Debtors' estates than the current self-liquidation.[33]  Moreover, Emerald's sale related diligence efforts to date appear to have unearthed several parties – certain, but not all of which were contacted by Houlihan – that may be interested in a going concern sale transaction.[34]  Accordingly, the value maximizing path in these Chapter 11 Cases is not the Debtors' chosen self-liquidation, but instead an orderly going concern sale process.

---

[32] First Day Transcript at 26:3 – 26:9.
[33] *See* Madden Declaration at ¶ 6.
[34] *Id.* at ¶ 5.

35.     In addition, and as discussed above, upon information and belief, the Debtors'
contemplated Bulk Sales of approximately 50% of their inventory outside the watchful eye of this
Court is outside the ordinary course of business and value destroying instead of value
maximizing.[35]  All these Bulk Sales accomplish is to pay off the Prepetition ABL Lenders and DIP
Lenders faster than they otherwise would have been paid.  Coupled with the onerous terms of the
proposed DIP Facility, the Debtors' current path is value destructive instead of accretive.

36.     Instead, the Court should permit the Committee to work with the Debtors to solicit
alternative going concern proposals before settling on a liquidation.  This protocol would be
consistent with both the Debtors' and Committee's fiduciary duties.  *See, e.g., In re Iridium
Operating, LLC,* 486 F.3d 452, 466 (2d Cir. 2007) (the "[c]ommittee has a fiduciary duty to
maximize their recovery of the [e]state's assets").

### C.     The Committee should be permitted to Run a Going Concern Sale Process With the Debtors and Solicit Alternative Proposals

37.     Section 105(a) of the Bankruptcy Code provides that the "court may issue any
order, process, or judgment that is necessary or appropriate to carry out the provisions of [the
Bankruptcy Code]."  The statute "is a powerful, versatile tool . . . within the context of bankruptcy
proceedings."  *Joubert v. ABN Amro Mortg. Group, Inc. (In re Joubert),* 411 F.3d 452, 455 (3d
Cir. 2005).  It should be construed liberally and the court should "sift the circumstances
surrounding any claim in order to ascertain that injustice or unfairness is not accomplished in the
administration of the debtor's estate, and in so doing it may adopt that remedy which it deems
most appropriate under the circumstances."  *Beal Bank, S.S.B. v. Jack's Marine, Inc.,* 201 B.R.
376 (E.D.Pa. 1996) (quoting *Momentum Mfg. Corp. v. Employee Creditors Comm. (In re
Momentum Mgf. Corp.),* 25 F.3d 1132, 1136 (2d Cir. 1994)).  Relief under the statute "is

---

[35] *Id.* at ¶ 8.

appropriate to prevent 'end runs' on the bankruptcy process." *In re Allegheny Int'l, Inc.,* 118 B.R. 282, 303 (Bankr. W.D.Pa. 1990).

38.    Courts have relied upon section 105(a) to grant relief that would mitigate harm to the bankruptcy estate. *See Schlein v. Golub (In re Schlein),* 178 B.R. 82, 86 (Bankr. E.D.Pa. 1995) (granting relief under section 105(a) in order to spare the parties from "the painful, expensive and lengthy legal odyssey" that was predicted to occur if denied). Courts have also relied on section 105(a) in granting relief necessary to ensure the efficient and expeditious administration of bankruptcy estates. *See, e.g., In re Raytech Corp.,* 222 B.R. 19, 24-25 (Bankr. D.Conn. 1998); *In re Johns-Manville Corp.,* 68 B.R. 618, 625 (Bankr. S.D.N.Y. 1986). Although broad, the equitable authority still must understandably be exercised within the confines of the Bankruptcy Code. *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206 (1998).

39.    In addition, section 1107(a) of the Bankruptcy Code provides that a debtor-in-possession is entitled to exercise the rights of a trustee "subject to such limitations or conditions as the court prescribes[.]" The imposition of conditions on a debtor-in-possession is within the sound discretion of the bankruptcy court. *In re Adelphia Commc'ns Corp.,* 336 B.R. 610, 665 (Bankr. S.D.N.Y. 2006) *aff'd* 342 B.R. 122 (S.D.N.Y. 2006). Although "caselaw addressing the imposition of conditions is very sparse," courts have held that any conditions imposed should be, most fundamentally, "in the interests of creditors and not prejudicial to them." *Id.* at 665 and 669.

40.    To accomplish the goal of facilitating an open and fair public sale designed to maximize value for the estate, bankruptcy courts are necessarily given discretion and latitude in conducting a sale. *See, e.g., In re Food Barn Stores, Inc.,* 107 F.3d 558, 564-65 (8th Cir. 1997); *see also In re Wintz Co.,* 219 F.3d 807, 812 (8th Cir. 2000) (stating that in structuring a sale of

assets, bankruptcy courts "have ample latitude to strike a satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization of assets").

