**EXHIBIT A**

<u>Purchase Agreement</u>

Post-Auction Execution Version

=====

**AMENDED AND RESTATED
AGREEMENT OF PURCHASE AND SALE**

between

**ELLETT BROTHERS, LLC,**

as Seller,

and

**E BROTHERS LTD.,**

as Purchaser

Premises:

1 Hunter Place
Bellefontaine, Ohio

=====

September 9, 2019

1.    Agreement to Sell and Purchase; Description of Property ................................ 2

2.    Inspection ................................................................................................................ 2

3.    Exceptions to Title; Title Matters .................................................................... 4

4.    Purchase Price and Payment ............................................................................ 7

5.    Closing .................................................................................................................. 8

6.    As Is ...................................................................................................................... 8

7.    Apportionments .................................................................................................. 10

8.    Representations and Warranties of the Parties; Certain Covenants ............... 12

9.    Closing Deliveries ............................................................................................ 16

10.   Conditions to Closing Obligations ................................................................ 17

11.   Limitation on Liability of Parties .................................................................... 20

12.   Fire or Other Casualty; Condemnation .......................................................... 21

13.   Brokerage .......................................................................................................... 22

14.   Closing Costs; Fees and Disbursements of Counsel, etc. ........................... 22

15.   Notices .............................................................................................................. 23

16.   Survival .............................................................................................................. 24

17.   Counterparts; Captions .................................................................................... 24

18.   Entire Agreement; Third Party Beneficiaries; Partial Invalidity ................. 24

19.   Waivers; Extensions ........................................................................................ 24

20.   No Recording .................................................................................................... 24

21.   Assignments ...................................................................................................... 25

22.   Pronouns; Joint and Several Liability ............................................................ 25

23.   Successors and Assigns .................................................................................... 25

24.   Escrow ................................................................................................................ 25

25.   Tax Proceedings ................................................................................................ 27

26.   Operation of the Property ................................................................................... 27

27.   Further Assurances ............................................................................................. 27

28.   Governing Law; Jurisdiction, Waivers .............................................................. 27

29.   Independent Counsel; Attorneys' Fees .............................................................. 28

30.   Non-Liability ..................................................................................................... 29

31.   Tax Deferred Exchange ...................................................................................... 29

32.   Other Provisions and Rules of Construction ...................................................... 29

SCHEDULES & EXHIBITS

**Schedules**

Schedule 3.1.6          Contracts

**Exhibits**

Exhibit A       Legal Description
Exhibit B       Form of Bill of Sale
Exhibit C       Form of FIRPTA Affidavit
Exhibit D       Sale Procedures Order

DM_US 160470241-8.105320.0013

## AMENDED AND RESTATED
## AGREEMENT OF PURCHASE AND SALE

THIS AMENDED AND RESTATED AGREEMENT OF PURCHASE AND SALE ("Agreement"), made as of September 9, 2019 (the "Execution Date"), is between ELLETT BROTHERS, LLC, a South Carolina limited liability company, having an office at 267 Columbia Avenue, Chapin, South Carolina 29036 ("Seller") and E BROTHERS LTD., an Ohio limited liability company, having an office at 811 North Main Street, Bellefontaine, Ohio 43311 ("Purchaser").  Seller and Purchaser shall be collectively referred to herein as the "Parties" or individually as a "Party".

## W I T N E S S E T H:

WHEREAS, on June 10, 2019, Seller and certain of its affiliates (collectively, the "Debtors") filed petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and the Debtors cases are currently pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") under the caption *In re SportCo Holdings, Inc.*, Case No. 19-11299 (the "Chapter 11 Cases");

WHEREAS, Seller is the owner of that certain parcel of real property located at and commonly known as 1 Hunter Place, Bellefontaine, Ohio, as more particularly described in Exhibit A annexed hereto (the "Land"), together with the structures and improvements located thereon (collectively, the  "Premises");

WHEREAS, Seller has marketed the Premises extensively and at the conclusion of the process has determined that Purchaser has made the highest and best offer for the Premises. Accordingly, Seller wishes to sell, transfer, convey, assign and deliver to Purchaser, in accordance with Section 363 and the other applicable provisions of the Bankruptcy Code, and Purchaser desires to purchase, all of Seller's right, title and interest in and to the Premises, upon the terms and subject to the conditions set forth in this Agreement (hereinafter collectively referred to as the "Transaction");

WHEREAS, on July 24, 2019, Seller and Purchaser entered into that certain Agreement of Purchase and Sale (the "Stalking Horse Purchase Agreement") dated as of that date (the "Original Execution Date") under which the Purchaser agreed to purchase, and the Seller agreed to sell, the Premises and consummate the Transactions on the terms and conditions set forth in the Stalking Horse Purchase Agreement;

WHEREAS, on August 16, 2019, the Bankruptcy Court entered that certain *Order (A) Establishing Bidding Procedures Relating to the Sale of the Bellefontaine Facility, Including Approving a Break-Up Fee and Expense Reimbursement, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, (C) Approving Form and Manner of Notice Relating Thereto, (D) Scheduling a Hearing to Consider the Proposed Sale, and (E) Granting Related Relief* [D.I. 278] (the "Bid Procedures Order") pursuant to which the

Bankruptcy Court, *inter alia*, approved the Stalking Horse Purchase Agreement and established the procedures for the public auction of the Premises (the "<u>Auction</u>") in accordance with the bidding procedures attached as <u>Exhibit 1</u> to the Bid Procedures Order (the "<u>Bidding Procedures</u>");

WHEREAS, in accordance with the Bidding Procedures, the Seller selected the Purchaser's final bid to acquire the Premises, which was submitted orally on the record at the Auction, as the highest or otherwise best offer to acquire the Premises (the "<u>Winning Bid</u>");

WHEREAS, the Seller and Purchase have agreed to amend and restate the Stalking Horse Purchase Agreement on the terms set forth in this Agreement to reflect the Purchaser's agreement to purchase, and the Seller's agreement to sell, the Premises on the mutually agreeable terms set forth in the Winning Bid pursuant to a "<u>Sale Order</u>" of the Bankruptcy Court approving such sale under Section 363 of the Bankruptcy Code;

WHEREAS, all of the obligations of the Parties under this Agreement are conditioned upon the approval of the Bankruptcy Court in accordance with Article III hereof; and

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto covenant and agree as follows:

1.    <u>Agreement to Sell and Purchase; Description of Property</u>.

1.1    Except as otherwise provided and subject to the terms and conditions set forth in this Agreement and subject to Bankruptcy Court approval, Seller sells, assigns and conveys to Purchaser, and Purchaser purchases and, where applicable, assumes from Seller, upon the terms and conditions of this Agreement, all right, title and interest of Seller in and to (a) the Premises, together with all right, title and interest of Seller in, to and under any easements, rights of way, strips and gores, air rights and development rights of any kind and nature affecting the Premises, (b) any improvements and fixtures now situated upon the Land, and (c) to the extent assignable without the consent of third Parties, permits, approvals, licenses and warranties held solely for use in connection with all or any portion of the Premises. All of the above enumerated property, rights and interests to be sold to Purchaser pursuant to this Agreement are hereinafter sometimes collectively referred to as the "<u>Property</u>".

2.    <u>Inspection</u>

2.1    Purchaser may, at any time from and after the Original Execution Date and until the date of the Closing or earlier termination of this Agreement, subject to the provisions below, to conduct such due diligence, review such information and conduct such inspections with respect to the Premises as the Purchaser deems necessary or desirable ("<u>Purchaser's Due Diligence</u>").

In furtherance of the foregoing, Purchaser, during regular business hours, upon reasonable prior notice to Seller (which may be telephonic), may inspect the Premises and perform such non-invasive tests as it may reasonably require, provided that (i) Purchaser shall perform such testing expeditiously and in a manner that minimizes, to the greatest extent practicable, damage to the

Premises, and restore the Premises, promptly following such testing, to its condition existing prior to such testing, and (ii) nothing found in connection with Purchaser's inspections shall release Purchaser of its obligations under this Agreement unless such finding constitutes the failure of an express condition to Purchaser's obligation to close as set forth in this Agreement.  Any entry upon the Premises shall be performed in a manner that minimizes disruption to the normal operation of the Premises or its occupants.  In conducting any inspection of, or otherwise accessing the Premises, Purchaser shall (a) exercise reasonable care at all times during which Purchaser is present at the Premises, (b) at Purchaser's expense, observe and comply with all applicable laws and any conditions imposed by any insurance policy then in effect with respect to the Premises and (c) not engage in any activities that would violate the provisions of any permit or license pertaining to the Premises.  Seller may have a representative of Seller accompany Purchaser during any such entry to the Premises.

2.2    Purchaser shall indemnify, defend and hold Seller, its officers, shareholders, partners, members, directors, employees, attorneys and agents (collectively, the "Seller Indemnified Parties") harmless from and against any and all liability, loss, cost, judgment, claim, damage or expense (including, without limitation, reasonable attorneys' fees and expenses), resulting from or arising out of any access to, or inspection or testing of, the Premises by Purchaser and its employees, agents, consultants, contractors and advisors (collectively, the "Testing Damages"); provided, however, that Purchaser shall not be liable to any of the Seller Indemnified Parties to the extent that any such Testing Damages are the result of (i) any pre-existing condition on or at the Premises or (ii) any gross negligence, bad faith or willful misconduct on behalf of any of the Seller Indemnified Parties (collectively, the "Seller Bad Acts").   The foregoing indemnification shall survive the Closing or the termination of this Agreement.

2.3    As a condition precedent to entering the Premises in connection with any inspection, Purchaser shall maintain or cause to be maintained, at Purchaser's sole cost and expense, a policy of comprehensive general public liability and property damage insurance by an insurer or syndicate of insurers reasonably acceptable to Seller: (a) with a combined single limit general liability and/or excess umbrella liability in amounts commercially reasonable for the inspection of properties similar to the Premises, (b) insuring Purchaser, Seller, their respective affiliates, Seller's lenders and any other person or entity reasonably designated in writing by Seller, as additional insureds, against any injuries or damages to persons or property that result from or are related to (x) Purchaser's access to the Premises or (y) any inspection, testing or other activity conducted thereon by Purchaser or representatives or agents of Purchaser, and (c) containing a provision to the effect that insurance provided by Purchaser hereunder shall be primary and noncontributing with any other insurance available to Seller.  Purchaser or its agents shall deliver (via email or otherwise) evidence of such insurance coverage to Seller prior to the commencement of the first inspection and proof of continued coverage prior to any subsequent inspection.

2.4    Notwithstanding any provision in this Agreement to the contrary, neither Purchaser nor any representative or agent of Purchaser shall contact any Federal, state, county, municipal or other department or governmental agency regarding the Premises without providing prior notice to Seller, provided the foregoing shall not limit customary municipal and public record searches.

2.5    Except as is expressly set forth in this Agreement, Seller makes no representations or warranties as to the truth, accuracy or completeness of any materials, data or other information supplied to Purchaser in connection with Purchaser's inspection of the Premises (e.g., that such materials are complete, accurate or the final version thereof, or that all such materials are in Seller's possession).  Except as set forth in this Agreement, it is the Parties' express understanding and agreement that such materials are provided only for Purchaser's convenience and, in doing so, Purchaser shall rely exclusively on its own independent investigation and evaluation of every aspect of the Premises and the development thereof and not on any materials supplied by Seller.  Except as is expressly set forth in this Agreement, Purchaser expressly disclaims any intent to rely on any such materials provided to it by Seller in connection with its inspection and agrees that it has relied and shall rely solely on its own independently developed or verified information.

3.    Exceptions to Title; Title Matters.

3.1    On the Closing Date (as defined herein), Seller shall sell and convey and Purchaser shall accept the Premises subject only to the following (collectively, the "Permitted Exceptions"):

3.1.1    All liens, encumbrances, defects, exceptions, easements, rights of way, restrictions, covenants, claims or other matters of a kind that the Title Company, in its reasonable discretion, would report on Schedule B of a title policy.

3.1.2    All presently existing and future liens for unpaid real estate taxes and water and sewer charges not due and payable as of the date of the Closing (as defined herein), subject to adjustment as herein below provided.

3.1.3    All present and future zoning, building, environmental and other laws, ordinances, codes, restrictions and regulations of all governmental authorities having jurisdiction with respect to the Premises, including, without limitation, landmark designations and all zoning variances and special exceptions, if any (collectively, "Laws and Regulations").

3.1.4    All covenants, restrictions and rights and all easements and agreements for the erection and/or maintenance of water, gas, steam, electric, telephone, sewer or other utility pipelines, poles, wires, conduits or other like facilities, and appurtenances thereto, over, across and under the Premises that are presently existing or of record (collectively, "Rights").

3.1.5    Any state of facts that would be disclosed by an accurate and complete survey of the Premises taken as of the Original Execution Date (collectively, "Facts").

3.1.6    All service, maintenance, telecommunications and other contracts in connection with the Premises (collectively, "Contracts"), if any, set forth on Schedule 3.1.6 attached hereto and made a part hereof.

3.1.7    All violations of building, fire, sanitary, environmental, housing and similar Laws and Regulations, and associated liens, whether or not noted or issued at the Original Execution Date or at the date of the Closing (collectively, "Violations"), but not any

4

fines, judgments or penalties arising out of such Violations which have been reduced to a definite sum, the payment of which shall be the responsibility of Seller.

3.1.8    Variations between tax lot lines and lines of record title.

3.1.9    Any exclusions from coverage that would be contained in an accurate title commitment issued by the Title Company with respect to the Premises as of the Original Execution Date).

3.1.10  (i) Any financing statements filed on a day more than five (5) years prior to the Closing and (ii) any financing statements filed against property no longer contained in the Premises, provided that, with respect to items (i) and (ii) of this Section 3.1.10, the Title Company shall remove them as exceptions from the title insurance policy to be issued to Purchaser at Closing or shall affirmatively insure over them (at no additional cost to Purchaser).