41.     Given the Debtors failure to maximize value of their estates for all of their creditors, the Committee proposes to refocus the pending sale process and work with the Debtors to ensure that the assets are thoroughly marketed on a going concern basis.  This refocus will legitimize the process and hopefully lead to a going concern sale and a go-forward customer for trade creditors. Admittedly, it is often preferable for sale processes to be conducted by debtors themselves. However, in light of the Debtors' conduct prior to and after the Petition Date, the Committee does not believe the Debtors are in a position, or for that matter, have any interest in, obtaining the highest or otherwise best offer for their assets.  The Debtors' sole goal is to pay the Prepetition ABL Lenders and DIP Lenders as quickly as possible, to the detriment of all other stakeholders. Therefore, the Committee believes that it is better and value maximizing for the Committee to become more intimately involved in the sale process.

42.     The Committee proposes to co-manage the marketing process on behalf of the estates, in a similar vein as a committee would bring derivative claims on behalf of the estates when a debtor has improperly failed or is otherwise unable to do so.  *See The Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery,* 330 F.3d 548 (3d Cir. 2003) (if permitted by the court, a committee may be authorized to pursue estate claims when the trustee or debtor-in-possession fails to do so).  Here, the Committee believes it is only prudent for it to work with the Debtors to run the going concern marketing process in an attempt to locate alternative bidders.

43.     Indeed, the Court in the *In re Freedom Communications, Inc.* case was faced with a motion from the creditors' committee requesting substantially similar relief as the motion requested herein, and granted the motion.  *See In re Freedom Commc'ns, Inc.,* Case No. 09-13046

(Bankr. D.Del. Dec. 2, 2009) Hr'g Tr. at 102-03 ("I am satisfied under the circumstances of this case that the committee should be afforded the opportunity if it seeks to test the marketplace."). Similar relief was also granted by the Court in *In re Signature Styles, LLC,* Case No. 11-11743 (Bankr. D.Del. July 6, 2011) and in *In re Fisker Automotive Holdings, Inc.,* Case No. 13-13087 (Bankr. D.Del. January 23, 2014) (the Court allowed the committee to run a sale process when it had identified a potential bidder). In these Chapter 11 Cases, the Committee seeks the same relief as that granted by the Courts in *Freedom Communications, Signature Styles,* and in *Fisker Automotive.*

44.    In order to implement this process, the Committee proposes that the following protocol be adopted and "so ordered" by the Court:

a.    The Committee and its advisors (in addition to the Debtors and their advisors) shall be authorized and permitted to disseminate Confidential Information[36] to third parties potentially interested in purchasing any or all of the Debtors' assets and/or sponsoring a plan of reorganization for these Chapter 11 Cases, subject to the terms and conditions below.

b.    Before the Committee or its advisors may disseminate Confidential Information to any third parties for the purpose of soliciting bids, the Committee shall provide the

---

[36] As used herein, "Confidential Information" shall mean: any nonpublic information of the Debtors, including, without limitation, information concerning the Debtors' assets, liabilities, business operations, business practices, business plans, intellectual property and trade secrets, financial projections, financial and business analyses and compilations and studies relating to the foregoing and other documents prepared by the Debtors or their advisors or other agents. "Confidential Information" includes, without limitation: (i) any notes, summaries, compilations, presentations, memoranda, or similar written materials disclosing or discussing confidential information; (ii) any discussion or oral presentation of written confidential information, and (c) any other information conveyed orally that the Debtors or their advisors or other agents advise the Committee should be treated as confidential. Notwithstanding the foregoing, "Confidential Information" does not include any information that: (i) is or becomes generally available to the public or is or becomes available to the Committee on a non-confidential basis, is each case to the extent that such information becomes so available other than by a violation of a contractual, legal, or fiduciary obligation to the Debtors, or (ii) was in possession of the Committee prior to its disclosure by the Debtors and is not subject to any other duty or obligation to maintain confidentiality.