3.1.11  Any other matter which the Title Company may raise as an exception to title, provided that (i) Title Company will omit or affirmatively insure (at no additional cost to Purchaser) against collection or enforcement of same out of the Property and (ii) no prohibition of future development or maintenance of the Premises will result therefrom, as may be applicable.

3.1.12  Any encumbrance that will be extinguished upon conveyance of the Premises to Purchaser, provided that the Title Company shall remove them as exceptions from the title insurance policy to be issued to Purchaser at Closing or shall affirmatively insure over them (at no additional cost to Purchaser).

3.1.13  Any liens, encumbrances, defects, exceptions, easements, rights of way, restrictions, covenants, claims or other matters that the Premises may be conveyed by Seller free and clear of under Bankruptcy Code section 363(f).

3.1.14  All other matters that, pursuant to the express terms of this Agreement, are deemed Permitted Exceptions.

3.2    Purchaser may cause title to the Premises to be examined by Blue Jacket Title, Ltd., d/b/a/ Scout Title (the "Title Company") and cause the Title Company to deliver to Seller, promptly following receipt thereof, a title commitment (the "Title Report"). At Closing, Purchaser may cause title to the Property to be insured by the Title Company at Purchaser's sole cost and expense. If the Title Report or any continuation report reveals any defect or exception to title to the Property that is not a Permitted Exception (each, a "Title Defect") and subject to which Purchaser believes, in its reasonable discretion, it is not required to accept title, Purchaser shall give written notice thereof to Seller after the date Purchaser receives such Title Report or continuation report, and Purchaser shall be deemed to have unconditionally waived any such matters as to which Purchaser fails to give such written notice to Seller within five (5) Business Days after the date Purchaser receives such Title Report or continuation report (and such matters shall be deemed to be Permitted Exceptions).  Purchaser acknowledges and agrees that TIME IS OF THE ESSENCE with respect to all time periods set forth in this Section 3.2.

3.3     If, on the Closing Date, a Title Defect results in Seller being unable to convey to Purchaser marketable title to the Property in accordance with the provisions of this Article 3, Seller shall be entitled, upon written notice delivered to Purchaser not less than five (5) Business Days prior to the Closing Date (or within a reasonable time, with respect to Title Defects first made known to Seller less than five (5) Business Days prior to the Closing Date), to reasonable adjournments of the Closing beyond the initial date set forth for the Closing hereunder in the first sentence of Section 5.1 one or more times for a period not to exceed (the "Outside Date") thirty (30) days (in the aggregate) (each such adjournment, up until the Outside Date, "Adjournment Period") to enable Seller to convey acceptable title to the Property to Purchaser but only to the extent Seller, during each Adjournment Period, is using commercially reasonable efforts to cure any such Title Defect(s).  If Seller notifies Purchaser in writing that it does not so elect to adjourn the Closing, or if at the adjourned date Seller is unable to convey marketable title subject to and in accordance with the provisions of this Agreement, or if Seller notifies Purchaser in writing that it has elected not to cure or extinguish any Title Defect, then Purchaser may terminate this Agreement by written notice to Seller, in which event Seller shall (i) instruct the Escrow Agent (as defined herein) to promptly return to Purchaser the Downpayment (as defined herein) and (ii) not, as a Non-Noticing Party (as defined herein), object to the disbursement of the Downpayment to the Purchaser in accordance with Section 24.1.2 herein (the "Seller Objection").  This Agreement shall thereupon be deemed canceled and become void and of no further effect, and neither Party hereto shall have any obligations of any nature to the other hereunder or by reason hereof, except that the provisions of Sections 2.3 and 11.3 and Articles 6, 13, 14, and 20 hereof shall survive such termination.  If Seller adjourns the Closing as provided above, this Agreement shall remain in effect for the Adjournment Period.  Notwithstanding the foregoing, Seller shall not be required to take or bring any action or proceeding or take any other steps to remove any Title Defect or to fulfill any condition precedent to Purchaser's obligations under this Agreement or to expend any moneys therefor, nor shall Purchaser have any right of action against Seller therefor, at law or in equity (including terminating this Agreement as provided herein).

3.4     Notwithstanding anything in Section 3.2 or 3.3 hereof to the contrary, Purchaser may, in its sole and absolute discretion, at any time accept such title as Seller can convey, without reduction of the Purchase Price or any credit or allowance on account thereof or any claim against Seller.  The acceptance of the Deed (as hereinafter defined) by Purchaser shall be deemed to be full performance of, and discharge of, every agreement and obligation on Seller's part to be performed under this Agreement, except for such matters that are expressly stated in this Agreement to survive the Closing, to the limit of such survival.

3.5     The amount of any unpaid taxes, assessments, and water and sewer charges that Seller is obligated to pay and discharge, with interest and penalties, and any other amounts required to be paid by Seller at Closing, may at the option of Seller be paid out of the Closing Funds.

3.6     If the Property, at the time of the Closing, is subject to any liens, such as for judgments or transfer, inheritance, estate, franchise, license or other similar taxes or any encumbrances or other title exceptions that would be grounds for Purchaser to reject title hereunder, the same shall not be deemed an objection to title provided that, at the time of the Closing, either (a) Seller delivers certified or official bank checks or Wire Transferred Funds at the Closing in the amount required to satisfy the same and delivers to Purchaser and/or the Title

6

Company at the Closing instruments in recordable form (and otherwise in form reasonably satisfactory to the Title Company in order to omit the same as an exception to its title policy) sufficient to satisfy and discharge of record such liens and encumbrances together with the cost of recording or filing such instruments or (b) the Title Company will otherwise issue or bind itself to issue a title policy which will omit such matter or will insure Purchaser against collection thereof from or enforcement thereof against the Property (at no additional cost to Purchaser).

4.    <u>Purchase Price and Payment</u>.

4.1    The purchase price payable to Seller for the Property shall be EIGHT MILLION FOUR HUNDRED FIFTEEN THOUSAND AND 00/100 US DOLLARS ($8,415,000.00) (the "<u>Purchase Price</u>"), subject to such apportionments, adjustments and credits as are provided herein.

4.2    The Purchase Price shall be payable by or on behalf of Purchaser as follows:

4.2.1    THREE HUNDRED SIXTY-NINE THOUSAND SEVEN HUNDRED FIFTY AND 00/100 US DOLLARS ($369,750.00) within three (3) Business Day after the Original Execution Date in immediately available funds, by federal funds wire transfer ("<u>Wire Transferred Funds</u>") to the Title Company, as escrow agent ("<u>Escrow Agent</u>"), pursuant to the instructions (the "<u>Wire Instructions</u>") provided by the Escrow Agent and <u>Article 24</u> herein and made a part hereof (the "Original <u>Downpayment</u>") and an additional FIFTY ONE THOUSAND AND 00/100 US DOLLARS ($51,000) with three (3) Business Days after the Execution Date to the Escrow Agent, pursuant to the Wire Instructions provided by the Escrow Agent and <u>Article 24</u> herein and made a part hereof (together with the Original Downpayment, the "<u>Downpayment</u>"). The Downpayment shall be held by Escrow Agent and shall be disbursed in accordance with the terms and conditions of this Agreement.

4.2.2    Any interest earned on the Downpayment shall (i) be paid together with the principal portion of the Downpayment to the Party entitled to retain the Downpayment in accordance with this Agreement and (ii) be credited to the Purchase Price upon Closing.

4.2.3    On the Closing Date, the balance of the Purchase Price (*i.e.*, less the Downpayment and any interest earned thereon) in accordance with <u>Section 4.1</u> hereof shall be paid to, or as directed by, Seller, subject to the apportionments, adjustments and credits provided herein (the "<u>Closing Funds</u>"), to be paid in Wire Transferred Funds and received on or prior to 4:00 PM Eastern Time on the Closing Date, TIME BEING OF THE ESSENCE WITH RESPECT THERETO, to an account or accounts at such bank or banks as shall be designated by Seller by written notice to Purchaser at least one (1) Business Day prior to the Closing Date. For the purposes of this Agreement, the capitalized term "<u>Business Day(s)</u>" means any day of the year on which banks are not required or authorized by law to close in New York City.

4.3    Purchaser represents and expressly acknowledges and agrees that notwithstanding any reference to Purchaser's lender herein or otherwise, Purchaser's obligations hereunder are not in any way conditioned upon or qualified by Purchaser's ability to obtain

7

financing of any type or nature whatsoever (*i.e.*, whether by way of debt financing or equity investment, or otherwise) to consummate the transaction contemplated hereby. On the Closing Date, Purchaser shall have sufficient liquidity and equity sources available to fund the entire Purchase Price hereunder.

5.      Closing.

5.1      The closing of the transaction contemplated hereby (the "Closing") shall occur at 10:00 AM Eastern Time on the date ten (10) days following entry of the Sale Order (as defined below) (such date, as the same may be adjourned by Seller as expressly provided herein, the "Closing Date"). Seller shall be entitled to adjourn the Closing Date one or more times upon at least one (1) Business Days' prior notice to Purchaser for the time period prescribed in Section 3.3 of this Agreement to remedy Title Defects or to satisfy any other conditions to Purchaser's obligation to consummate the Closing under this Agreement. Purchaser and Seller each acknowledge and agree that TIME IS OF THE ESSENCE with respect to the performance by Purchaser and Seller of its respective obligations to purchase or sell (as the case may be) the Property (including Purchaser's obligation to pay the Purchase Price) as provided in this Agreement on the Closing Date (or the Closing Date as adjourned by Seller as provided above).

5.2      The Closing shall occur through an escrow closing using the Escrow Agent as the Closing agent.

6.      As Is.

6.1      Except as expressly set forth in this Agreement to the contrary, Purchaser is expressly purchasing the Property in its existing condition "AS IS, WHERE IS, AND WITH ALL FAULTS" with respect to all facts, circumstances, conditions and defects, and, except as is expressly set forth in this Agreement to the contrary, Seller has no obligation to determine or correct any such facts, circumstances, conditions or defects or to compensate Purchaser for same. Seller has specifically bargained for the assumption by Purchaser of all responsibility to investigate the Property, Laws and Regulations, Rights, Facts, Contracts and Violations and of all risk of adverse conditions and has structured the Purchase Price and other terms of this Agreement in consideration thereof. Purchaser shall undertake all such investigations of the Property, Laws and Regulations, Rights, Facts, Contracts and Violations as Purchaser deems necessary or appropriate under the circumstances as to the status of the Property and based upon same, except as is expressly set forth in this Agreement to the contrary, Purchaser is and will be relying strictly and solely upon such inspections and examinations and the advice and counsel of its own consultants, agents, legal counsel and officers and Purchaser is and will be fully satisfied that the Purchase Price is fair and adequate consideration for the Property.

6.2      Except as is expressly set forth in this Agreement to the contrary, Seller hereby disclaims all warranties of any kind or nature whatsoever (including warranties of habitability and fitness for particular purposes), whether expressed or implied, including, without limitation, warranties with respect to the Property. Except as is expressly set forth in this Agreement to the contrary, Purchaser acknowledges that it is not relying upon any representation of any kind or nature made by Seller or Broker, or any of Seller's direct or indirect members, partners, shareholders, officers, directors, employees or agents (collectively, the "Seller Related

8

<u>Parties</u>") with respect to the Property, and that, in fact, no such representations were made except as expressly set forth in this Agreement.

        6.3    Seller makes no representation or warranty with respect to the presence of Hazardous Materials on, above or beneath the Premises (or any parcel in proximity thereto) or in any water on or under the Premises. Purchaser's consummation of the closing hereunder shall be deemed to constitute an express waiver of Purchaser's right to cause Seller to be joined in any action brought under any Environmental Laws. The term "<u>Hazardous Materials</u>" means (a) those substances included within the definitions of any one or more of the terms "hazardous materials," "hazardous wastes," "hazardous substances," "industrial wastes," and "toxic pollutants," as such terms are defined under the Environmental Laws, or any of them, (b) petroleum and petroleum products, including, without limitation, crude oil and any fractions thereof, (c) natural gas, synthetic gas and any mixtures thereof, (d) asbestos and or any material that contains any hydrated mineral silicate, including, without limitation, chrysotile, amosite, crocidolite, tremolite, anthophylite and/or actinolite, whether friable or non-friable (collectively, "<u>Asbestos</u>"), (e) polychlorinated biphenyl ("<u>PCBs</u>") or PCB-containing materials or fluids, (f) radon, (g) mold, (h) any other hazardous or radioactive substance, material, pollutant, contaminant or waste, and (i) any other substance with respect to which any Environmental Law or governmental authority requires environmental investigation, monitoring or remediation; <u>provided</u>, that Hazardous Materials shall not include items used in the ordinary course of business by Seller or any user of the Premises with respect the operation, maintenance, repair or cleaning of the Premises or any portion thereof. The term "<u>Environmental Laws</u>" means all federal, state and local laws, statutes, ordinances and regulations, now or hereafter in effect, in each case as amended or supplemented from time to time, including, without limitation, all applicable judicial or administrative orders, applicable consent decrees and binding judgments relating to the regulation and protection of human health, safety, the environment and natural resources (including, without limitation, ambient air, surface, water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 et seq.), the Hazardous Material Transportation Act, as amended (49 U.S.C. §§ 1801 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. §§ 136 et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S. §§ 6901 et seq.), the Toxic Substance Control Act, as amended (15 U.S.C. §§ 2601 et seq.), the Clean Air Act, as amended (42 U.S.C. §§ 7401 et seq.), the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251 et seq.), the Occupational Safety and Health Act, as amended (29 U.S.C. §§ 651 et seq.), the Safe Drinking Water Act, as amended (42 U.S.C. §§ 300f et seq.), Environmental Protection Agency regulations pertaining to Asbestos, applicable Ohio state statutes and the rules and regulations promulgated pursuant thereto regulating the storage, use and disposal of Hazardous Materials, and any state or local counterpart or equivalent of any of the foregoing, and any federal, state or local transfer of ownership notification or approval statutes.