Debtors with two (2) business days' notice of its intention to disseminate such information in such notice, the Committee shall set forth the identity of the intended recipient and the general categories of information to be supplied to such recipient, together with a copy of a confidentiality agreement executed by such recipient.

c.  Unless the Committee receives a written objection from the Debtors to the notice of intention to supply Confidential Information, including the basis for any such objection, the Committee shall be authorized to proceed with the dissemination of such confidentiality agreement to interested third parties.

d.  If the Committee receives a written objection, the Committee and the Debtors shall endeavor in good faith to resolve any disputed issues.  If unsuccessful, the matter shall be presented jointly by the parties to the Court on an expedited basis.  No Confidential Information shall be provided to a third party pending resolution of the objection either consensually or by order of the Court.

e.  The Committee's advisors shall be permitted and authorized to participate in all aspects of the sale process, including, but not limited to: (i) all in-person and telephonic meetings with management, including management presentations, receive copies of any written materials provided in connection with the same and be provided with reasonable access to management in connection with the Committees' and Debtors' sale process, (ii) receive all correspondence from potential bidders within one (1) business day of receipt by the Debtors or their advisors, (iii) participate in weekly sale process update calls with the Debtors or their advisors, (iv) receive weekly, written updates from the Debtors or their advisors concerning potential bidders contacted and the status of each contact, and

> (v) receive weekly data-room statistics, to the extent available, as reasonably requested by the Committee's advisors.

45.    The Committee submits that there is ample authority under sections 105(a) and 1107(a) of the Bankruptcy Code to permit the Committee to work with the Debtors on the sale process and to solicit going concern bids for the Debtors' assets.

### D. The Court Should Grant the Committee Relief From the Interim DIP Order and Deny the Debtors' DIP Motion

46.    Reconsideration of the Interim DIP Order is necessary under the circumstances of these Chapter 11 Cases.  Rule 60(b) of the Federal Rules, as made applicable to these proceedings pursuant to Rule 9024 of the Bankruptcy Rules, provides in relevant part that a bankruptcy court may vacate an order for mistake, inadvertence, surprise, or excusable neglect, fraud, misrepresentation, or misconduct by an opposing party, or for any other reason justifying relief. The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence.  *In re Scotto-DiClemente,* 463 B.R. 308, 310 (Bankr. D.N.J. 2012).  A motion for reconsideration may be granted "where (i) there has been an intervening change in controlling law; (ii) new evidence has become available; or (iii) there is a need to prevent manifest injustice or to correct a clear error of fact or law."  *In re Energy Future Holdings Corp*., 575 B.R. 616, 628 (Bankr. D. Del. 2017), *aff'd* 904 F.3d 298 (3d Cir. 2018).

47.    When entertaining a Rule 60(b) motion for reconsideration, a bankruptcy court must determine whether "the alleged overlooked controlling decision of law or dispositive factual matter was of a nature that, if considered by the [c]ourt, might reasonably have resulted in a different conclusion."  *Scotto-DiClemente,* 463 B.R. at 310 (citing *Davis v. Spirit of N.J.,* 2000 WL 33302241, at *2 (D.N.J. 2000)).  A court commits clear error of law "if the record cannot support the findings that led to the ruling."  *Pollak v. Portfolio Recovery Associates, LLC,* 2018

WL 1226108, at *2 (D.N.J. 2018) (internal citation omitted).  In exercising its discretion when ruling on a motion for reconsideration, a bankruptcy court "must keep an open mind . . . [and] should not hesitate to grant the motion when compelled to prevent manifest injustice or to correct clear legal error." *Id.* (citing *Brambles USA, Inc. v. Blocker,* 735 F.Supp. 1239, 1241 (D.Del. 1990)).  The decision to grant or deny a motion for reconsideration is committed to the discretion of the trial court.  *In re Energy Future Holdings Corp*., 575 B.R. at 629.

48.     While the proposed DIP Financing may be appropriate in the context of a going-concern sale process, the additional costs the estates will incur in conjunction with a self-liquidation, while the estates are cash flow positive, is the textbook definition of value destruction. Postpetition financing should only be approved if "the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."  *In re Ames Dep't Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).  Courts considering whether to approve postpetition financing "have focused their attention on proposed terms that would tilt the conduct of the bankruptcy case [and] prejudice, at an early state, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors[.]" *See id.* at 47; *see also In re Mid-State Raceway*, 323 B.R. 40, 59 (Bankr. N.D.N.Y. 2005) ("[B]ankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender."); *In re FCX, Inc.*, 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) ("[T]he court should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors.").

49.     As previously noted, the Debtors filed the DIP Motion on the Petition Date and the Court entered the Interim DIP Order prior to the Committee's formation.  According to the

Debtors, but controverted by various parties during the First Day Hearing,[37] including this Court, the Debtors claimed that:

> Without access to the Cash Collateral and the [DIP Facility], the Debtors will not have sufficient liquidity to operate their business during these Chapter 11 Cases.  Indeed, without immediate access to the Cash Collateral and the DIP Facility, the Debtors would face imminent shut-down and liquidation, which would destroy millions of dollars of the Debtors' value as a going concern and put the Debtors' Employees out of work.