        6.4    Purchaser has relied solely upon Purchaser's own knowledge of the Premises based on Purchaser's Due Diligence in determining the Premises' physical condition and Purchaser agrees that it shall assume the risk that adverse matters, including but not limited to, adverse physical and environmental conditions may not have been revealed by Purchaser's investigations. Purchaser hereby releases Seller, the Seller Related Parties and their respective successors and assigns from and against any and all claims which Purchaser or any Party related

to or affiliated with Purchaser (each, a "Purchaser Related Party") has or may have arising from or related to any matter or thing related to or in connection with the Property including the documents and information referred to herein and any environmental conditions, and neither Purchaser nor any Purchaser Related Party shall look to Seller, the Seller Related Parties or their respective successors and assigns in connection with the foregoing for any redress or relief. This release shall be given full force and effect according to each of its express terms and provisions, including those relating to unknown and unsuspected claims, damages and causes of action. To the extent required to be operative, the disclaimers and warranties contained herein are "conspicuous" disclaimers for purposes of any applicable law, rule, regulation or order. Notwithstanding any terms or conditions of this Agreement to the contrary, Purchaser shall have the right to cause to be conducted an environmental assessment or assessments of the Premises prior to Closing. If the results of the assessments are unsatisfactory to Purchaser, in Purchaser's reasonable discretion (not to be unreasonably withheld), Purchaser may terminate this Agreement and shall be refunded the Downpayment upon written notice to Seller.

6.5     The provisions of this Article 6 shall survive the Closing and shall not be deemed to have merged into any of the documents executed or delivered at the Closing.

7.     Apportionments.

7.1     Prior to the Closing, Seller shall determine the amounts of apportionments of the items set forth in this Section 7.1 and any other items to be apportioned hereunder between the Parties as of 11:59 PM on the day preceding the Closing Date and notify Purchaser thereof. Purchaser shall promptly review Seller's determinations and promptly provide comments thereto or its approval thereof, in its reasonable discretion, but in any event prior to Closing. Thereafter, Purchaser and Seller shall each (or jointly) inform Escrow Agent of such apportionments, who, at the Closing, shall apportion such items. Any errors in the apportionments pursuant to this Article 7 shall be corrected by appropriate re-adjustment between Seller and Purchaser post-closing, provided that notice of any such error, with supporting calculations, shall be given by Purchaser to Seller or by Seller to Purchaser, as the case may be, no later than ninety (90) days after the Closing. The items to be apportioned are:

7.1.1     Real estate taxes, unmetered water and sewer charges and any and all other municipal or governmental assessments of any and every nature levied or imposed upon the Premises in respect of the current fiscal year of the applicable taxing authority in which the Closing Date occurs (the "Current Tax Year"), on a per diem basis based upon the number of days in the Current Tax Year prior to the Closing Date (which shall be allocated to Seller) and the number of days in the Current Tax Year on and after the Closing Date (which shall be allocated to Purchaser). If the Closing shall occur before the tax rate for the Current Tax Year is fixed, the apportionment of real estate taxes shall be upon the basis of the tax rate for the next preceding fiscal period applied to the latest assessed valuation. Promptly after the new tax rate is fixed for the Current Tax Year, the apportionment of real estate taxes shall be recomputed on the per diem basis set forth above. Upon the Closing Date and subject to the adjustment provided above, Purchaser shall be responsible for real estate taxes and assessments levied or imposed upon the Premises or the subdivided portions thereof payable in respect of the Current Tax Year and all periods after the Current Tax Year. In no event shall Seller be charged with or be responsible for any increase in the real estate taxes or assessments levied or imposed upon the Premises for any

10

fiscal year commencing following the Current Tax Year resulting from the transfer of the Property herein contemplated or for any reason.  In the event that any assessments levied or imposed upon the Premises are payable in installments, the installment for the Current Tax Year shall be prorated in the manner set forth above and Purchaser hereby assumes the obligation to pay any such installments due on and after the Closing Date.

7.1.2   Seller and Purchaser shall cooperate and coordinate a transfer to the Purchaser of all Contracts and/or responsibility for the supply to the Property of electric power and other utilities, if any, on the Closing Date, with Purchaser causing all such utility services to be placed in its name as of the Closing Date, provided, however, if Seller, despite using commercially reasonable efforts, cannot coordinate a transfer of the Contracts, and/or responsibility for the supply of utilities on the Closing Date, then Seller shall use commercially reasonable efforts to cooperate with Purchaser to ensure that post-closing such transfer is effectuated.  Notwithstanding the foregoing, if Seller's accounts are not closed as of the Closing, Seller shall use commercially reasonable efforts to cause all services using meters to be read as of the Closing Date, and charges and fees due under Contracts for the supply to the Property of electric power and other utilities, if any, in respect of the billing period of the related service provider in which the Closing Date occurs (the "Current Billing Period") shall be apportioned on a per diem basis based upon the number of days in the Current Billing Period prior to the Closing Date (which shall be allocated to Seller) and the number of days in the Current Billing Period on and after the Closing Date (which shall be allocated to Purchaser) and assuming that all charges are incurred uniformly during the Current Billing Period.  It is agreed that all deposits, if any, made by Seller as security with respect to any utility service shall be credited to Seller if such amounts remain on deposit after the Closing for the benefit of Purchaser; provided, however, in lieu thereof, Seller shall be entitled in its sole discretion to receive a refund of such security deposits directly from any such service provider without credit to Purchaser.  Calculations hereunder shall be based upon the most recent invoice rendered to Seller by the applicable service provider and, after an actual bill covering the period ending on the Closing Date is received, the apportionment of such charges hereunder shall be recomputed.

7.1.3   Any charges or fees for transferable licenses and permits for the Property.

7.1.4   All other items customarily apportioned in connection with sales of similar property in the State of Ohio, County of Logan.

7.2   Seller shall not be required to assign any policies of insurance in respect of the Property to Purchaser, and Purchaser shall be responsible for obtaining its own insurance as of the Closing Date.

7.3   The provisions of this Article 7 shall survive the Closing; provided, however, that any re-prorations or re-apportionments shall be made as and when required under Section 7.1 hereof.  Any corrected adjustment or proration shall be paid in Wire Transferred Funds to the Party entitled thereto.

DM_US 160470241-8.105320.0013

8.    <u>Representations and Warranties of the Parties; Certain Covenants</u>.

8.1    Seller warrants, represents and covenants to and with Purchaser that the following are true and correct on the Original Execution Date and as of the date hereof (or as of the date set forth on any Exhibit to this Agreement if a preparation date is set forth thereon):

8.1.1    Seller is a limited liability company duly organized and in good standing under the laws of the State of South Carolina, and, subject to Bankruptcy Court approval, has the requisite power and authority to enter into and to perform the terms of this Agreement.  Other than as set forth in <u>Section 10.4</u>, Seller is not subject to any law, order, decree or restriction that prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby, and the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby have been duly authorized by all requisite action of Seller.  Subject to Bankruptcy Court approval, this Agreement constitutes, and each document and instrument contemplated hereby to be executed and delivered by Seller, when executed and delivered, shall constitute the legal, valid and binding obligation of Seller enforceable against Seller in accordance with its respective terms (subject to bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally).

8.1.2    Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code 1986, as amended, or any regulations promulgated thereunder (collectively, the "<u>Code</u>").

8.1.3    Subject to Bankruptcy Court Approval, and other than as set forth in <u>Section 10.4</u>, neither the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated hereby is prohibited by, or requires Seller to obtain any consent, authorization, approval or registration under any law, statute, rule, regulation, judgment, order, writ, injunction or decree that is binding upon Seller.

8.1.4    As of the Original Execution Date and as of the date hereof, there are no litigations, claims, actions, or proceedings pending or, to Seller's knowledge, threatened against Seller (except the Chapter 11 Cases) that, if determined adversely to Seller, would result in any material adverse change in the development or condition of the Property.

8.1.5    To Seller's knowledge, there are no pending condemnation or eminent domain proceedings against the Premises, and Seller has not received written notice of any threatened condemnation or eminent domain proceedings against the Premises.

8.1.6    To Seller's knowledge, neither Seller nor any of its respective officers or directors is a Prohibited Person. For the purposes of this Agreement, "<u>Prohibited Person</u>" shall mean any Person: (a) that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "<u>Executive Order</u>"); (b) that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order; (c) that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or (d) that is identified on

12

the "specifically designated national" list published by OFAC at its official website, or at any replacement website or other replacement official publication of such list, or is named on any other U.S. or foreign government or regulatory list. For the purposes of this Agreement, "Person" shall mean any individual, corporation, limited partnership, limited liability company, joint venture, trust or other organization, whether or not a legal entity, and any government (and any political subdivision thereof), agency or other administrative body.

8.1.7    Seller has not granted any person or entity the right or option to purchase the Property or any interest therein including, without limitation, any air or development rights affecting or appurtenant to the same and, to Seller's knowledge, there is no option to purchase or right of first offer or refusal to purchase the Property or any interest therein, including, without limitation, any air or development rights affecting or appurtenant to the same. There are no leases or other agreements granting occupancy of the Property except as set forth on Schedule 3.1.6.

8.1.8    There are no employment or union agreements to which Seller is a Party that will be binding upon Purchaser.

8.1.9    For the purposes of this Agreement, the terms "to Seller's actual knowledge," "to Seller's knowledge" and phrases of similar import shall mean the actual present knowledge (and not constructive knowledge) of Seller, without independent inquiry or investigation, and shall not mean Seller's predecessors in title to the Premises.

The provisions of this Section 8.1 shall (i) be subject to the provisions of Section 11.3.3 hereof and (ii) survive the Closing only to the extent set forth in Section 8.4 hereof.

8.2    Purchaser warrants, represents and covenants to and with Seller that the following are true and correct on the Original Execution Date and as of the date hereof:

8.2.1    Purchaser is a limited liability company duly organized and in good standing under the laws of the State of Ohio, duly qualified to do business under the laws of the State of Ohio and has the requisite power and authority to enter into and perform the terms of this Agreement.  Other than as set forth in Section 10.4, Purchaser is not subject to any law, order, decree or restriction that prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby.  This Agreement constitutes, and each document and instrument contemplated hereby to be executed and delivered by Purchaser, when executed and delivered, shall constitute the legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its respective terms (subject to bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditor's rights generally).

8.2.2    Other than as set forth in Section 10.4, neither the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated hereby is prohibited by, or requires Purchaser to obtain any consent, authorization, approval or registration under any law, statute, rule, regulation, judgment, order, writ, injunction or decree that is binding upon Purchaser.

8.2.3    There are no judgments, orders, or decrees of any kind against Purchaser unpaid or unsatisfied of record, nor any actions, suits or other legal or

DM_US 160470241-8.105320.0013

administrative proceedings pending or, to Purchaser's actual knowledge, threatened against Purchaser, that would have any material adverse effect on Purchaser, its financial condition or its ability to consummate the transactions contemplated by this Agreement.

8.2.4    To Purchaser's knowledge, neither Purchaser nor any of its investors or any of their respective officers or directors is a Prohibited Person.

8.2.5    Purchaser and its investors and each of their respective officers and/or directors are in compliance with all applicable orders, rules and regulations issued by, and recommendations of, the U.S. Department of the Treasury and its Office of Foreign Assets Control (collectively, "OFAC") pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) ("IEEPA") and the Patriot Act Public Law 107-56 – October 26, 2001, as amended (the "Patriot Act").

8.2.6    Neither Purchaser nor any of its investors is (i) a "Prohibited Foreign Shell Bank" (as defined in the Patriot Act), or (ii) named on any available lists of known or suspected terrorists, terrorist organizations or of other sanctioned persons issued by the United States government and/or the government(s) of any jurisdiction(s) in which Purchaser is doing business.

The provisions of this Section 8.2 shall survive the Closing for a period of one-hundred and eighty (180) days.

8.3    Except as specifically set forth in this Agreement, Purchaser hereby acknowledges that neither Seller nor any of the Seller Related Parties nor Broker nor any agent nor any representative nor any purported agent or representative of Seller or any of the Seller Related Parties or Broker have made, and neither Seller nor any of the Seller Related Parties nor Broker are liable for or bound in any manner by, any express or implied warranties, guaranties, promises, statements, inducements, representations or information pertaining to the Property or any part thereof. Without limiting the generality of the foregoing, Purchaser has not relied on any representations or warranties, and Seller, the Seller Related Parties and Broker have not made any representations or warranties other than as expressly set forth herein, in either case express or implied, as to (a) the current or future real estate tax liability, assessment or valuation of the Property, (b) the potential qualification of the Property for any and all benefits conferred by Federal, state or municipal laws, whether for subsidies, special real estate tax treatment, insurance, mortgages, or any other benefits, whether similar or dissimilar to those enumerated, (c) the compliance of the Property, in its current or any future state, with applicable zoning ordinances and the ability to obtain a change in the zoning or a variance with respect to the Property's non-compliance, if any, with said zoning ordinance, (d) the availability of any financing for the acquisition, alteration, rehabilitation or operation of the Property from any source, including, without limitation, any state, city or Federal government or any institutional lender, (e) the current or future use of the Property, including, without limitation, the Property's use for residential (including hotel, cooperative or condominium use) or commercial purposes, (f) the present and future condition and operating state of any and all machinery or equipment on the Property and the present and future structural and physical condition of the Premises, (g) the ownership or state of title of any personal property on the Property, (h) the presence or absence of any Laws and Regulations or any Violations, or (i) the layout, income, expenses, operation, agreements, licenses,

easements, instruments, documents or Contracts of or in any way affecting the Property. Further, neither Seller nor any of the Seller Related Parties nor Broker are liable for or bound by (and Purchaser has not relied upon) any verbal or written statements, representations or any other information respecting the Property furnished by Seller, any of the Seller Related Parties or Broker or any broker, employee, agent, consultant or other person representing or purportedly representing Seller, any of the Seller Related Parties or Broker. The provisions of this <u>Section 8.3</u> shall survive the Closing.