*See* First Day Declaration at ¶ 75.

50.     These two misleading sentences epitomize the Debtors' cavalier attitude since the filing of these Chapter 11 Cases.  The DIP Facility is not preventing a liquidation, but instead was sought in conjunction with a self-liquidation and not a going concern sale.  Likewise, the Debtors are cash flow positive if the claims of the Prepetition ABL Lenders and DIP Lenders are not paid down during the Chapter 11 Cases and this self-liquidation could have taken place outside of Chapter 11.[38]  Thus, the real value destruction in these Chapter 11 Cases is the additional layer of costs borne by the Debtors' estates because of the DIP facility.    Finally, while certain of the Debtors' employees are still employed, they would have been employed if the liquidation took place outside of Court.  In addition, these same employees will be laid off on a rolling basis once the liquidation is complete.

51.     The Debtors have not demonstrated that they cannot live on cash collateral and all indications point to them being cash flow positive, including their own budget.  Handing the Debtors' cash collateral over to the lenders now, to allow re-borrowing such as here, in the form of a creeping roll-up is not necessary to fund a bankruptcy case, which is the role of a DIP facility.

---

[37] First Day Transcript at 36:1 – 99:17.
[38] First Day Transcript at 38:24 – 40:13.

In addition, the following provisions of the financing approved by the Interim DIP Order are value destructive and inappropriate based on the pending self-liquidation:

a. The "creeping roll-up" is inappropriate as the Prepetition ABL Lenders and DIP Lenders claim that they are oversecured. *See* Interim DIP Order at ¶¶ (j)(ii).

b. The $500,000 closing fee and .375% unused line fee are excessive under the circumstances. *See* Interim DIP Order at ¶¶ 2, 20; DIP Credit Agreement at ¶ 6.1.

c. A lien on avoidance action proceeds or any potential claims, or proceeds of such claims, against the equity sponsor, directors and officers, or Prospect is inappropriate. *See* Interim DIP Order at ¶ 5; DIP Credit Agreement at ¶ 6.1. These claims could provide substantial value to holders of general unsecured claims.

d. The challenge period applies to the Term Loan Lenders, but it should not. *See* Interim DIP Order at ¶¶ 38, 39, and 58. There may be valuable claims against the Term Loan Lenders that the Committee needs sufficient opportunity to investigate.

e. The fees of the professionals retained by the Prepetition ABL Lenders and DIP Lenders being paid by the Debtors during the pendency of these Chapter 11 Cases could be substantial and should not be allowed.

f. Failure to include section 503(b)(9) claims in the budget in a situation where those claims may be trade creditors only source of recovery due to the self-liquidation.

g. Inclusion of $1.9 million of proposed severance payments and $1.5 million of retention payments in the budget where the Debtors chosen course of action is self-liquidation.

52. Given the Committee's very recent appointment, coupled with the terms of the Interim DIP Order, which unquestionably wastes estate assets, and the discovery of the Debtors'

contemplated Bulk Sales, the Committee submits that sufficient cause exists under Rule 60(b) of the Federal Rules for the Court to grant the Committee relief from the Interim DIP Order and deny the Debtors' DIP Motion.  Reconsidering and denying the Interim DIP Order rather than reviewing the Interim DIP Order during the second day hearing not scheduled until July 16, 2019 is necessary because by then much of the self-liquidation proposed by the Debtors will be consummated, stripping the estates of most of their remaining value.

## NOTICE

53.     The Committee has provided notice of this Motion to: (a) counsel to the Debtors; (b) the Office of the United States Trustee for the District of Delaware; (c) the holders of the 30 top unsecured claims against the Debtors; (d) counsel to the DIP Agent and Prepetition ABL Agent; (e) counsel to the Prepetition Term loan Agent; and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Committee submits that, in light of the nature of the relief requested, no other or further notice need be given.

## CONCLUSION

WHEREFORE, based upon the foregoing, the Committee respectfully requests that the Court enter an order granting the relief requested in the Motion and such other and further relief as the Court deems just and appropriate.

Dated:  June 25, 2019            **MORRIS JAMES LLP**

/s/ Eric J. Monzo
Eric J. Monzo (DE Bar No. 5214)
Brya M. Keilson (DE Bar No. 4643)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: emonzo@morrisjames.com
E-mail: bkeilson@morrisjames.com

and

Jeffrey Cohen, Esq.
Eric Chafetz, Esq.
Gabriel L. Olivera, Esq.
Lowenstein Sandler LLP
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 262-6700
Facsimile: (212) 262-7402
E-mail: jcohen@lowenstein.com
E-mail: echafetz@lowenstein.com
E-mail: golivera@lowenstein.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*