8.4     Subject to <u>Section 11.3</u> hereof, Seller's representations and warranties (as the same may be modified or deemed modified as provided herein or updated and made as of the date of the Closing pursuant to <u>Section 10.2.3</u> hereof) shall terminate as of the Closing.

8.5     Notwithstanding anything to the contrary contained herein:

8.5.1     All of Seller's representations and warranties herein shall automatically be deemed modified to reflect Purchaser's Knowledge as of the Original Execution Date. As used herein, "<u>Purchaser's Knowledge</u>" shall mean, collectively, the actual knowledge of Purchaser and (a) all information with respect to the Property disclosed in this Agreement (including in any exhibit or schedule to this Agreement); (b) any information disclosed in any of the Due Diligence Materials or other materials relating to the Premises received by or made available to Purchaser or its agents, attorneys or representatives before the Closing; and (c) any other information disclosed in writing to Purchaser or its agents, attorneys or representatives by Seller or Seller's agents, attorneys or representatives before the Closing (including, without limitation, the matters set forth on any certificate delivered to Purchaser pursuant to <u>Section 9.1.4</u> below).

8.5.2     If, after the Original Execution Date but prior to the Closing, Purchaser first becomes aware of a Breach (as defined in <u>Section 11.3</u> below) of any of the representations or warranties made herein by Seller (as modified pursuant to <u>Section 8.5.1</u>), Purchaser may deliver to Seller a Claim Notice (as defined in <u>Section 11.3</u> below) with respect to such Breach within five (5) Business Days after so becoming aware (but, in any event, prior to the Closing), TIME BEING OF THE ESSENCE with respect to the delivery of such Claim Notice. In such event, Seller shall have the right (but not the obligation) to attempt to cure such Breach and shall, at its option, be entitled to extend the Closing Date pursuant to <u>Section 5.1</u> for the purpose of such cure. If Seller elects to attempt to so cure but is unable to so cure any such Breach, or if Seller does not attempt any such cure, then Purchaser, as its sole remedy for any and all such Breaches, shall elect either to (i) waive such Breaches and consummate the transaction contemplated hereby without any reduction of or credit against the Purchase Price and without any right to make a claim against Seller with respect thereto, or (ii) provided that such Breaches were not within Purchaser's Knowledge as of the Original Execution Date and such Breaches result in a Material Adverse Effect (as defined in <u>Section 11.3</u> below), terminate this Agreement in its entirety by written notice given to Seller on or prior to the Closing Date, in which event this Agreement shall be terminated, the Downpayment shall be returned to Purchaser and, thereafter, neither Party shall have any further rights or obligations hereunder except as provided in any section hereof that by its terms expressly provides that it survives any termination of this Agreement.

15

9.    <u>Closing Deliveries</u>.

9.1    At or prior to the Closing:

9.1.1    Seller shall execute, acknowledge and deliver a quitclaim deed in the form mutually agreed upon by Seller and Purchaser (the "<u>Deed</u>").

9.1.2    Seller shall execute and deliver to Purchaser in respect of the Property a bill of sale, conveying and transferring to Purchaser all of Seller's right, title and interest, if any, in and to certain personal property at the Premises in the form attached hereto as <u>Exhibit B</u> and made a part hereof, it being understood and agreed that no portion of the Purchase Price is being paid on account of any personal property; <u>provided</u>, <u>however</u>, that if any sales tax shall be payable by reason of the sale of such personal property, Seller shall be responsible for the payment of any such sales tax.

9.1.3    Seller shall deliver to Purchaser a certificate, duly executed by Seller, in accordance with Section 1445 of the Code, in the form of <u>Exhibit C</u> attached hereto and made a part hereof.

9.1.4    Seller shall deliver to Purchaser a certificate of Seller, dated as of the Closing, certifying to the fulfillment of the conditions set forth in <u>Section 10.2.3</u> hereof.

9.1.5    Seller shall execute, acknowledge and deliver in respect of the Property a conveyance fee statement of value and receipt.

9.1.6    Seller shall execute and deliver to Purchaser (or, at Purchaser's election, the Title Company) a standard title insurance affidavit substantially in Title Company's customary form regarding Parties in possession and liens, together with such changes requested by Seller as are reasonably acceptable to the Title Company.

9.1.7    Seller shall deliver to the Title Company such evidence of Seller's authority to consummate the transaction contemplated by this Agreement as shall be reasonably required by the Title Company in connection with the recordation of the Deed.

9.2    At or prior to the Closing:

9.2.1    The Escrow Agent will release the Downpayment to the Seller and Purchaser shall pay to Seller or the Escrow Agent, as applicable, the balance of the Purchase Price required pursuant to <u>Section 4.2</u> hereof.

9.3    Seller and Purchaser, at the Closing, shall prepare, execute and deliver to each other (or cause the Title Company to prepare and deliver to Seller and Purchaser for their execution), subject to all the terms and provisions of this Agreement, (a) a closing statement setting forth, inter alia, the closing adjustments, prorations, and material monetary terms of the transaction contemplated hereby and (b) such other instruments and documents as may be reasonably required to effectuate the consummation of the transactions described in this Agreement.

16

10.    Conditions to Closing Obligations.

10.1    Notwithstanding anything to the contrary contained herein, the obligation of Seller to close title in accordance with this Agreement is expressly conditioned upon the fulfillment by and as of the time of the Closing of each of the conditions listed below, provided that Seller, at its election, evidenced by written notice delivered to Purchaser at or prior to the Closing, may waive any of such conditions:

10.1.1  The Sale Order shall have been entered by the Bankruptcy Court approving the sale to Purchaser.  All such orders must be final, in effect and must not have been reversed or stayed or modified in any material respect.

10.1.2  Purchaser shall have executed and delivered to Seller all of the documents, and shall have taken or caused to be taken all of the other material actions, required of Purchaser in this Agreement.

10.1.3  All representations and warranties made by Purchaser in this Agreement shall be true and correct in all material respects as of the date of the Closing.

10.1.4  The Downpayment shall be paid to Seller and the balance of the Purchase Price shall be paid or applied in accordance with Section 4.2 hereof.

10.2    Notwithstanding anything to the contrary contained herein, the obligation of Purchaser to close title and pay the Purchase Price in accordance with this Agreement is expressly conditioned upon the fulfillment by and as of the time of the Closing of each of the conditions listed below, provided that Purchaser, at its election, evidenced by written notice delivered to Seller at or prior to the Closing, may waive all or any of such conditions:

10.2.1  The Sale Order shall have been entered by the Bankruptcy Court approving the sale to Purchaser.  All such orders must be final, in effect and must not have been reversed or stayed or modified in any material respect.

10.2.2  Seller shall have executed and delivered to Purchaser all of the documents, and shall have taken or caused to be taken all of the other material actions, required of Seller under this Agreement.

10.2.3  Except as provided below, subject to Section 8.5 hereof, all representations and warranties made by Seller in this Agreement shall be true and correct in all material respects as of the Closing Date (or as of the date set forth on any Exhibit to this Agreement if a preparation date is set forth thereon).  To the extent the facts and circumstances underlying such representations and warranties may have changed in any material respect as of the Closing, Seller shall represent in a certificate delivered pursuant to Section 9.1.4 hereof such changed facts and circumstances.  For purposes hereof, a representation or warranty (as same has been modified or deemed modified pursuant to Section 8.5) shall not be deemed to have been breached if the representation or warranty is not true and correct in all material respects as of the Closing Date and Purchaser, in Purchaser's sole discretion, does not elect to terminate this Agreement in accordance with Section 8.5.2 with respect thereto on or prior to the Closing Date, subject to Purchaser's rights under Section 11.3.1.

17

10.3     If the conditions set forth in <u>Section 10.2</u> have not been satisfied or waived by Purchaser, Purchaser shall have the right to terminate this Agreement by giving written notice to Seller and Escrow Agent, in which event the Downpayment Return (as defined below) shall occur and thereafter Seller and Purchaser shall be released from any further liability to the other hereunder, except that the provisions of <u>Section 2.3</u> and <u>Articles 13</u>, <u>14</u>, <u>20</u>, and <u>28</u> shall survive such termination.

10.4     <u>Bankruptcy Court Approval</u>.

10.4.1 <u>Entry of Sale Procedures Order</u>.  No later than three (3) business day after the Execution Date, Seller shall file a motion (the "<u>Sale Procedures Motion</u>") with the Bankruptcy Court seeking entry of an order (the "<u>Sale Procedures Order</u>") which shall (a) include all of the following provisions, unless otherwise ordered by the Bankruptcy Court:  (i) an bid deadline of no later than August 30, 2019; (ii) an auction date of no later than September 6, 2019; (iii) a sale hearing of no later than September 11, 2019; (iv) a break-up fee in the amount of $270,000; (v) expense reimbursement in an amount not to exceed $100,000; (vi) an initial overbid of $420,000; and (vii) an incremental overbid of $50,000, and (b) be in a form substantially similar to <u>Exhibit D</u>:

10.4.2 <u>Entry of Order Approving Sale</u>.

(a)     In the event there is no Auction, or that Purchaser presents the winning bid at the Auction, then Seller shall use its best efforts to obtain entry of an order of the Bankruptcy Court approving the sale on the terms of this Agreement within three days after the Sale Hearing, or such other date set by the Bankruptcy Court. The Sale Order shall be in accordance with the terms of this Agreement, shall be in a form satisfactory to Purchaser and Seller, and shall, among other things:

(i)     approve and direct the sale of the Premises to Purchaser free and clear of all liens, claims or interests, based on appropriate findings and rulings pursuant to, *inter alia*, Sections 363(b), (f) and (m) of the Bankruptcy Code, and the release of Purchaser of any rights otherwise associated with, and which may otherwise be to the benefit of, any third parties;

(ii)     include a finding that Purchaser is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code, *provided* that Purchaser cooperates with Seller to provide evidence, including an appropriate declaration of a representative of Purchaser to obtain such finding;

(iii)     include a finding that Purchaser is not deemed to be a successor to Seller, to have, *de facto* or otherwise, merged with or into Seller or to be a mere continuation of Seller;

(iv)     include a finding that the sale of the Premises to Purchaser is an exercise of Seller's reasonable business judgment and that the final Purchase Price is a fair and reasonable price for the Premises;

18

(v)     include a finding confirming the adequacy of notice to all creditors and parties in interest and parties to any executory contract, unexpired lease or right of entry;

(vi)     include a finding that the prepetition and postpetition marketing process was reasonable and appropriate and manifested a good faith effort to maximize the value of the Premises; and

(vii)     include provisions for the retention of jurisdiction in the Bankruptcy Court over matters relating to the transactions contemplated in this Agreement, including matters relating to title to the Purchased Assets and claims against the Purchased Assets that arose or were based on facts or occurrences prior to the Closing. Furthermore, the Sale Order shall not have been reversed, stayed, modified or amended.

(b)     Seller shall provide notice of any hearing on the motion to approve the Sale Order or any other matter before the Bankruptcy Court relating to this Agreement or the Transaction, in each case as required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the District of Delaware or as otherwise ordered by the Bankruptcy Court.

(c)     Notwithstanding anything to the contrary in this Section 10.4 or any other provision of this Agreement, in the event that a Qualified Bid of a third party (an "Alternative Purchaser," and the underlying agreement between the Alternative Purchaser and Seller, the "Alternative Purchase Agreement") is approved by the Bankruptcy Court at the hearing on the Sale Motion, this Agreement, shall become an approved "back-up bid" pursuant to the Sale Procedures Order unless at the Auction, other higher and better bids are received and the Seller elects to make a different Alternative Purchaser the "back-up bidder".

10.4.3  Certain Bankruptcy Undertakings by Seller.

(a)     Except as ordered by the Bankruptcy Court, Seller shall neither take any action, nor fail to take any action, which action or failure to act would reasonably be expected to prevent or impede the consummation of the transactions contemplated by this Agreement in accordance with the terms of this Agreement; or (ii) result in (A) the reversal, avoidance, revocation, vacating or modification (in any manner that would reasonably be expected to materially and adversely affect Purchaser's rights hereunder), or (B) the entry of a stay pending appeal.

(b)     If the Sale Procedures Order, the Sale Order or any other order of the Bankruptcy Court relating to this Agreement is appealed by any Person (or a petition for certiorari or motion for rehearing or re-argument is filed with respect thereto), Seller, with the cooperation and support of Purchaser, shall take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion, and shall endeavor to obtain an expedited resolution of such appeal.

11.    <u>Limitation on Liability of Parties.</u>

11.1    If Purchaser defaults in the performance of its obligations under this Agreement (and Purchaser shall have until the earlier of three (3) Business Day opportunity to cure any such default or the scheduled date of Closing) and the Closing does not occur as a result thereof (a "<u>Purchaser Default</u>"), Seller's sole and exclusive remedy shall be (and Seller hereby waives any and all other rights and remedies at law, in equity or otherwise), and Seller shall be entitled, to retain the Downpayment and any interest earned thereon, as and for full and complete liquidated and agreed damages for Purchaser's default, and Purchaser shall be released from any further liability to Seller hereunder, except that the provisions of <u>Sections</u> <u>2.3</u> and <u>11.3</u> and <u>Articles 6</u>, <u>13</u>, <u>14</u>, and <u>20</u> hereof shall survive.  SELLER AND PURCHASER AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES WHICH SELLER MAY SUFFER UPON A PURCHASER DEFAULT AND THAT THE DOWNPAYMENT, TOGETHER WITH ANY INTEREST EARNED THEREON, REPRESENTS A REASONABLE ESTIMATE OF THE TOTAL NET DETRIMENT THAT SELLER WOULD SUFFER UPON A PURCHASER DEFAULT.  SUCH LIQUIDATED AND AGREED DAMAGES ARE NOT INTENDED AS A FORFEITURE OR A PENALTY WITHIN THE MEANING OF APPLICABLE LAW.

11.2    Except as otherwise provided in the Sale Procedures Order, if Seller defaults in the performance of its obligations under this Agreement (and Seller shall have a three (3) Business Days after receipt of notice from Purchaser to cure any such default) and the Closing does not occur as a result thereof (a "<u>Seller Default</u>"), Purchaser, as Purchaser's sole and exclusive remedies may (i) instruct Escrow Agent in accordance with <u>Article 24</u> to return to Purchaser the Downpayment with the interest earned thereon, if any (a "<u>Downpayment Return</u>"), upon which return Seller shall be released from any further liability to Purchaser hereunder, except that the provisions of <u>Articles 13</u>, <u>14</u>, and <u>20</u> shall survive or (ii) waive any such Seller default and proceed to Closing.  In no event shall Seller be liable to Purchaser for any damages of any kind whatsoever.

11.3    Any claim by Purchaser of a breach of one or more of Seller's representations and warranties pursuant to <u>Section 8.1</u> hereof, as modified pursuant to <u>Section 8.5</u> hereof (individually, a "<u>Breach</u>" and, collectively, as applicable, "<u>Breaches</u>") shall be made by Purchaser by delivering to Seller written notice (a "<u>Claim Notice</u>") prior to Closing, which Claim Notice shall set forth (a) a description in reasonable detail of the claimed Breach or Breaches and (b) the Section and subsection of this Agreement under which the claimed Breach or Breaches is (are) asserted.  As used in this Agreement, the term "<u>Material Adverse Effect</u>" means an aggregate loss, cost or expense to the Purchaser resulting from any alleged Breach or Breaches in an amount greater than FIFTY THOUSAND AND 00/100 U.S. Dollars ($50,000.00). Purchaser's and Seller's rights and remedies in respect of any alleged Breach or Breaches shall, without limiting the foregoing, be as set forth in <u>Section 8.5.2</u> above and below:

11.3.1 If Purchaser becomes aware of a Breach that does not, or Breaches that in the aggregate do not, have a Material Adverse Effect, then Purchaser must proceed to Closing without any adjustment of the Purchase Price.

20

11.3.2  If Purchaser becomes aware of a Breach that has, or Breaches that in the aggregate have, a Material Adverse Effect (a "Material Breach"), then the provisions of Section 8.5.2 above shall apply.

11.3.3  The terms and provisions of this Section 11.3 shall survive the Closing and/or termination of this Agreement.

## 12.    Fire or Other Casualty; Condemnation.

12.1    Seller agrees between the Original Execution Date and the date of Closing (a) to maintain its present liability insurance policy and (b) to give Purchaser prompt written notice of any fire or other casualty occurring at the Premises, between the Original Execution Date and the date of the Closing, or of any actual or threatened condemnation of all or any part of the Property of which Seller obtains knowledge.  No fire or other casualty occurring at the Premises shall give rise to any right of Purchaser to terminate this Agreement, but Seller shall pay or assign to Purchaser at Closing any insurance proceeds paid or payable as a result of such fire or casualty.

12.2    If prior to the Closing there shall occur a taking by condemnation of any material portion of the Property, then Purchaser may terminate this Agreement by written notice given to Seller within fifteen (15) Business Days after Seller has given Purchaser the notice referred to in Section 12.1 hereof, or at the Closing, whichever is earlier, in which event Escrow Agent shall make a Downpayment Return to Purchaser and this Agreement shall thereupon be null and void and neither Party hereto shall thereupon have any further obligation to the other, except that the provisions of Articles 6, 13, 14, and 20 shall survive such termination.  If Purchaser does not elect to terminate this Agreement as aforesaid, then the Closing shall take place as herein provided, without abatement of the Purchase Price, and Seller shall (i) assign to Purchaser at the Closing, by written instrument in form reasonably satisfactory to Purchaser, all of the Seller's interest in and to any condemnation awards that may be payable to Seller on account of any such condemnation and (ii) deliver to Purchaser any such proceeds or awards actually theretofore paid less any amounts (such difference, the "Reimbursable Amounts") theretofore actually and reasonably expended or incurred by or for the account of Seller (x) in negotiating and/or obtaining any condemnation award (including, without limitation, reasonable attorneys' fees and expenses), and/or (y) for the cost of any compliance with laws ("Compliance Costs"), protective restoration or emergency repairs to avoid or minimize the imminent threat of either (A) loss or impairment of life or of personal injury or (B) damage to the Property ("Emergency Costs") made by or on behalf of Seller as a result of such condemnation but only to the extent Seller has not theretofore been reimbursed by its insurance carriers or other third Parties for such expenditures.  For the purposes of this Section 12.2, "material portion" with respect to the Property refers to any loss due to a condemnation that permanently and materially impairs the current, future and contemplated use and operation of the Property.

12.3    If, prior to the Closing, there shall occur a taking by condemnation of any part of the Property which is not material, then and in such event, neither Party shall have the right to terminate its obligations under this Agreement by reason thereof, but Seller shall assign to Purchaser at the Closing, by written instrument in form and substance reasonably satisfactory to Purchaser, all of Seller's interest in any condemnation awards which may be payable to Seller

on account of any such condemnation, and shall deliver to Purchaser any such awards actually theretofore paid, in each case less any Reimbursable Amounts.

12.4    Nothing contained in this <u>Article 12</u> shall be construed to impose upon Seller any obligation to repair any damage or destruction caused by fire or other casualty or condemnation.

12.5    In the event Purchaser does not elect to terminate this Agreement in accordance with <u>Section 12.2</u>, or upon the occurrence of the events set forth in <u>Section 12.3</u> hereof, Purchaser shall have the exclusive right to negotiate, compromise or contest the obtaining of any insurance proceeds and/or any condemnation awards.

12.6    This Article shall be an express agreement to the contrary for purposes of Section 5-1311 of the New York General Obligations Law.

13.    <u>Brokerage</u>.

13.1    Purchaser represents and warrants to Seller that it has not dealt or negotiated with, or engaged on its own behalf or for its benefit, any broker, finder, consultant, advisor, or professional in the capacity of a broker or finder (each a "<u>Broker</u>") in connection with this Agreement or the transactions contemplated hereby other than CBRE, Inc. ("<u>CBRE</u>").

13.2    Seller represents and warrants to Purchaser that it has not dealt or negotiated with, or engaged on its own behalf or for its benefit, any Broker in connection with this Agreement or the transactions contemplated hereby other than CBRE.  Seller hereby agrees to indemnify, defend and hold Purchaser and its direct and indirect shareholders, officers, directors, partners, principals, members, employees, agents, contractors and any successors or assigns of the foregoing, harmless from and against any and all claims, demands, causes of action, losses, costs and expenses (including reasonable attorneys' fees, court costs and disbursements) arising from any claim for commission, fees or other compensation or reimbursement for expenses made by any Broker (including CBRE) engaged by or claiming to have dealt with Seller in connection with this Agreement or the transactions contemplated hereby, unless such other Broker was engaged by Purchaser in connection with this Agreement or the transactions contemplated hereby and was not engaged by Seller.

The provisions of this <u>Article 13</u> shall survive the termination of this Agreement or the Closing.

14.    <u>Closing Costs; Fees and Disbursements of Counsel, etc</u>.  At the Closing, Seller shall pay the conveyance and transfer fees (the "<u>Transfer Taxes</u>"), upon or payable in connection with the transfer of title to the Property and the recordation of the Deed, which Transfer Taxes borne by Seller shall be paid for out of the Closing Funds.  All such tax payments shall be made payable directly to the order of the appropriate governmental officer or the Title Company. Purchaser shall pay (i) all costs and expenses of Purchaser's Due Diligence, (ii) all charges for recording and/or filing the Deed, (iii) all of Purchaser's title charges and survey costs, including the premium on Purchaser's title policy, and (iv) any and all costs associated with any financing Purchaser may obtain to consummate the acquisition of the Property. Seller and Purchaser shall each be responsible for paying one-half of any escrow costs and fees of the Escrow Agent. Except

to the extent of any indemnification obligation provided for elsewhere in this Agreement, each of the Parties hereto shall bear and pay the fees and disbursements of its own counsel, accountants and other advisors in connection with the negotiation and preparation of this Agreement and the Closing.  The provisions of this <u>Article 14</u> shall survive the Closing.

15.    <u>Notices</u>.  Except as otherwise provided in this Agreement, all notices, demands, requests, consents, approvals or other communications (for the purposes of this <u>Article 15</u> collectively referred to as "<u>Notices</u>") required or permitted to be given hereunder or which are given with respect to this Agreement, in order to constitute effective notice to the other Party, shall be in writing and shall be deemed to have been given (a) when personally delivered with signed delivery receipt obtained or when such personal delivery is refused by the recipient, (b) when transmitted by email to the appropriate email address listed below, if followed by the giving of such Notice pursuant to one of the other means set forth in this <u>Article 15</u> before the end of the first Business Day thereafter, (c) one (1) Business Day after deposit with a prepaid reputable overnight courier if delivered by such courier, or (d) three (3) Business Days after the date so mailed if sent postage prepaid by registered or certified mail, return receipt requested, in each case addressed as follows:

| | |
|---|---|
| If to Seller, to: | Ellett Brothers, LLC<br>267 Columbia Avenue<br>Chapin, SC 29036<br>Attention: Dalton Edgecomb, CRO<br>Email: dedgecomb@winterharborco.com |
| with a copy to: | McDermott Will & Emery LLP<br>340 Madison Avenue<br>New York, NY 10173<br>Attention:  Tim Walsh, Esq.<br>Email: twwalsh@mwe.com |
| If to Purchaser, to: | E Brothers Ltd.<br>811 North Main Street<br>Bellefontaine, OH 43311<br>Attention: Matt Robinson<br>Email: matt@robinsoninvestmentsltd.com |
| with a copy to: | Thompson, Dunlap & Heydinger, Ltd.<br>1111 Rush Ave., P.O. Box 68<br>Bellefontaine, Ohio 43311<br>Attention: Joshua M. Stolly, Esq.<br>Email:  jstolly@tdhlaw.com |
| If to Escrow Agent, to: | Scout Title<br>113 W. Columbus Ave.<br>Bellefontaine, Ohio 43311<br>Attention:  Gabe Wickline, Esq.<br>Email:  Gabe.Wickline@scouttitle.com |

23

Notices shall be valid only if served in the manner provided above. Notices may be sent by the attorneys for the respective Parties and each such Notice so served shall have the same force and effect as if sent by such Party. Either Party may, by notice to the other, change its notice address or any notice Party.

16.    Survival. Except as otherwise expressly set forth in this Agreement, the provisions of this Agreement shall not survive the Closing provided for herein.

17.    Counterparts; Captions. This Agreement may be executed in counterparts, each of which shall be deemed an original. The captions are for convenience of reference only and shall not affect the construction to be given any of the provisions hereof.

18.    Entire Agreement; Third Party Beneficiaries; Partial Invalidity. This Agreement (including all Schedules and Exhibits annexed hereto), contains the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior understandings, if any, with respect thereto. This Agreement may not be modified, changed, supplemented or terminated, nor may any obligations hereunder be waived, except by written instrument signed by the Party to be charged or by its agent duly authorized in writing or as otherwise expressly permitted herein. The Parties do not intend to confer any benefit hereunder on any person, firm or corporation other than the Parties hereto. If any term or provision of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term and provision of this Agreement shall be valid and enforced to the fullest extent permitted by law. The provisions of this Article 18 shall survive the Closing.

19.    Waivers; Extensions. No waiver of any breach of any agreement or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of any other agreement or provision herein contained. No extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts.

20.    No Recording. The Parties hereto agree that neither this Agreement nor any memorandum or notice hereof shall be recorded. Any breach of the provisions of this Article 20 shall constitute a default by such Party. In furtherance of the foregoing, Purchaser (a) acknowledges that the filing of a lis pendens or other evidence of Purchaser's rights or the existence of this Agreement against the Property could cause significant monetary and other damages to Seller and (b) hereby indemnifies Seller from and against any and all claims, losses, liabilities and expenses (including, without limitation, reasonable attorneys' fees incurred in the enforcement of the foregoing indemnification obligation) arising out of the breach by Purchaser of any of its obligations under this Article 20. Should Purchaser file a lis pendens or other instrument against the Premises or any portion thereof, then the limitation on remedies and damages against Purchaser contained herein shall be null and void, and in addition to the Downpayment and any interest earned thereon, Purchaser shall be liable to Seller for all damages incurred by Seller as a result of such lis pendens or instrument, as adjudicated by a court of

competent jurisdiction.  The provisions of this <u>Article 20</u> shall survive the termination of this Agreement.

21.    <u>Assignments</u>.  Purchaser shall neither assign its rights nor delegate its obligations hereunder without obtaining Seller's prior written consent, which consent may be granted or withheld in Seller's sole discretion, and any such assignment made without Seller's prior written consent shall be void ab initio and shall constitute a Purchaser Default.  Transfers of direct and indirect interests in Purchaser shall be deemed an assignment for purposes of this <u>Article 21</u>.  Notwithstanding the foregoing, Purchaser shall have the one-time right, without Seller's consent but upon prior written notice to Seller, to assign its rights in this Agreement or transfer (or permit the transfer of) any direct or indirect interest in Purchaser to any entity which is, directly or indirectly, controlled by, controlling, or under common control with, Purchaser.  For the purposes hereof, "<u>control</u>" and derivations thereof shall refer to the ownership of not less than fifty percent (50%) of an entity's voting ownership securities.

22.    <u>Pronouns; Joint and Several Liability</u>.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the Parties may require.

23.    <u>Successors and Assigns</u>.  This Agreement shall bind and inure to the benefit of Seller, Purchaser and their respective permitted successors and assigns.

24.    <u>Escrow</u>.

24.1    Escrow Agent shall hold the Downpayment, in a non-interest bearing escrow account, in accordance with the following:

24.1.1 Escrow Agent shall hold the Downpayment in Escrow Agent's escrow account at Liberty National Bank (the "<u>Bank</u>").

24.1.2 If Escrow Agent receives a written request signed by Purchaser or Seller (the "<u>Noticing Party</u>") stating that this Agreement has been canceled or terminated in accordance with the terms hereof and that the Noticing Party is entitled to the Downpayment, or that the other Party hereto (the "<u>Non-Noticing Party</u>") has defaulted in the performance of its obligations hereunder, Escrow Agent shall deliver a copy of such request to the Non-Noticing Party.  The Non-Noticing Party shall have the right to object to such request for the Downpayment by written notice of objection delivered to and received by Escrow Agent within ten (10) Business Days after the date of Escrow Agent's delivery of such copy to the Non-Noticing Party, but not thereafter.  If Escrow Agent shall not have so received a written notice of objection from the Non-Noticing Party within the applicable timeframe, Escrow Agent shall deliver the Downpayment, together with the interest earned thereon, to the Noticing Party.  If Escrow Agent shall have received a written notice of objection within the time herein prescribed, Escrow Agent shall refuse to comply with any requests or demands on it and shall continue to hold the Downpayment, together with any interest earned thereon, until Escrow Agent receives either (a) a written notice signed by both Seller and Purchaser stating who is entitled to the Downpayment (and interest thereon) or (b) a final order of a court of competent jurisdiction directing disbursement of the Downpayment (and interest thereon), in a specific manner, in either of which

events Escrow Agent shall then disburse the Downpayment, together with the interest earned thereon, in accordance with such notice or order. Escrow Agent shall not be or become liable in any way or to any person or entity for its refusal to comply with any such requests or demands until and unless it has received a direction of the nature described in clauses (a) or (b) immediately above.

24.2    Any notice to Escrow Agent shall be sufficient only if received by Escrow Agent within the applicable time period set forth herein. All notices from Escrow Agent to Seller and/or Purchaser, or from Seller and/or Purchaser to Escrow Agent, provided for in this Article 24 shall be delivered in accordance with Article 15 hereof.

24.3    Notwithstanding the foregoing, if Escrow Agent shall have received a written notice of objection as provided for in Section 24.1.2 hereof within the time therein prescribed, or shall have received at any time before actual disbursement of the Downpayment, a written notice signed by either Seller or Purchaser disputing entitlement to the Downpayment or, shall otherwise believe in good faith at any time that a disagreement or dispute has arisen between the Parties hereto over entitlement to the Downpayment, (whether or not litigation has been instituted), Escrow Agent shall have the right, upon written notice to both Seller and Purchaser, (a) to deposit the Downpayment, together with the interest earned thereon, with the Clerk of the Bankruptcy Court and/or (b) to take such reasonable affirmative steps as it may, at its option, elect in order to terminate its duties as Escrow Agent, and thereupon Escrow Agent shall be released of and from all liability hereunder except for its gross negligence or willful misconduct.

24.4    Escrow Agent is acting hereunder without charge as an accommodation to Purchaser and Seller, it being understood and agreed that Escrow Agent shall not be liable for any error in judgment or any act done or omitted by it in good faith or pursuant to court order, or for any mistake of fact or law. Escrow Agent shall not incur any liability in acting upon any document or instrument believed thereby to be genuine. Escrow Agent is hereby released and exculpated from all liability hereunder, except only for bad faith, willful misconduct or gross negligence. Escrow Agent may assume that any person purporting to give it any notice on behalf of any Party has been authorized to do so. Escrow Agent shall not be liable for, and Purchaser and Seller hereby jointly and severally agree to indemnify Escrow Agent against, any loss, liability or expense, including reasonable attorneys' fees, arising out of any dispute under this Agreement, including the cost and expense of defending itself against any claim arising hereunder.

24.5    Purchaser hereby acknowledges and agrees that the Downpayment held by Escrow Agent does not and shall not constitute property of the estate of Purchaser within the meaning of section 541 of title 11 of the United States Code, or substantially similar provisions of state law (the "Bankruptcy Code"), and Purchaser's interest in such Downpayment is limited to the right to have the Downpayment returned if and when the conditions for the return of the Downpayment to Purchaser are satisfied as set forth herein. Purchaser hereby acknowledges and agrees that (i) the proper giving of notice by Seller to release the Downpayment as provided hereunder and/or (ii) the proper release of the Downpayment to Seller as provided hereunder shall not be a violation of any provision of the Bankruptcy Code, including, without limitation, Section 362 of the Bankruptcy Code, or require the approval of any court with jurisdiction over any case in which Purchaser or any affiliate of Purchaser is a debtor. Purchaser hereby waives any provision of the Bankruptcy Code necessary to invoke the foregoing, including, without limitation, sections

26

105 and 362, and waives any right to defend against any motion for relief from the automatic stay that may be filed by Seller.

25.    <u>Tax Proceedings</u>.    If any proceedings for the reduction of the assessed valuation of the Premises ("<u>Tax Proceedings</u>") relating to any tax years ending prior to the Current Tax Year are pending at the time of the Closing, Seller reserves and shall have the right to continue to prosecute and/or settle the same in Seller's sole discretion and at Seller's cost (with fees to tax certiorari counsel to be pro rated based on relative benefit), and any refunds or credits due for the periods prior to Purchaser's ownership of the Property shall remain the sole property of Seller. From and after the Original Execution Date until the Closing, Seller is hereby authorized to commence any new Tax Proceedings and/or continue any Tax Proceedings, and in Seller's sole discretion to litigate or settle same; <u>provided</u>, <u>however</u>, that Purchaser shall be entitled to that portion of any refund or future tax benefit relating to the period occurring after the Closing after payment to Seller of all costs and expenses, including, without limitation, reasonable attorneys' fees and disbursements, incurred by Seller in obtaining such refund or in obtaining any future tax benefits including benefits based on decreases in assessed valuation.    Purchaser shall deliver to Seller, reasonably promptly after request therefor, receipted tax bills and canceled checks used in payment of such taxes and shall execute any and all consents or other documents, and do any act or thing reasonably necessary for the collection of such refund by Seller.    The provisions of this <u>Article 25</u> shall survive the Closing.

26.    <u>Operation of the Property</u>.

26.1    Prior to Closing, Seller shall have the right to make, without Purchaser's approval, repairs required by law or which may be required in the event of an emergency to preserve the Property or prevent injury to persons.

26.2    From the Original Execution Date until the Closing Date or earlier termination of this Agreement, Seller (i) shall operate the Premises in a manner consistent with the manner it has operated the Premises prior to the Original Execution Date, but shall have no obligation to make any improvements or repairs and (ii) shall not enter into any lease or contract with respect to the Property that survives Closing without the prior written consent of the Purchaser, which consent may be withheld at Purchaser's sole and absolute discretion.

27.    <u>Further Assurances</u>.    The Parties each agree to do such other and further acts and things, and to execute and deliver such instruments and documents (not creating any obligations additional to those otherwise imposed by this Agreement) as either may reasonably request from time to time, whether at or after the Closing, in furtherance of the purposes of this Agreement.    The provisions of this <u>Article 27</u> shall survive the Closing.

28.    <u>Governing Law; Jurisdiction, Waivers</u>.

28.1    This Agreement has been negotiated, executed and delivered and shall be governed by and construed in accordance with the laws of the State of New York from time to time in effect, without giving effect to the State of New York's principles of conflicts of law, except that it is the intent and purpose of Seller and Purchaser that the provisions of Section 5-1401 of the General Obligations Law of the State of New York shall apply to this Agreement.

EACH PARTY HERETO AGREES THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE TRIED AND LITIGATED IN STATE OR FEDERAL COURTS LOCATED IN THE STATE OF NEW YORK, UNLESS SUCH ACTIONS OR PROCEEDINGS ARE REQUIRED TO BE BROUGHT IN ANOTHER COURT TO OBTAIN SUBJECT MATTER JURISDICTION OVER THE MATTER IN CONTROVERSY.  TO THE EXTENT PERMITTED BY LAW, EACH PARTY HERETO IRREVOCABLY WAIVES ANY RIGHT ANY PARTY HERETO MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS, TO ASSERT THAT ANY PARTY HERETO IS NOT SUBJECT TO THE JURISDICTION OF THE AFORESAID COURTS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS ARTICLE 28. SERVICE OF PROCESS, SUFFICIENT FOR PERSONAL JURISDICTION IN ANY ACTION AGAINST ANY PARTY HERETO, MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ANY SUCH PARTY'S ADDRESS INDICATED IN ARTICLE 15 HEREOF.

28.2    EACH OF SELLER AND PURCHASER HEREBY EXPRESSLY AND UNCONDITIONALLY WAIVES, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY THE OTHER PARTY HERETO UNDER THIS AGREEMENT OR IN CONNECTION WITH ANY TRANSACTION CONTEMPLATED HEREBY, ANY AND EVERY RIGHT EACH OF SELLER AND PURCHASER MAY HAVE TO (A) INJUNCTIVE RELIEF (EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT TO THE CONTRARY), (B) A TRIAL BY JURY, (C) INTERPOSE ANY COUNTERCLAIM THEREIN (EXCEPT FOR ANY COMPULSORY COUNTERCLAIM WHICH, IF NOT ASSERTED IN SUCH SUIT, ACTION OR PROCEEDING, WOULD BE WAIVED), AND (D) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING.

29.    Independent Counsel; Attorneys' Fees.

29.1    Seller and Purchaser each acknowledge that: (a) they have been represented by independent counsel in connection with this Agreement; (b) they have executed this Agreement with the advice of such counsel; and (c) this Agreement is the result of negotiations between the Parties hereto and the advice and assistance of their respective counsel.  This Agreement was prepared jointly by Seller's and Purchaser's respective counsel no uncertainty or ambiguity in this Agreement shall be construed against either Party on account of its counsel having prepared this Agreement.

29.2    In connection with any litigation, including appellate proceedings, initiated by a Party hereto against the other Party hereto and arising out of this Agreement or any instrument or document executed pursuant hereto, the Party adjudicated to be the substantially prevailing Party shall be entitled to recover reasonable attorneys' fees and disbursements from the other Party.

29.3    The provisions of this Article 29 shall survive the Closing or the termination of this Agreement.

30.    <u>Non-Liability</u>.  Notwithstanding anything to the contrary contained in this Agreement, none of the Seller Related Parties shall have any personal obligation or liability hereunder, and Purchaser shall not seek to assert any claim or enforce any of its rights hereunder against any of the Seller Related Parties.

31.    <u>Tax Deferred Exchange</u>.  Notwithstanding anything to the contrary set forth herein, Seller may take such steps as Seller shall deem necessary or desirable to qualify the sale of the Property (or any portion thereof) under Section 1031 of the Code, including (a) the use of, and/or assignment of this Agreement to, a "qualified intermediary" within the meaning of Treasury Regulations § 1.1031(k)-1(g)(4), (b) the use of any other multiparty arrangement described in Treasury Regulations § 1.1031(k) l(g) and/or in accordance with revenue procedure 2000-37, and/or (c) the assignment of the right to receive proceeds from the sale of the Property (a "1031 Transaction").   Purchaser shall comply with all requests of Seller in effectuating a 1031 Transaction, so long as (i) such transaction does not increase the Purchase Price, (ii) such transaction will not delay the Closing or otherwise affect the Closing and (iii) there is no additional loss, cost, damage, tax, expense or consequence incurred by Purchaser resulting from, or in connection with, such transaction.  The provisions of this <u>Article 31</u> shall survive the Closing or earlier termination of this Agreement.

32.    <u>Other Provisions and Rules of Construction</u>.  The words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The word "including" shall be deemed to be followed by the words "without limitation."  The terms defined in the singular shall have comparable meaning when used in the plural and vice-versa.  All references to "Section" or "Sections," "Paragraph" or "Paragraphs," "Clause" or "Clauses," "Schedule" or "Schedules" or "Exhibit" or "Exhibits" refer to the corresponding Sections, Paragraphs, Clauses, Schedules or Exhibits of this Agreement unless otherwise indicated.  The Parties acknowledge that they were represented by their own separate counsel in connection with the negotiation and drafting of this Agreement and that neither this Agreement nor any of the terms and provisions hereof shall be subject to the principle of construing its or their meaning against the Party which drafted the same.  In the event the provisions of this Agreement provide for the performance of an obligation by Purchaser or Seller on a day other than a Business Day, then the time for the performance of such obligation shall be automatically adjourned to the first (1st) Business Day immediately succeeding the day on which such obligation would otherwise be required to be performed.  In the event the provisions of this Agreement provide that Purchaser or Seller shall have the right to adjourn the performance of an obligation by Purchaser or Seller, as applicable, to a day that is other than a Business Day, then Purchaser or Seller, as applicable, shall have the right to adjourn the time for the performance of such obligation to the first (1st) Business Day immediately succeeding the day on which such adjourned obligation would otherwise be required to be performed.

[Signatures Follow on Next Page]

DM_US 160470241-8.105320.0013

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the day and year first above written.

SELLER:

ELLETT BROTHERS, LLC,
a South Carolina limited liability company

By: _____
    Name: *Dalton Edgecomb*
    Title: *Chief Restructuring Officer*

PURCHASER:

E BROTHERS LTD.,
an Ohio limited liability company

By: _____
    Name:
    Title:

[Signature Page to Agreement of Purchase and Sale]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the day and year first above written.

SELLER:

ELLETT BROTHERS, LLC,
a South Carolina limited liability company

By:_____
    Name:
    Title:

PURCHASER:

E BROTHERS LTD.,
an Ohio limited liability company

By:_____
    Name: *Matthew H Robinson*
    Title: *Manager*

[Signature Page to Agreement of Purchase and Sale]

SOLELY FOR THE PURPOSES OF
CONFIRMING RECEIPT OF THE
DOWNPAYMENT AND THE OBLIGATIONS
OF ESCROW AGENT HEREUNDER,
INCLUDING SECTION 24:


ESCROW AGENT:

BLUE JACKET TITLE, LTD.
d/b/a Scout Title

By: _____
    Name: Gabriel D. Wickline
    Title: Authorized Representative

[Signature Page to Agreement of Purchase and Sale]

## SCHEDULE 3.1.6

### Contracts

1.  Elevator Maintenance Contract dated as of October 25, 2018 between United Sporting Companies, Inc. and Schindler Elevator Corporation

2.  Electricity Purchase Contract dated as of November 14, 2018 between Ellett Brothers, LLC and Interstate Gas Supply, Inc.

3.  Natural Gas Purchase Contract dated as of November 14, 2018 between Ellett Brothers, LLC and Interstate Gas Supply, Inc.

4.  Sprinkler & Systems Contract dated as of November 14, 2018 between Ellett Brothers, LLC and A1 Sprinkler & Systems Integration, LLC

5.  Preventive Maintenance Agreement dated August 2, 2018 between Ellett Brothers, LLC and Applied Mechanical Systems, Inc.

6.  Services Agreement dated September 11, 2018 between United Sporting Companies, Inc. and Presidio Networked Solutions Group, LLC

7.  Water, Sanitary Sewer and Refuse Service Contract dated August 1, 2018 between Ellett Brothers, LLC and the Department of Public Utilities, Bellefontaine, OH

8.  Internet Service Contract dated July 16, 2018 between United Sporting Companies, Inc. and CenturyLink Sales Solutions, Inc.

## EXHIBIT A

## Legal Description of the Land

**Parcel I:**

The following described real estate situated in the State of Ohio, County of Logan, Township of Lake and being part of Virginia Military Surveys 2873 and 5245 and Section 36, Town 4, Range 14 in the City of Bellefontaine and more particularly described as follows:

Beginning at an 0.625 inch iron bar found in the Ludlow Line at the northeast corner of Columbian Heights Addition;

Thence with the north line of said Columbian Heights Addition and the north line of a 14.56 acre tract conveyed to Discon Services, Inc. as described in O.R. Vol. 13 Page 156 N. 79 degrees 55'19" W. 700.00 feet to a 0.625 inch iron bar set (this bearing is assumed and all other bearings are from angles and distances measured in the field survey.)

Thence N. 10 degrees 04'41" E. 656.08 feet to a 0.625 inch iron bar set.

Thence N. 25 degrees 12'30" E. 107.66 feet to a 0.625 inch iron bar set.

Thence S. 79 degrees 55'19" E. 513.48 feet to a 0.625 inch iron bar set in the west right of way line of Hunter Place.

Thence with said west right of way line on a curve to the left with a radius of 80.00 feet, an arc length of 102.18 feet long chord bearing S. 48 degrees 30'35" E. 95.37 feet to a 0.625 inch iron bar set.

Thence continuing with said west right of way line on a curve to the right with a radius of 30.00 feet, an arc length of 44.39 feet, long chord bearing S. 42 degrees 42'25" E., 40.45 feet to a 0.625 inch iron bar set.

Thence continuing with the said west right of way line S. 00 degrees 18'54" E. 697.27 feet to a 0.625 inch iron bar set, passing a 0.625 inch iron bar set in the common line of V.M.S. 2873 and 5245 at 511.60 feet.

Thence N. 79 degrees 55'19" W. 80.98 feet to the point of beginning.

Containing 12.277 acres more or less.

The above described 12.277 acre tract having 2.029 acres in VMS 2873, 0.397 acres in VMS 5245 and 9.851 acres in Section 36, Town 4, Range 14.

EXCEPTING THEREFROM the following described real estate:

Situated in the State of Ohio, County of Logan Township of Lake being part of Virginia Military Survey 5245 in the City of Bellefontaine and more particularly described as follows:

Beginning at a 0.625 inch iron bar found in the Ludlow Line at the northeast corner of Columbian Heights Addition;

Thence with said Ludlow Line, N. 9 degrees 16'39" W. 187.84 feet to a stone found.

Thence with the common east-west line of Virginia Military Surveys 2873 and 5245 S. 82 degrees 44'20" E. 109.87 feet to a 0.625 inch bar set in the west right of way line of Hunter Place.

Thence with said west right of way line S. 0 degrees 18'54" E. 185.67 feet to a 0.625 inch iron bar set at the projection of the north line of said Columbian Heights Addition.

Thence along said projection N. 79 degrees 55'19" W. (this bearing is assumed and all other bearings are from angles and distances measured in this field survey) 80.98 feet to the place of beginning.

Containing 0.397 acres more or less and being in V.M.S. 5245.  Leaving after exception 11.88 acres more or less.

Parcel # 17-077-00-00-023.001 (2.029 AC, VMS 2873)
Parcel # 17-077-00-00-025.001 (9.851 AC, Section 36-4-14)

## **Parcel II:**

Situated in the State of Ohio, County of Logan Township of Lake being part of Virginia Military Survey 5245 in the City of Bellefontaine and more particularly described as follows:

Beginning at a 0.625 inch iron bar found in the Ludlow Line at the northeast corner of Columbian Heights Addition;

Thence with said Ludlow Line, N. 9 degrees 16'39" W. 187.84 feet to a stone found.

Thence with the common east-west line of Virginia Military Surveys 2873 and 5245 S. 82 degrees 44'20" E. 109.87 feet to a 0.625 inch bar set in the west right of way line of Hunter Place.

Thence with said west right of way line S. 0 degrees 18'54" E. 185.67 feet to a 0.625 inch iron bar set at the projection of the north line of said Columbian Heights Addition.

Thence along said projection N. 79 degrees 55'19" W. (this bearing is assumed and all other bearings are from angles and distances measured in this field survey) 80.98 feet to the place of beginning.

Containing 0.397 acres more or less and being in V.M.S. 5245.

Parcel # 17-077-20-03-009.001

**EXHIBIT B**

**Form of Bill of Sale**

**BILL OF SALE**

KNOW ALL MEN BY THESE PRESENTS, that on this ___ day of _____, 2019, ELLETT BROTHERS, LLC, a South Carolina limited liability company ("**Seller**"), for good and valuable consideration paid by E BROTHERS LTD., an Ohio limited liability company ("**Purchaser**"), hereby grants, bargains, sells, conveys, sets over, transfers, assigns and delivers to Purchaser, its successors and assigns, all of Seller's right, title and interest in and to those certain fixtures, equipment and articles of personal property set forth on <u>Schedule I</u> hereof and attached to, located on or in, or used in connection with the ownership, operation, management or maintenance of, the land and improvements located at and commonly known as, 1 Hunter Place, Bellefontaine, Ohio (collectively, the "**Personal Property**"), together with all of Seller's right, title and interest in and to all unexpired warranties and guaranties affecting the Personal Property, in each case to the extent legally transferrable.

TO HAVE AND TO HOLD the same unto Purchaser, its successors and assigns to and for its own use and behalf forever.

This Bill of Sale shall be without representation or warranty by, and without recourse to, Seller.

IN WITNESS WHEREOF, Seller has caused these presents to be duly executed as of the date first set forth above.

SELLER:

ELLETT BROTHERS, LLC
a South Carolina limited liability company

By:_____
    Name:
    Title:

B-1

**SCHEDULE I**

**Personal Property**

**(Attached behind)**

DM_US 160470241-8.105320.0013

| Item # | Qty. | Equip # | Year | Make | Model | Serial # | Description |
|---|---|---|---|---|---|---|---|
| 1 | 1 | N/A | 2014 | STEEL KING | N/A | N/A | PICK MODULE, 3-LEVEL, 44'W X 212'L, CONSISTING OF:<br><br>(1) MEZZANINE STRUCTURE, 3-LEVEL; (82) SECTIONS CASE FLOW RACKING, 5-LEVELS H X 6-LANES DEEP X 96"W [2,460-LANES TOTAL]; (3) STAIR SYSTEMS; ASSORTED SAFETY GATES |
| 2 | 1 | N/A | 2014 | DEMATIC | N/A | N/A | AUTOMATED ORDER FULFILLMENT SYSTEM, CONSISTING OF:<br><br>(1) DEMATIC MULTI SHUTTLE AUTOMATIC STORAGE AND RETRIEVAL SYSTEM, 180'L, 17-LEVEL HIGH, 2-AISLE, 2-POSITION PER AISLE, 600-MM X 400-MM X 325-MM MAXIMUM LOAD SIZE, W/ (2) PICK AND PLACE UNITS, TOUCHSCREEN PROGRAMMABLE LOGIC CONTROL; (4) PUTT WALLS, EACH W/ VISUALIZATION SYSTEM, (2) 32" LCD MONITORS, 24"W X 40' LONG ROLLER CONVEYOR, GRAVITY FED; (6) POSITION DECANTING AREA, EACH W/ LCD MONITOR, BAR CODE SCANNER, LABEL PRINTER; (2) TAPING STATIONS, EACH W/ 3M TOP AND BOTTOM CASE TAPER, SEALED AIR RAPID FILL AF1304 VOID FILL PACKAGING SYSTEM, LCD MONITOR, BAR CODE SCANNER, LABEL PRINTER, 24"W X 40' LONG ROLLER CONVEYOR, GRAVITY FED; (29) PACKAGING STATIONS, EACH W/ LCD MONITOR, BAR CODE SCANNER, LABEL PRINTER, BETTER PACK 500 TAPE SHOOTER; (4) SHIPPING LANES, EACH W/ LCD MONITOR, BAR CODE SCANNER, LABEL PRINTER, BETTER PACK 500 TAPE SHOOTER; (2) NESTAFLEX 24"W FLEXIBLE EXTENDABLE POWER ROLLER CONVEYOR; (3) LONG GUN PICK STATIONS, EACH W/ VISUALIZATION SYSTEM; (1) 7200'L X 24"W POWER CONVEYOR, ROLLER AND BELT TYPE |
| 3 | LOT | N/A | N/A | N/A | N/A | N/A | MISCELLANEOUS MATERIAL HANDLING EQUIPMENT, INCLUDING BUT NOT LIMITED TO:<br>(350) PALLET RACKING SECTIONS, HEAVY DUTY TYPE, 48"D X 96"W X 15'H |
| 4 | LOT | N/A | 2014 | STEEL KING | N/A | N/A | MISCELLANEOUS MATERIAL HANDLING EQUIPMENT, INCLUDING BUT NOT LIMITED TO: APPROXIMATELY (1,700) LINEAR FEET PALLET RACKING, HEAVY DUTY TYPE, 20'H X 48"D |
| 5 | LOT | N/A | 2014 | STEEL KING | N/A | N/A | MISCELLANEOUS MATERIAL HANDLING EQUIPMENT, INCLUDING BUT NOT LIMITED TO: APPROXIMATELY (4,200) LINEAR FEET PALLET RACKING, HEAVY DUTY TYPE, 24'H X 42"D |
| 6 | LOT | N/A | 2014 | STEEL KING | N/A | N/A | MISCELLANEOUS MATERIAL HANDLING EQUIPMENT, INCLUDING BUT NOT LIMITED TO: (52) PALLET RACKING SECTIONS, HEAVY DUTY, 48"D X 96"L X 24'H, EACH 2-BAY WIDE X 2-BAY DEEP X 5-LEVEL HIGH; (1) PALLET FLOW LEVEL; (4) PUSH BACK LEVEL |
| 7 | LOT | N/A | 2014 | STEEL KING | N/A | N/A | MISCELLANEOUS MATERIAL HANDLING EQUIPMENT, INCLUDING BUT NOT LIMITED TO: (119) PALLET RACKING SECTIONS, HEAVY DUTY, 48"D X 96"L X 16'H [LONG GUN STORAGE] |
| 8 | 1 | N/A | 2013 | SACKETT SYSTEMS | HHA24-2-DSV-REFURV1 | 20132204 | BATTERY HANDLER, 10,000-LB CAPACITY, HYDRAULIC, SELF-PROPELLED, PNEUMATIC BATTERY EXTRACTOR, W/ 2-LEVEL, 20-POSITION CHARGER STORAGE RACK |
| 9 | 1 | N/A | 2014 | ADVANCE | CS7000-48B | 1000053610 | FLOOR SWEEPER/SCRUBBER, ELECTRIC |
| 10 | LOT | N/A | 2014 | N/A | N/A | N/A | MISCELLANEOUS SUPPORT EQUIPMENT, LOCATED IN MAINTENANCE SHOP, INCLUDING BUT NOT LIMITED TO: (1) 2014 JET J-3410 HORIZONTAL BAND SAW, 7" X 12", S/N 14035643; (1) 2014 MILLER BOBCAT 250 WELDER GENERATOR, CART MOUNTED, S/N ME030921R; (1) 2014 MILLER MILLERMATIC 140 ARC WELDER, S/N ME130676N; ASSORTED HAND TOOLS; POWER TOOLS; WELDING CARTS; STORAGE CABINETS; SAFETY EQUIPMENT |
| 11 | 1 | N/A | 2005 | KAESER | AS25 | 1184 | AIR COMPRESSOR, 25-HP, ROTARY SCREW TYPE, FULLY ENCLOSED, SKID MOUNTED, 3,548-HOURS INDICATED |
| 12 | 1 | N/A | 2005 | KAESER | AS25 | 1187 | AIR COMPRESSOR, 25-HP, ROTARY SCREW TYPE, FULLY ENCLOSED, SKID MOUNTED, 5,418-HOURS INDICATED |
| 13 | 1 | N/A | 2005 | KAESER | TCH32 | 1037 | AIR DRYER, 110-SCFM, REFRIGERATED TYPE, W/ VERTICAL AIR RECEIVING TANK |

| Item # | Qty. | Equip # | Year | Make | Model | Serial # | Description |
|--------|------|---------|------|------|-------|----------|-------------|
| 14 | 1 | N/A | 2014 | GENIE | GS-2632 | GS3214A-148905 | SCISSOR LIFT, ELECTRIC |
| 15 | 1 | N/A | 2013 | PEARSON | CE25 | 2013CE2513447 | CASE ERECTOR, 25-CARTONS PER MINUTE, MAGAZINE TYPE CARTON FEEDER, ALLEN-BRADLEY PANELVIEW PLUS 400 PROGRAMMABLE LOGIC CONTROL, W/ 16"W X 20'L OUTFIELD CONVEYOR, SKATE WHEEL TYPE |
| 16 | 1 | N/A | 2013 | PEARSON | CE25 | 2013CE2513448 | CASE ERECTOR, 25-CARTONS PER MINUTE, MAGAZINE TYPE CARTON FEEDER, ALLEN-BRADLEY PANELVIEW PLUS 400 PROGRAMMABLE LOGIC CONTROL, W/ 16"W X 20'L OUTFIELD CONVEYOR, SKATE WHEEL TYPE |
| 17 | 1 | N/A | 2013 | HANEL | LEAN-LIFT 2460-825 ES31 | 422.582 | PARTS STORAGE AND RETRIEVAL SYSTEM, VERTICAL CAROUSEL TYPE, 66,150-LB MAXIMUM LOAD CAPACITY, ESTIMATED 10'W X 10'D X 20'H |
| 18 | 1 | N/A | 2006 | BALDOR | IDLC250-JD | 95982243 | GENERATOR, DIESEL FUELED, 250-KW, 313-KVA, W/ MODEL 6081HF001 DIESEL ENGINE, S/N PE6081H169771, FULLY ENCLOSED, MOUNTED ON FUEL TANK |
| 19 | 1 | N/A | 2013 | SP INDUSTRIES | CP-2101-HD | 13119299 | COMPACTOR, 2-CUBIC YARD CAPACITY, 50,900-PSI RAM FORCE, 46" X 57" OPENING |
| 20 | 1 | N/A | 2013 | SP INDUSTRIES | CP-3101-HD | 13119300 | COMPACTOR, 3-CUBIC YARD CAPACITY, 69,000-PSI RAM FORCE, 59" X 57" OPENING |
| 21 | 1 | N/A | 2013 | CATERPILLAR | 3465 | AFN01236 | GENERATOR, DIESEL FUELED, 750-KW, 938-KVA, W/ MODEL SR-4B DIESEL ENGINE, S/N 1EZ07975, FULLY ENCLOSED, MOUNTED ON FUEL TANK |
| 22 | 1 | N/A | 2013 | PTR | 7200HD | 135620 | BALER, VERTICAL HYDRAULIC TYPE, 72" X 36" X 48" BALE |
| 23 | LOT | N/A | N/A | N/A | N/A | N/A | MISCELLANEOUS SUPPORT EQUIPMENT THROUGHOUT FACILITY, INCLUDING BUT NOT LIMITED TO: (27) 2013 GLADIATOR BARCODE SCANNERS; (18) 2014 DT RESEARCH DT315CT RUGGED TABLETS;  (1) 16' X 32' X 9' IN-PLANT OFFICE; ASSORTED SHELVING; SAFETY CAGING; LADDERS; HAND PALLET JACKS; ROLLING STAIRWAYS; DOCK PLATES; DOCK LIGHTS; BANDING CARTS; TAPE MACHINES; LABEL PRINTERS |
| 24 | 1 | 55 | 2012 | PACK MULE | SC775-6CA | SC4426 | STOCK CHASER, ELECTRIC, RIDER TYPE, 1,000-LB DECK CAPACITY, 2,000-LB TOWING CAPACITY |
| 25 | 1 | 54 | 2012 | PACK MULE | SC775-6CA | SC4908 | STOCK CHASER, ELECTRIC, RIDER TYPE, 1,000-LB DECK CAPACITY, 2,000-LB TOWING CAPACITY |
| 26 | 1 | 53 | 2012 | PACK MULE | SC775-6CA | SC4428 | STOCK CHASER, ELECTRIC, RIDER TYPE, 1,000-LB DECK CAPACITY, 2,000-LB TOWING CAPACITY |
| 27 | 1 | 52 | 2012 | PACK MULE | SC775-6CA | SC4424 | STOCK CHASER, ELECTRIC, RIDER TYPE, 1,000-LB DECK CAPACITY, 2,000-LB TOWING CAPACITY |
| 28 | 1 | 5 | 2006 | PACK MULE | SC775-6SA | SC2830 | STOCK CHASER, ELECTRIC, RIDER TYPE, 1,000-LB DECK CAPACITY, 2,000-LB TOWING CAPACITY |
| 29 | 1 | 13 | 2012 | PACK MULE | SC775-6CA | SC4194 | STOCK CHASER, ELECTRIC, RIDER TYPE, 1,000-LB DECK CAPACITY, 2,000-LB TOWING CAPACITY |
| 30 | 1 | 11 | 2012 | PACK MULE | SC775-6CA | SC4195 | STOCK CHASER, ELECTRIC, RIDER TYPE, 1,000-LB DECK CAPACITY, 2,000-LB TOWING CAPACITY |
| 31 | 1 | 56 | 2012 | PACK MULE | SC775-6CA | SC4430 | STOCK CHASER, ELECTRIC, RIDER TYPE, 1,000-LB DECK CAPACITY, 2,000-LB TOWING CAPACITY |
| 32 | 1 | 57 | 2012 | PACK MULE | SC775-6CA | SC4425 | STOCK CHASER, ELECTRIC, RIDER TYPE, 1,000-LB DECK CAPACITY, 2,000-LB TOWING CAPACITY |
| 33 | 1 | 16 | 2012 | PACK MULE | SC775-6CA | SC4318 | STOCK CHASER, ELECTRIC, RIDER TYPE, 1,000-LB DECK CAPACITY, 2,000-LB TOWING CAPACITY |
| 34 | 1 | 24 | 2012 | PACK MULE | SC775-6CA | SC4319 | STOCK CHASER, ELECTRIC, RIDER TYPE, 1,000-LB DECK CAPACITY, 2,000-LB TOWING CAPACITY |
| 35 | 1 | 23 | 2012 | PACK MULE | SC775-6CA | SC4321 | STOCK CHASER, ELECTRIC, RIDER TYPE, 1,000-LB DECK CAPACITY, 2,000-LB TOWING CAPACITY |
| 36 | 1 | 26 | 2012 | PACK MULE | SC775-6CA | SC4806 | STOCK CHASER, ELECTRIC, RIDER TYPE, 1,000-LB DECK CAPACITY, 2,000-LB TOWING CAPACITY |
| 37 | 1 | 51 | 2012 | PACK MULE | SC775-6CA | SC4807 | STOCK CHASER, ELECTRIC, RIDER TYPE, 1,000-LB DECK CAPACITY, 2,000-LB TOWING CAPACITY |
| 38 | 1 | 31 | 2008 | CROWN | SC4540-40 | 9A158141 | FORK TRUCK, 4,000-LB CAPACITY, ELECTRIC POWERED |
| 39 | 1 | 70 | 2005 | MITSUBISHI | FB20KT | EFB5B50434 | LIFT TRUCK, 4,000-LB CAPACITY, ELECTRIC POWERED, 3-WHEEL |
| 40 | 1 | 51 | 1999 | RAYMOND | EAS- | EASI99BC22941 | ORDER PICKER, 3,000-LB CAPACITY, ELECTRIC POWERED, 204" MAXIMUM LIFT HEIGHT |
| 41 | 1 | 24 | 2009 | JUNGHEINRICH | ECR327 | 90364343 | PALLET JACK, 6,000-LB CAPACITY, RIDER TYPE, ELECTRIC POWERED |
| 42 | 1 | 69 | 2000 | CROWN | SC4040-40TT | 9A112179 | LIFT TRUCK, 4,000-LB CAPACITY, ELECTRIC POWERED |
| 43 | 1 | 6 | N/A | CROWN | SC4540-40 | 9A152882 | LIFT TRUCK, 4,000-LB CAPACITY, ELECTRIC POWERED |
| 44 | 1 | 52 | 1999 | RAYMOND | EAS-OPC30TT | EASI99BC23735 | ORDER PICKER, 3,000-LB CAPACITY, ELECTRIC POWERED, 204" MAXIMUM LIFT HEIGHT |
| 45 | 1 | 15 | 2014 | CROWN | SP4050-30 | 1A409852 | ORDER PICKER, 3,000-LB CAPACITY, ELECTRIC POWERED, 366" MAXIMUM LIFT HEIGHT, 4,500-HOURS REPORTED |

| Item # | Qty. | Equip # | Year | Make | Model | Serial # | Description |
|--------|------|---------|------|------|-------|----------|-------------|
| 46 | 1 | 12 | 2014 | CROWN | SP4050-30 | 1A709921 | ORDER PICKER, 3,000-LB CAPACITY, ELECTRIC POWERED, 366" MAXIMUM LIFT HEIGHT, 4,658-HOURS REPORTED |
| 47 | 1 | 11 | 2014 | CROWN | SP4050-30 | 1A409994 | ORDER PICKER, 3,000-LB CAPACITY, ELECTRIC POWERED, 366" MAXIMUM LIFT HEIGHT, 5,233-HOURS REPORTED |
| 48 | 1 | 13 | 2014 | CROWN | SP4050-30 | 1A410069 | ORDER PICKER, 3,000-LB CAPACITY, ELECTRIC POWERED, 366" MAXIMUM LIFT HEIGHT, 5,173-HOURS REPORTED |
| 49 | 1 | 9 | 2014 | CROWN | SP4050-30 | 1A410131 | ORDER PICKER, 3,000-LB CAPACITY, ELECTRIC POWERED, 366" MAXIMUM LIFT HEIGHT, 5,304-HOURS REPORTED |
| 50 | 1 | 14 | 2014 | CROWN | SP4050-30 | 1A410132 | ORDER PICKER, 3,000-LB CAPACITY, ELECTRIC POWERED, 366" MAXIMUM LIFT HEIGHT, 4,850-HOURS REPORTED |
| 51 | 1 | 1 | 2014 | CROWN | RM6025-45 | 1A411837 | LIFT TRUCK, 4,500-LB CAPACITY, NARROW AISLE REACH TYPE, ELECTRIC POWERED, 400" MAXIMUM LIFT HEIGHT, 1,312-HOURS REPORTED |
| 52 | 1 | 3 | 2014 | CROWN | RM6025-45 | 1A411838 | LIFT TRUCK, 4,500-LB CAPACITY, NARROW AISLE REACH TYPE, ELECTRIC POWERED, 400" MAXIMUM LIFT HEIGHT, 1,902-HOURS REPORTED |
| 53 | 1 | 2 | 2014 | CROWN | RM6025-45 | 1A411839 | LIFT TRUCK, 4,500-LB CAPACITY, NARROW AISLE REACH TYPE, ELECTRIC POWERED, 400" MAXIMUM LIFT HEIGHT, 1,902-HOURS REPORTED |
| 54 | LOT | N/A | N/A | N/A | N/A | N/A | MISCELLANEOUS SUPPORT EQUIPMENT, INCLUDING BUT NOT LIMITED TO: (25) LIFT TRUCK BATTERY CHARGERS, ASSORTED |
| 55 | 1 | 7 | 2006 | PACK MULE | SC750-CD | SC2930 | STOCK CHASER, ELECTRIC, RIDER TYPE, 1,000-LB DECK CAPACITY, 2,000-LB TOWING CAPACITY |
| 56 | 1 | 16 | 2015 | CROWN | SP4050-30 | 1A440513 | ORDER PICKER, 3,000-LB CAPACITY, ELECTRIC POWERED, 366" MAXIMUM LIFT HEIGHT, 1,653-HOURS REPORTED |
| 57 | 1 | 17 | 2015 | CROWN | SP4050-30 | 1A440514 | ORDER PICKER, 3,000-LB CAPACITY, ELECTRIC POWERED, 366" MAXIMUM LIFT HEIGHT, 1,813-HOURS REPORTED |
| 58 | 1 | 18 | 2015 | CROWN | SP4050-30 | 1A434395 | ORDER PICKER, 3,000-LB CAPACITY, ELECTRIC POWERED, 366" MAXIMUM LIFT HEIGHT, 1,645-HOURS REPORTED |
| 59 | 1 | 19 | 2015 | CROWN | SP4050-30 | 1A433257 | ORDER PICKER, 3,000-LB CAPACITY, ELECTRIC POWERED, 366" MAXIMUM LIFT HEIGHT, 1,390-HOURS REPORTED |
| 60 | 1 | 20 | 2015 | CROWN | SP4050-30 | 1A433776 | ORDER PICKER, 3,000-LB CAPACITY, ELECTRIC POWERED, 366" MAXIMUM LIFT HEIGHT |
| 61 | 1 | 21 | 2015 | CROWN | SP4050-30 | 1A433777 | ORDER PICKER, 3,000-LB CAPACITY, ELECTRIC POWERED, 366" MAXIMUM LIFT HEIGHT |
| 62 | 1 | N/A | 2009 | HIGHLIGHT | PREDATOR XS | N/A | PALLET STRETCH WRAPPER |

## EXHIBIT C

### Form of FIRPTA Affidavit

Section 1445 of the Internal Revenue Code of 1986 as amended (the "Code") provides that a transferee of a United States real property interest ("USRPI") must withhold tax if the transferor is a foreign person.  For U.S. tax purposes (including section 1445), the owner of a disregarded entity (which has legal title to a USRPI under local law) will be the transferor of the property and not the disregarded entity. To inform the transferee that withholding of tax is not required upon the disposition of a USRPI by ELLETT BROTHERS, LLC ("Transferor"), the undersigned hereby certifies the following:

Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Code and Income Tax Regulations);

Transferor is not a disregarded entity as defined in § 1.1445-2(b)(2)(iii);

Transferor's U.S. employer identification number is 57-0957069; and

Transferor's office address is 267 Columbia Avenue, Chapin, South Carolina 29036.

Transferor understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury I declare that I have examined this certification and to my knowledge and belief it is true, correct, and complete, and I further declare that I have authority to sign this document.

Date:  _____, 2019


**ELLETT BROTHERS, LLC**


By:_____
    Name:
    Title:

**EXHIBIT D**

Form of Sale Procedures Order

See attached.