## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>SPORTCO HOLDINGS, INC., *et al.,*<br><br>      Debtors. | Chapter 11<br><br>Case No. 19-11299 (LSS)<br>(Jointly Administered) |
| RONALD FRIEDMAN, as trustee for the<br>SportCo Creditors' Liquidation Trust,<br><br>      Plaintiff,<br><br>v.<br><br>WELLSPRING CAPITAL MANAGEMENT,<br>LLC, WELLSPRING CAPITAL PARTNERS IV,<br>L.P., WCM GENPAR IV, L.P., WCM GENPAR<br>IV GP, LLC, ALEXANDER E. CARLES,<br>WILLIAM F. DAWSON, JR., JOHN E.<br>MORNINGSTAR, and BRADLEY JOHNSON,<br><br>      Defendants. | Adversary Proc. No. |

## COMPLAINT

Ronald Friedman (the "Trustee"), as trustee for the SportCo Creditors' Liquidation Trust (the "Liquidation Trust"), by and through his undersigned attorneys, hereby brings this action against (1) Wellspring Capital Management LLC; (2) Wellspring Capital Partners IV, L.P.; (3) WCM GenPar IV, L.P.; (4) WCM GenPar IV GP, LLC (collectively, Wellspring Capital Management LLC, Wellspring Capital Partners IV, L.P., WCM GenPar IV, L.P., and WCM GenPar IV GP, LLC are referred to as "Wellspring Capital"); and (5) Alexander E. Carles, William F. Dawson, Jr., John E. Morningstar, and Bradley Johnson (collectively, the "D&O Defendants"), and alleges as follows:

## **NATURE OF THE ACTION**

1.      SportCo Holdings, Inc. and its subsidiaries (collectively, "SportCo" or the "Debtors"),[1] owing hundreds of millions of dollars to their creditors, filed for bankruptcy on June 10, 2019 (the "Petition Date").

2.      What led to the Chapter 11 filing was a pattern and practice of self-dealing and gross mismanagement by Wellspring Capital and the D&O Defendants, which saw both groups profit handily, ultimately at the expense of SportCo's creditors and other stakeholders.

3.      After acquiring the Debtors in 2008, Wellspring Capital and the D&O Defendants saddled SportCo and the other Debtors with hundreds of millions of debt in 2012 and 2013. Wellspring Capital then commanded, and the D&O Defendants authorized, the Debtors to dividend more than $200,000,000 to Wellspring Capital and other unknown parties.

4.      Once Wellspring Capital siphoned the vast majority of the Debtors' operating capital out of the companies, it left the D&O Defendants in charge of the Debtors.  Tasked with that responsibility, the D&O Defendants further exacerbated the Debtors' financial issues by treating the Debtors' assets like a personal slush fund.

5.      Among other things, the D&O Defendants used SportCo's nominal assets to pay bonuses to themselves and the employees of another, unrelated Wellspring-Capital-owned company, and also spent SportCo's funds on lavish trips to golf courses and resorts in Argentina, Finland, and Bermuda, unrelated to any business purpose.

---

[1] *See In re SportCo Holdings, Inc., et al.*, Case No. 19-11299 (LSS) (the "Delaware Bankruptcy Cases"). The other Debtors in the Delaware Bankruptcy Cases are: Ellett Brothers, LLC United Sporting Company, Inc. Bonitz Brothers, Inc.; Ellett Brothers, LLC; Evans Sports, Inc.; Jerry's Sports, Inc.; Outdoor Sports Headquarters, Inc.; Quality Boxes, Inc.; Simmons Guns Specialties, Inc.; SportCo Holdings, Inc.; and United Sporting Companies, Inc.

6.      As a result of the D&O Defendants' reckless spending over a few years' period, the Debtors became hopelessly insolvent.  So much so that the Debtors could no longer afford to pay quarterly interest on the loans that Wellspring Capital and the D&O Defendants strapped the Debtors with in 2012 and 2013.

7.      In an effort to avoid being held accountable for prior misuse of funds and to preserve their ability to continue to misuse the Debtors' funds for personal, non-business purposes, the D&O Defendants, at the behest of Wellspring Capital, pitched an asset acquisition opportunity that they claimed would save the Debtors.

8.      The D&O Defendants convinced the Debtors' lenders to allow them to spend what precious little cash the Debtors had left—$7,000,000—to acquire the assets of a bankrupt competitor, AcuSport Corporation ("AcuSport").  The D&O Defendants claimed that the "synergies" arising from the deal would quickly reap millions in cash for the Debtors, and would increase the Debtors' revenues by hundreds of millions of dollars.

9.      However, in reality, the D&O Defendants knew little about the company they were proposing that the Debtors buy.

10.     The D&O Defendants conducted minimal diligence in deciding to pursue the transaction—further evidence that the transaction was, in reality, a scheme to delay payments of quarterly interest the Debtors owed to their lenders, and not entered into for a legitimate business purpose.

11.     For example, the D&O Defendants conducted such little diligence that they were surprised to learn after the transaction closed that the Debtors (firearm distributors whose business, in large part, involves the storage of firearms) would incur hundreds of thousands of dollars of

additional costs in connection with obtaining permits to store their merchandise (firearms) at a new facility the Debtors had acquired as part of the transaction.

12.     The D&O Defendants' failure to adequately research and diligence the transaction they pitched to the Debtors' lenders had unexpected consequences when the transaction closed in summer 2018: (1) the Debtors incurred millions in unexpected (but easily anticipated and foreseeable) costs and delays associated with integrating the Debtors with the business the Debtors acquired; (2) the Debtors failed to realize the expected revenue gains that the D&O Defendants pitched as a central reason for entering into the transaction in the first place; and (3) the D&O Defendants substantially misvalued the inventory they believed the Debtors were purchasing—the Debtors recovered approximately *$139,000* in inventory, which the D&O Defendants initially pitched as valued at *$14,000,000*.

13.     The transaction was such a failure that, after it closed, one of the Debtors' financial advisors estimated the Debtors' purchase of AcuSport was "a marginal investment" that had resulted in "0 incremental sales dollars" and "an added $2.3 million in costs to pay the sales force."

14.     The failed transaction left the Debtors without cash.  Quickly, the Debtors' vendors began to withhold shipments and/or reduce the Debtors' credit lines to zero.  Also, the interest payments the Debtors' lenders had waived in the beginning of 2018 were set to restart at the end of the fourth quarter of 2018.

15.     With no money and significant interest payments coming due, the Debtors were forced to negotiate with their lenders to restructure their debt to avoid sending SportCo into bankruptcy.

16.    In late 2018, the Debtors and their lenders entered into negotiations to restructure the Debtors' balance sheet.  By the end of December 2018, the Debtors and their lenders had nearly reached an agreement on the debt restructuring.

17.    Under the proposed debt restructuring agreement, one of the Debtors' lenders would forgive a substantial part of its loan in exchange for significant equity in the company.  The deal would correspondingly reduce Wellspring Capital's ownership interest.

18.    The debt restructuring agreement, as principally agreed to between the Debtors and their lenders, would have permitted the Debtors to continue to operate as a going concern and most importantly would have preserved value for the Debtors' estates.  The debt restructuring agreement was in the Debtors' best interests.

19.    However, on December 26, 2018, after the Debtors and their lenders reached an agreement in principle to restructure the Debtors' balance sheet—and a day before the Debtors were set to default on their pre-petition loan covenants—the Debtors, at the behest of Wellspring Capital and the D&O Defendants, refused to sign the agreement without a broad release and indemnification for the benefit of Wellspring Capital and the D&O Defendants.

20.    The lenders, believing, among other things, that the releases served no business purpose, refused to agree to any such broad releases or indemnification for Wellspring Capital and the D&O Defendants.

21.    When Wellspring Capital and the D&O Defendants realized they would not receive releases from any potential claims against them under the proposed debt restructuring, they abandoned the restructuring and plunged the Debtors into a freefall bankruptcy.

22.    Once the Debtors were rendered insolvent, the Debtors' creditors gained standing to pursue the D&O Defendant's breaches of their fiduciary duties to the Debtors.  The Liquidating

Trustee now brings this action against Wellspring Capital and the D&O Defendants to recover on the claims Wellspring Capital and the D&O Defendants so desperately tried to avoid.

## PARTIES AND RELATED ENTITIES

23.    Plaintiff Ronald Friedman, a citizen of New York, is the Trustee for the Liquidation Trust.  The Liquidation Trust was formed pursuant to the Fourth Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation (the "Plan of Liquidation") filed in the Delaware Bankruptcy Cases.  Pursuant to Section VIII(D) of the Plan of Liquidation, the Debtors transferred certain causes of action, including those asserted herein, to the Liquidation Trust.

24.    Defendant Wellspring Capital Management LLC is a Delaware limited liability company with its principal place of business at 390 Park Avenue, New York, New York 10022.  At all times relevant to these claims, Wellspring Capital controlled (a) Wellspring Capital Partners IV, L.P. ("Wellspring IV"), the largest shareholder of SportCo, (b) SportCo's and its subsidiaries' boards of directors, and (c) the Debtors and their subsidiaries.  Furthermore, at all times relevant hereto, Wellspring Capital served as the manager of SportCo pursuant to the terms of a management agreement.

25.    Defendant Wellspring IV is a New York limited partnership with its principal place of business at 390 Park Avenue, New York, New York 10022.  Wellspring IV was, at all relevant times, SportCo's private equity sponsor and largest shareholder, holding a controlling ownership stake in SportCo.

26.    Defendant WCM GenPar IV, L.P. is a New York limited partnership with its principal place of business at 390 Park Avenue, New York, New York 10022.  WCM GenPar IV, L.P. is the general partner of Wellspring IV.

-6-

27.     Defendant WCM GenPar IV GP, LLC is a New York limited liability company with its principal place of business at 390 Park Avenue, New York, New York 10022.  WCM GenPar IV GP, LLC is the general partner of WCM GenPar IV, L.P.

28.     Defendant Alexander E. Carles ("Carles") is an individual who at all relevant times was a Managing Partner of Wellspring Capital.  Carles also served as an officer and director of SportCo and its subsidiaries.  Upon information and belief, Carles is a citizen and resident of the State of Connecticut.

29.     Defendant William F. Dawson, Jr. ("Dawson") is an individual who at all relevant times was the Chief Executive Officer of Wellspring Capital.  Dawson also served as a director of SportCo and its subsidiaries.  Upon information and belief, Dawson is a citizen and resident of the State of New York.

30.     Defendant John E. Morningstar ("Morningstar") is an individual who at all relevant times was a Managing Partner of Wellspring Capital.  Morningstar also served as a director of SportCo and its subsidiaries.  Upon information and belief, Morningstar is a citizen and resident of the State of Connecticut.

31.     Defendant Bradley Johnson ("Johnson") is an individual who, at all relevant times, was the President and Chief Executive Officer of SportCo and its subsidiaries.

32.     SportCo is a Delaware corporation that had its principal place of business in Chapin, South Carolina.  SportCo was the parent and 100% owner of Debtor United Sporting Company, Inc. ("United Sporting"), which, in turn, was the 100% owner of Ellett Brothers, LLC ("Ellett"), the principal operating company.

33.     United Sporting is a Delaware corporation that had its principal place of business and headquarters at 267 Columbia Avenue, Chapin, South Carolina.

34.     Ellett is a South Carolina limited liability company that had its principal place of business and headquarters at 267 Columbia Avenue, Chapin, South Carolina. Ellett was, at all relevant times, the parent company of various subsidiaries, each of which has its own chief executive officer and principal place of business in Chapin, South Carolina.

## JURISDICTION AND VENUE

35.     This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).  The claims asserted herein arise under 11 U.S.C. §§ 544 and 550 and/or relate to the Delaware Bankruptcy Case, a case under Title 11 of the U.S. Code.

36.     Venue lies in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

37.     This is a core proceeding.

## STATEMENT OF FACTS

**A.      A series of transactions in 2012 and 2013 Financially Destroyed the Debtors.**

38.     Ellett was founded 1933, in the midst of the Great Depression.  Initially, the company exclusively distributed fishing equipment.  In 1957, Ellett began distributing hunting and shooting sports products and outdoor accessories.  Since then, and until recently, those products made up Ellet's core business.

39.     Ellett operated successfully throughout the eighties and nineties and ultimately went public in June 1993, making its initial public offering at $9 a share.  At that time, Ellett employed 240 employees, all of whom were stationed at its headquarters in Chapin, South Carolina, the sole location of Ellett's operations.  The company survived and flourished through the 1990s.

40.     In 2008, Wellspring Capital, through its fund Wellspring IV, acquired Ellett (the "Wellspring Acquisition") and formed SportCo Holdings, Inc. as a holding company to hold United Sporting (Ellett's direct parent), Ellett, and Ellett's subsidiaries indirectly.

41.     Wellspring Capital and the D&O Defendants orchestrated a series of transactions in 2012 and 2013 that destroyed the Debtors financially and put them squarely on the road to insolvency.[2]

42.     On September 28, 2012, Wellspring Capital and the D&O Defendants caused SportCo to enter into (i) a Third Amended and Restated Loan and Security Agreement, and (ii) a Second Lien Loan and Security Agreement (the "2012 Second Lien Loan Agreement," and together with the Third Amended and Restated Loan and Security Agreement, the "2012 Loan Agreements").

43.     Pursuant to the 2012 Loan Agreements, certain lenders collectively loaned $280 million to SportCo (the "2012 Loan").  The proceeds from the 2012 Loan were wired to Ellett in South Carolina.  SportCo Holdings, Inc. and United Sporting, pursuant to certain guaranty agreements, each dated September 28, 2012, guaranteed amounts due under the 2012 Second Lien Loan Agreement.

44.     The Debtors used approximately $139.6 million of the loan proceeds to repay the borrowers' existing debts.

45.     The Debtors, at the direction of Wellspring Capital—which controlled the Debtors' board of directors—and the D&O Defendants used the remaining proceeds of the 2012 Loan to fund distributions (the "2012 Transfers") totaling $134,003,871.20 to Wellspring Capital and various unknown individuals.

---

[2] Although the 2012 and 2013 Transfers caused the Debtors' insolvency, pursuant to the Plan of Liquidation, they are not the subject of claims raised herein. Claims arising from the 2012 and 2013 Transfers, among others, have been raised in the action captioned *Ronald Friedman as trustee for the SportCo Creditors' Liquidation Trust v. Wellspring Capital Management et al.*, Case No. 19-112299 (LSS), Adversary No. 19-80071-dd currently pending in the Bankruptcy Court for the District of South Carolina (the "Carolina Complaint" or the "SC Action").

46.    On March 7, 2013, Prospect Capital Corporation ("Prospect"), SportCo, and other lenders entered into a First Amendment to Third Amended and Restated Loan and Security Agreement and Consent and a First Amended and Limited Consent (the "2013 Loan Agreements").  Pursuant to the 2013 Loan Agreements, Prospect provided an additional $60 million to SportCo (the "2013 Loan"). SportCo Holdings Inc. and United Sporting, pursuant to the First Amended and Limited Consent, agreed to guarantee repayment of the 2013 Loan.

47.    On or after the closing date of the loan, Ellett voluntarily transferred an additional $54,860,549.74 to Wellspring Capital and various individuals as cash distributions (the "2013 Transfers").

48.    The 2012 Transfer and 2013 Transfer siphoned nearly all of the Debtors' cash out of the Debtors.  As a result, the Debtors were financially crippled beginning in 2012 and eventually fell into a deepening insolvency through the Petition Date.

**B.    Wellspring Capital and the D&O Defendants used SportCo's assets for their own personal benefit.**

**1.    Wellspring Capital and the D&O Defendants conspire to transfer SportCo's funds to cover expenses for another Wellspring Capital portfolio company.**

49.    Instead of carefully managing the Debtors' resources in light of the insolvency that the 2012 Transfer and 2013 Transfer caused, Wellspring Capital and the D&O Defendants used SportCo's treasury for personal gain.

50.    Among other things, Wellspring and the D&O Defendants authorized distributions from SportCo's accounts to pay bonuses to employees of Crosman Corporation ("Crosman")[3]— another entity that Wellspring Capital owned, but that was not under the same ownership umbrella as SportCo or any of the other Debtors.

---

[3] Defendant Johnson, in addition to operating as CEO of SportCo, was also CEO of Crosman.

51.     For example, on October 20, 2016, Defendant Johnson reported to Defendant Carles that he planned to issue an approximately $600,000, half-year bonus to the employees at Crosman (the "Crosman Bonus").  Defendant Carles replied later that day: "Looks good . . . We are gonna [sic] cover crosman out of usc."

52.     Later, on December 6, 2016, Defendant Johnson sent Defendant Carles information relating to the Crosman Bonus.  Defendant Carles replied: "This looks reasonable.  USC component is a no brainer."

53.     Thus, at the direction of Defendants Carles and Johnson, SportCo paid at least $600,000 to Crosman employees for services that the employees performed for the benefit of Crosman, and not at any of the Debtors.

54.     Defendants Carles and Johnson did not stop there.  Defendant Johnson ordered, and Defendant Carles authorized, Defendant Johnson's bonus for his services at Crosman to be paid from SportCo funds.

55.     Specifically, on December 12, 2016, Defendant Johnson instructed two Crosman employees: "Per my discussions with [Wellspring Capital], the amount listed for me shall be paid for out of [SportCo] payroll."

56.     Thereafter, at the direction of Defendants Johnson and Carles, SportCo paid Defendant Johnson at least $112,500 on or around December 2016 (the "Johnson Crosman Bonus").  A December 19, 2016 email from SportCo's then Chief Financial Officer, Michelle Mosier, confirmed that the bonus was for Defendant Johnson's "work on Crosman—not USC related."  Thus, Defendant Johnson received at least $112,500 of SportCo's funds for services he performed that were wholly unrelated to SportCo.

57.     On information and belief, Wellspring Capital and the D&O Defendants conspired to (and did) use the Debtors' funds to pay for other Crosman-related expenses not addressed above.

58.     On information and belief, Wellspring Capital and the D&O Defendants conspired to (and did) use the Debtors' funds to pay for other Wellspring Capital portfolio companies' expenses not addressed above.

59.     In addition, Defendant Johnson directed SportCo to pay at least a portion of his monthly Crosman-related expenses, the total amount of which will be proven at trial.

60.     At same time that the D&O Defendants and Wellspring Capital were forcing the Debtors to pay out the sums described above to Wellspring-Capital-owned companies for no reasonably equivalent value, the Debtors were hopelessly insolvent.

## 2. Wellspring Capital and the D&O Defendants use SportCo's funds for lavish vacations and luxury goods and services.

61.     Instead of taking steps to manage the Debtors' costs to preserve value for the Debtors' stakeholders as they were obligated to do, and in addition to using SportCo's money to cover expenses for other Wellspring-Capital-owned companies, the D&O Defendants used the Debtors' funds to pay for numerous lavish vacations and other luxury goods and services.

62.     In an October 18, 2016 email, for example, Defendant Johnson informed Michelle Mosier ("Mosier") that he and Wellspring Capital were considering moving SportCo's headquarters to Bermuda.  Among the reasons that Defendant Johnson listed for the move, chief among them was that he and the other D&O Defendants could hold board meetings in Bermuda. On October 21, 2016, Ms. Mosier responded that relocating SportCo to Bermuda would not have any added tax benefits.  But Ms. Mosier made sure to reassure Defendant Johnson that she had "No issue with traveling to Bermuda for board meetings and deducting those expenses . . . ."

63.    The D&O Defendants also planned, and attended, a wasteful trip to the 2017 Masters Golf Tournament (the "Masters Trip") using funds of the Debtors.

64.    During the Masters Trip, Defendants Carles, Johnson, Dawson, and other non-Debtor-related individuals stayed at the "Champions Retreat – Nelson Cottage" in Evans, Georgia for at least three days.  Defendants Carles, Johnson, Dawson, and other non-Debtor-related individuals had all of their meals at the Champions Retreat and attended the golf tournament at the Augusta National Golf Course on Thursday and Friday.

65.    SportCo paid for the Masters Trip including, but not limited to, costs that Defendants Carles, Johnson, and Dawson incurred personally.

66.    Only a few days after the Masters Trip, the D&O Defendants booked another expensive trip on SportCo's tab—this time to Argentina (the "Argentina Trip").

67.    On April 12, 2017, Defendant Carles wrote to Defendant Johnson: "let's build the book on Argentina early.  Set the hook."  Defendant Johnson responded on April 14, 2017, noting that he had booked the trip and explained: "I've got 10 sports but could get more if we need them. What do you think?  Whole thing with 10 guys will cost $40K excluding air.  Is that ok?" Defendant Carles replied: "Looks great.  Let's lock it down but keep mum until we get through the covenant . . . . Also, assuming we sell Crosman, wanna do Bermuda in late spring as a closing event?"  Defendant Johnson replied: "Got it on Argentina" and then provided Defendant Carles with options for the proposed trip to Bermuda.

68.    In an August 21, 2017 letter, Defendant Johnson explained the Argentina Trip to potential attendees, including Defendant Carles, another Wellspring Capital employee, and nine others.  Defendant Johnson scheduled the Argentina Trip to last from December 3, 2017 to December 7, 2017.  Defendant Johnson further explained to the proposed attendees that

"everything but your personal needs will be taken care of.  All meals, lodging, hunting fees, guns, shells, in country transportation, tips and entertainment are covered."

69.     Almost immediately after the Argentina Trip concluded on December 7, 2017, Defendant Johnson booked and paid for yet another vacation in Sweden (the "Ice Hotel Trip") with the Debtors' funds.

70.     Specifically, Defendant Johnson reserved six luxury rooms for three nights in late February 2018 at the "Icehotel" in Jukkasjarvi, Sweden for himself and five guests.  Activities over the course of the three-day Ice Hotel Trip included dogsledding, five course meals, classes on winter survival techniques, ice sculpting courses, and snow mobile tours.  All told the Ice Hotel Trip cost approximately $18,138 when booked.

71.     On information and belief the D&O Defendants and Wellspring Capital conspired to (and did) cause the Debtors to pay for similarly expensive vacations for the D&O Defendants that had no business purpose.

72.     In the period from April 2017 through January 2018, the D&O Defendants and Wellspring Capital caused the Debtors to spend more than $100,000 on posh vacations for themselves.  At the same time, the Debtors were struggling to pay their vendors.

73.     As just one example, on December 4, 2017—just one day before the Argentina Trip—one of the Debtors' key vendors reported that SportCo was "$2.2M past due."  Despite Defendant Johnson's plea to permit SportCo to delay its payment to that vendor, the vendor informed Defendant Johnson that it needed the entire $2,200,000 that SportCo owed paid in full before it would ship any additional product to SportCo.

74.     Thus, while SportCo spent thousands (and potentially more) on vacations for the D&O Defendants, SportCo's vendors went unpaid.

**C.**     **With the Debtors in deep financial trouble, the D&O Defendants and Wellspring Capital force the Debtors to hastily acquire AcuSport out of its Chapter 11 case without proper diligence.**

75.     As the Debtors' financial condition deteriorated due to the D&O Defendants' reckless spending, it became clear that the Debtors would default on their obligations under the 2012 Loans and 2013 Loans.

76.     In early 2018, Wellspring Capital notified Prospect that the Debtors would default on the interest payment due to Prospect in the amount of $4.7 million in the second quarter of 2018.

77.     To induce the Debtors' lenders to forbear on interest payments they were owed, the D&O Defendants and Wellspring Capital formulated a proposal for SportCo to purchase certain assets of AcuSport, another firearms distribution company.

78.     In reality, the proposal to purchase AcuSport (the "AcuSport Acquisition") was nothing more than a façade. The D&O Defendants had neither adequately diligenced the AcuSport Acquisition nor considered the inevitable and foreseeable consequences of entering into the transaction.[4]

79.     The D&O Defendants pitched (to the Debtors' board and to Prospect) the AcuSport Acquisition as a no-brainer deal with no accompanying downside for SportCo's business.

80.     In or around late 2017, the D&O Defendants outwardly represented to their lenders that, as part of the AcuSport Acquisition, the Debtors would acquire $14 million worth of AcuSport inventory and would immediately realize a $7 million profit on such inventory.

---

[4] AcuSport was on the verge of bankruptcy between 2017 and 2018. On May 1, 2018, AcuSport filed for Chapter 11 bankruptcy in the Bankruptcy Court for the Southern District of Ohio in the cases captioned: *In re ASPC Corp., f/k/a AcuSport Corporation*, Case No. 18-52736.

81.     Additionally, a May 9, 2018 presentation to SportCo's vendors pitching the AcuSport Acquisition prepared at the direction of Defendant Johnson represented that "[a]s a conservative estimate, [SportCo] is projecting the ability to immediately pick up 30% of AcuSport's revenue, or $150mm annually, following the acquisition."

82.     Despite the outward representations the D&O Defendants made concerning the benefits of the AcuSport Acquisition, internally, the D&O Defendants and other SportCo employees were more skeptical of the deal.

83.     For example, in an October 27, 2017 email from Defendant Johnson to Defendant Carles, Defendant Johnson admitted that AcuSport's numbers were "ugly."

84.     In a later email on November 8, 2017, Mosier remarked that AcuSport's sales for the year 2017 had been the company's lowest since 2011.

85.     The defendants were also apparently skeptical about the financial models that AcuSport was providing to SportCo and the veracity of the financial statistics.

86.     In a November 13, 2017 email from Defendant Johnson to Mosier, Defendant Johnson warned Mosier to "[b]e careful" in trusting AcuSport and their financial adviser because "there [was] gamesmanship afoot."

87.     Despite AcuSport's unquestionably poor financials and the questions surrounding their accuracy, the D&O Defendants pressed forward, selling the AcuSport Acquisition to the Debtors' lenders as the only way to the save the Debtors from a bankruptcy filing.

88.     On October 27, 2017, Defendant Carles misrepresented in writing to one of the Debtors' lenders that "the only way to optimize is to merge with Acusport".

89.     On November 12, 2017, Defendant Carles further dialed up the purported urgency and benefits of the AcuSport Acquisition, writing to a representative from Prospect: "You know

[Prospect's] rights better than me, but I'm not going to beat around the bush . . . If you think Acusport must get done, I would go to committee tomorrow and figure out what you can live with. Brad and I know the business a lot better and we think it must get done . . . . We need to make the merger happen or deal with the consequences which could be severe."

90.     While Defendants Carles and Johnson outwardly represented that SportCo was on the verge of bankruptcy, internally, they were also, in breach of their fiduciary duties, conspiring to raise Defendant Johnson's salary substantially and to award Defendant Johnson significant additional bonuses.

91.     Specifically, in an email dated December 12, 2017, Defendants Carles and Johnson agreed that Defendant Johnson's "salary [would] increase to $1.0M/year from a current base of $600M" (the "Johnson Salary Increase").

92.     In addition, they agreed to award Johnson with a $100,000 quarterly bonus through December 31, 2019, subject to Defendant Johnson remaining at SportCo through December 31, 2019, or until Wellspring Capital lost control of the company, whichever came first (the "Johnson Quarterly Bonuses").

93.     With these significant transfers to Defendant Johnson in place, both Defendants Carles and Johnson continued to advocate for the AcuSport Acquisition while at the same time expressing their concern that SportCo was in dire financial straits.

94.     To pressure the Debtors' lenders to waive their interest payments to allow the Debtors to pursue the AcuSport Acquisition, Defendant Carles repeatedly attacked Mr. Carratu of Prospect through professionally inappropriate and lewd emails.

95.     Defendant Johnson also, on several occasions, misrepresented the value of AcuSport's inventory that induced Prospect to agree to the AcuSport Acquisition.

96.    Carles supplemented Johnson's representations by continuing to pressure the Debtors' lenders into agreeing to the AcuSport Acquisition: "Gotta get your interest?   The company will explode Rich!  We are hiring lawyers and advisors. . . . You lit the match because of your cocaine addled boss and lack of risk management were asleep at the switch.  They'll probably go to jail for securities fraud from what I understand . . . If you don't care then ignore the warnings I give you. THIS IS SERIOUS. ACT FAST. PRESERVE YOUR PRINCIPAL. PROTECT THE EMPLOYEES."

97.    The D&O Defendants and Wellspring Capital made all of these misrepresentations despite their concerns about AcuSport's poor financial performance and the questions surrounding their accuracy.

98.    The Debtors' internal emails and financial analysis reveal that the Debtors, under the control of the D&O Defendants and Wellspring Capital, engaged in significantly less due diligence in connection with the AcuSport Acquisition than compared to the due diligence they engaged in prior to other contemplated acquisitions.

99.    Nonetheless, the D&O Defendants and Wellspring Capital ultimately convinced all of the Debtors' lenders to waive the interest payments the Debtors owed to them and permitted the company to enter into the AcuSport Acquisition.

100.    The Debtors executed the asset purchase agreement effectuating the AcuSport Acquisition in or around May 3, 2018 and spent what was effectively the Debtors' last available cash—$7,000,000—to effectuate the asset purchase.

101.    Almost immediately, the D&O Defendants' failure to adequately diligence the AcuSport Acquisition came back to haunt the Debtors.

102.    Several of SportCo's vendors immediately saw the AcuSport Acquisition as a severe misstep and dropped the Debtors' credit lines to zero—refusing to ship goods to the Debtors without insurance or payment in advance.

103.    On May 3, 2018, Defendant Johnson's subordinate reported that one of the Debtors' vendors called him and "said they [were] uncomfortable with news of us purchasing Acusports assets and effective immediately they are taking our credit limit to zero."

104.    On May 4, 2018, Defendant Johnson reported that he "[h]eard from [another vendor] we are being dropped as of May 12.  They won't ship us without insurance since Acu[Sport]."

105.    The same day, two of the Debtors' trade insurance providers reported they had dropped their coverage for the Debtors because of the AcuSport Acquisition.

106.    The D&O Defendants' failure to adequately diligence the AcuSport Acquisition also saddled the Debtors with unforeseen costs.  A May 31, 2018 email from one of Defendant Johnson's subordinates reported to Defendant Johnson that the Debtors would incur an additional $970,000 in costs to build out servers that the Debtors were supposed to have acquired in the AcuSport Acquisition.

107.    Although Defendant Johnson's subordinate claimed that AcuSport had misrepresented that it owned the Connectria platform, emails from June 2018 reveal that AcuSport explicitly informed Ms. Mosier that AcuSport did not own, but rather leased, the Connectria platform.  The additional costs relating to the Connectria platform were therefore attributable to the D&O Defendants' lack of diligence, and not misrepresentations on the part of AcuSport.

108.    Email correspondence from June 2018 further reveals that the D&O Defendants did not consider that they would need to obtain firearm-related licenses to store firearms at the

Bellefontaine, Ohio facility the Debtors acquired in the AcuSport Acquisition. After executing the APA, counsel for the Debtors requested to delay closing of the AcuSport Acquisition (which counsel to AcuSport rejected) on the basis of this "unforeseen" cost.

109.   On July 17, 2018, an internal analysis concluded that while the Debtors had acquired an automated storage and retrieval system as part of the AcuSport Acquisition, starting it up and integrating it would require a $1,500,000 investment over the following twelve months. The report concluded that the funds would better be spent paying vendors on discount terms.

110.   Further, the D&O Defendants had failed to consider the difference in size between AcuSport and SportCo when deciding to acquire AcuSport's licenses.

111.   On August 28, 2018, Bonny Moore of Stibo Systems reported to John McCarthy, SportCo's Chief Information Officer, that "the combined United Sporting organization is at least twice the size of AcuSport when it purchased the STEP system. In order to arrive at a fair cost of the license extension, I would suggest we use the cost of the software as it was purchase by AcuSport in 2006 which is USC $220,000 plus associated annual maintenance."

112.   Mr. McCarthy replied: "To be transparent, I am very surprised by the number you have proposed."

113.   During the summer of 2018, the Debtors also began to learn that the AcuSport Acquisition would not result in the $150,000,000 increase in revenue they had planned.

114.   On July 16, 2018, one of the Debtors' financial advisors stated that his evaluation of the AcuSport Acquisition was that it was "a marginal investment." Under the financial advisor's initial analysis, the Debtors' acquisition of AcuSport's sales force had resulted in "0 incremental sales dollars" and "an added $2.3 million in costs to pay the sales force."

115.    By August 14, 2018, one of the Debtors' employees reported that the Debtors had captured only a small percentage (less than 25 percent) of AcuSport's market share among large retailers.  Specifically, the employee noted that "all assigned accounts in this model did $180m in business with AcuSport in 2017, but just 17.7m with USC YTD.  That delta is something we need to keep in mind . . . we should discuss as a leadership team."

116.    Thus, the amount of additional sales that the AcuSport Acquisition actually yielded was not anywhere close to what the D&O Defendants misrepresented to the Debtors' lenders and vendors.

117.    A September 11, 2018 shareholder presentation effectively acknowledged that the AcuSport Acquisition was not necessary from a sales perspective: "it appears that we captured much of AcuSport's market share *prior* to acquiring their facilities, and we *have not* seen a post-acquisition revenue lift."

118.    In addition, instead of yielding $14,000,000 worth of AcuSport inventory, the AcuSport Acquisition only included inventory valued at approximately $139,000.

119.    While the unexpected (but easily anticipated) costs of the AcuSport Acquisition began to materialize and pile on, the D&O Defendants had returned to business as usual—greedily spending the Debtors' money to fuel their foreign vacations (discussed previously).

120.    Almost immediately after the AcuSport Acquisition closed, the D&O Defendants planned yet another vacation using the funds of the Debtors.

121.    Purportedly to reward certain of the Debtors' employees and others for their efforts in connection with the AcuSport Acquisition, the D&O Defendants and Wellspring Capital forced the Debtors to pay for a four-day, three-night vacation for 10 persons and their spouses (20 total) at the Coral Beach and Tennis Club in Bermuda (the "Bermuda Trip").

122.    Defendant Johnson detailed the trip in a July 17, 2018 email, in which he polled potential attendees as to whether they wanted to "golf," "relax on the beach," shop and sight see, or "go sailing."  Instead of preserving the Debtors' minimal and deteriorating assets, the D&O Defendants were more concerned about continuing to use the Debtors to fund their extravagant lifestyles.  Indeed, all told, the Debtors inappropriately and recklessly spent $165,813 in meal and travel expenses that the D&O Defendants incurred in connection with the AcuSport Acquisition, a transaction that the Debtors never should have entered into in the first place.

123.    In sum, in mere months, the AcuSport Acquisition turned out to be the exact opposite of what the D&O Defendants had pitched—the Debtors failed to realize any profits from left-over AcuSport inventory, the Debtors failed to realize significant revenue increases from AcuSport's previous market share, and the Debtors suffered significant increased costs associated with integrating SportCo and AcuSport.

124.    Failing to realize any return on the $7,000,000 invested in the AcuSport Acquisition, by fall 2018, the Debtors were once again bound to default on the covenants in the 2012 Loan Agreement and 2013 Loan Agreement.

**D.**    **At the Direction of the D&O Defendants and Wellspring Capital, the Debtors' reject an out-of-court debt restructuring that would have benefitted all of the Debtors' creditors.**

125.    With the Debtors penniless as a result of the AcuSport Acquisition, by fall 2018 it was clear, yet again, that the Debtors were potentially in breach of their obligations under the 2012 Loan Agreements and 2013 Loan Agreements.

126.    On September 8, 2018, Defendant Johnson advised Richard Carratu of Prospect that the Debtors' were potentially in breach of their current fixed asset coverage ratio in the 2012 Loan Agreements.  On October 27, 2018, Defendant Johnson reported that getting waivers and

accompanying letters from the Debtors' lenders was a "Required Immediate Action" for the Debtors.

127.    The same day, Defendant Johnson further reported that certain lenders were willing to extend the maturity date for the first lien ("1L") portion of the 2012 Loan and that Prospect and certain lenders were willing to waive interest payments for the second lien ("2L") portions of the 2012 Loan and 2013 Loan in exchange for a majority ownership stake in the Debtors.

128.    To avoid breaching the 2012 Loan Agreement and 2013 Loan Agreement, the Debtors and the Debtors' 1L and 2L lenders began negotiating a deal to restructure the Debtors' debt.

129.    In connection with these negotiations, on November 9, 2018, the Debtors exchanged with their 2L lenders an initial term sheet to restructure the 2L portions of the 2012 Loan and 2013 Loan (the "Initial Term Sheet").

130.    Under the Initial Term Sheet: (a) the Debtors would continue to owe the 2L lenders $25,000,000; (b) the Debtors' 2L lenders would waive the remaining amounts due to them under the 2012 Loan Agreements and 2013 Loan Agreements; (c) in exchange, the Debtors' 2L lenders would acquire 90 percent of the preferred stock of the Debtors and 70 percent of the Debtors' common stock; and (d) Wellspring's equity interests in the Debtors would be reduced to 10 percent of the Debtors' preferred stock and 30 percent of the Debtors' common stock.

131.    Notably, the Initial Term Sheet did not include a release for Wellspring Capital or the D&O Defendants.

132.    Had the Debtors entered into the Initial Term Sheet, the Debtors would have continued to operate as a going concern and the Debtors' and Debtors' stakeholders' best interests—particularly the Debtors' unsecured creditors' interests—would have been maximized.

133.    Over the course of November and December 2018, the Debtors, the Debtors' 2L lenders, and Wellspring Capital (through Defendant Carles) continued to negotiate the restructuring of the Debtors' 2L debt.

134.    However, on the brink of reaching a deal in late December, Wellspring Capital and the D&O Defendants squelched those efforts by refusing, at the last minute, to execute any term sheet that did not include broad release and indemnification language in favor of the D&O Defendants and Wellspring Capital.

135.    In late December, Defendant Carles expressed his concern to Defendant Johnson and others that the lenders would consider suing SportCo's board members.  Defendant Carles wrote: "We also have to work on very broad releases from both 1Ls and 2Ls.  Don't trust them and board can't give away the company and then get sued for doing so."

136.    After Defendant Carles' message, Defendant Johnson expressly requested the releases to be added to the rebuttal term sheet that the Debtors were preparing to send to their 2L lenders.

137.    After the Debtors and their 2L lenders had exchanged multiple term sheets throughout November and December, on December 26, 2018—a day before the Debtors were set to breach the 2012 Loan and 2013 Loan by missing their fourth-quarter interest payments—the Debtors, at the behest of Wellspring Capital and the D&O Defendants, sent the 2L lenders a term sheet that included broad release and indemnification language in favor of the D&O Defendants and Wellspring Capital.

138.    Prospect, for the Debtors' 2L lenders, responded that "the release and indemnification language that we saw for the first time at 5:13pm tonight from [Debtors' counsel] is an issue."

139.    After further non-substantive discussions, on December 28, 2018, counsel for the 2L lenders wrote: "[k]indly strike both the indemnification and release provisions in their entirety from the term sheet, and then we can come close to finalizing the rest."

140.    Counsel for the Debtors refused to remove the release and indemnification provision from the term sheet and responded that "[r]eleases were always discussed.  This is supposed to be a consensual deal with all the parties and it needs to be done today."

141.    Prospect, for the 2L lenders, responded and again requested the removal of the release and indemnification provisions.  Further, Prospect stated that "[w]e expect [Wellspring's] consent to dropping those two provisions to permit Prospect's consent to the rest of the term sheet . . . ."  Counsel for the Debtors, again, responded that the Debtors would not agree to remove the release and indemnification provisions.

142.    Ultimately, the Debtors and the 2L lenders were unable to agree on terms to restructure the Debtors' 2L debt.

143.    Disregarding the fiduciary duties they owed to the Debtors, Wellspring Capital and the D&O Defendants refused to execute any term sheet that did not include broad release and indemnification provisions for the benefit of the D&O Defendants and Wellspring Capital.

**E.    The Debtors filed for bankruptcy in 2019.**

144.    On December 31, 2018, the Debtors defaulted on the 2012 Loan and 2013 Loan. The Debtors subsequently filed for bankruptcy on June 10, 2019 (the "Petition Date").

145.    Both prior to and after filing for bankruptcy, the Debtors hastily liquidated their assets at substantial discounts, effectively destroying any possible recovery for general unsecured creditors.

146.    As of the Petition Date, the Debtors' creditors asserted $260 million worth of general unsecured claims against the Debtors' estates.

## CAUSES OF ACTION

### COUNT ONE
### (The D&O Defendants, In Causing The Debtors To Enter Into The AcuSport Acquisition, Breached The Fiduciary Duties Of Care And Loyalty)

147.    Plaintiff repeats and re-alleges each of the allegations set forth above and below as if set forth herein.

148.    At all times relevant hereto, there have been one or more creditors who have held, and still hold, unsecured claims against the Debtors that were, and are, allowable under 11 U.S.C. § 502.

149.    During the Debtors' insolvency—which began in 2012 and has continued since then, through and including the Petition Date—the D&O Defendants in their respective capacities as directors, executive officers, and/or employees of the Debtors, each individually owed the Debtors fiduciary duties of care and loyalty under applicable state corporate law.

150.    Those duties required the D&O Defendants to seek to reasonably maximize corporate value, and where, as here, liquidation was inevitable and underway, to preserve maximum corporate value for distribution to creditors and shareholders in the order of their priority.

151.    By failing to conduct adequate diligence and mis-valuing (or intentionally misrepresenting the value of) the AcuSport Acquisition, and approving the AcuSport Acquisition on the basis of the incorrect or misrepresented value thereof, the D&O Defendants breached the duty of care they each owed to the Debtors.

152.    The D&O Defendants promoted the AcuSport Acquisition because each D&O Defendant individually stood to receive substantial additional value if the Debtors' lenders waived

the Debtors' interest payments, and in doing so, the D&O Defendants breached the duty of loyalty they each owed to the Debtors.

153.    This conduct by the D&O Defendants constituted gross negligence.

154.    The AcuSport Acquisition inflicted serious harm on the Debtors.

155.    The failed AcuSport Acquisition, which the D&O Defendants advocated for and approved, deprived the Debtors' estate of significant value and caused the Debtors to file for bankruptcy.  As a result, the Debtors' estates have been harmed and the Debtors' creditors have received nothing in exchange for the millions of dollars the Debtors owed them.

156.    The D&O Defendants' breaches of the fiduciary duties of care and loyalty have therefore damaged the Debtors and their business in an amount to be determined at trial.

## <u>COUNT TWO</u>
**(Wellspring Capital Aided And Abetted The D&O Defendants' Breaches Of The Fiduciary Duties Of Care And Loyalty In Connection With The AcuSport Acquisition)**

157.    Plaintiff repeats and re-alleges each of the allegations set forth above and below as if fully set forth herein.

158.    Wellspring Capital, as the owner of all of the Debtors' equity, controlled the D&O Defendants and therefore the Debtors' business, and was responsible for overseeing the activities of the D&O Defendants and of the Debtors.

159.    The D&O Defendants each breached the fiduciary duties of care and loyalty that they each owed to the Debtors.

160.    In its role as the Debtors' sole equity holder, Wellspring Capital knew that the D&O Defendants were breaching their fiduciary duties of care and loyalty and gave substantial assistance or encouragement to the D&O Defendants in these bad acts.

161.    Through this conduct, Wellspring Capital aided and abetted the D&O Defendants' breaches of the fiduciary duties of care and loyalty, causing damage to the interests of the Debtors and their creditors in an amount to be determined at trial.

### COUNT THREE
**(The D&O Defendants, In Failing To Agree to Restructure The Debtors' Debt Without Releases And Indemnification In Their Favor, Breached The Fiduciary Duties Of Care And Loyalty)**

162.    Plaintiff repeats and re-alleges each of the allegations set forth above and below as if set forth herein.

163.    At all times relevant hereto, there have been one or more creditors who have held and still hold unsecured claims against the Debtors that were, and are, allowable under 11 U.S.C. § 502.

164.    During the Debtors' insolvency—which began in 2012 and has continued since then, through and including the Petition Date—the D&O Defendants, in their respective capacities as directors, executive officers, and/or employees of the Debtors, each individually owed the Debtors fiduciary duties of care and loyalty under applicable state corporate law.

165.    Those duties required the D&O Defendants to seek to reasonably maximize corporate value, and where, as here, liquidation was inevitable and underway, to preserve maximum corporate value for distribution to creditors and shareholders in the order of their priority.

166.    The D&O Defendants refused, at the last minute, to execute any debt restructuring agreement that did not include broad release and indemnification language in favor of the D&O Defendants and Wellspring Capital because they, and not the Debtors' creditors, stood to receive substantial value if the Debtors' debt restructuring agreement included such provisions.

167.     Entering into any of the restructuring agreements that the Debtors' lenders had proposed between November and December 2018 would have substantially benefitted the Debtors' estates as the Debtors would not have had to file for bankruptcy and thereafter liquidate their assets in heavily discounted liquidation sales.

168.     Instead of entering into any of the proposed agreements, the D&O Defendants placed their own self-interests above those of their fiduciaries—specifically, the Debtors—and permitted the Debtors to breach their loan covenants instead of entering into a restructuring agreement that did not provide the D&O Defendants or Wellspring Capital with releases and the benefit of indemnification.

169.     In doing so, the D&O Defendants breached the fiduciary duties of care and loyalty that they owed to the Debtors.

170.     This conduct by the D&O Defendants was grossly negligent.

171.     The D&O Defendants' decision to forego a consensual debt restructuring caused the Debtors to file for bankruptcy.  As a result, the Debtors' business and prospects have been harmed and the Debtors' creditors have received nothing in exchange for the millions of dollars the Debtors owed them.

172.     The D&O Defendants' breaches of the fiduciary duties of care and loyalty have therefore damaged the Debtors and their creditors in an amount to be determined at trial.

## <u>COUNT FOUR</u>
### (Wellspring Capital Aided And Abetted The D&O Defendants' Breaches of the Fiduciary Duties of Care And Loyalty In Connection With The Debtors' Failure To Restructure their Debt)

173.     Plaintiff repeats and re-alleges each of the allegations set forth above and below as if fully set forth herein.

174.    Wellspring Capital, as the owner of all of the Debtors' equity, controlled the D&O Defendants and therefore the Debtors' business and was responsible for overseeing the activities of the D&O Defendants and of the Debtors.

175.    The D&O Defendants each breached the fiduciary duties of care and loyalty that they owed to the Debtors.

176.    In its role as the Debtors' sole equity holder, and because of its control of the D&O Defendants, Wellspring Capital knew that the D&O Defendants were breaching their fiduciary duties of care and loyalty, and Wellspring Capital gave substantial assistance or encouragement to the D&O Defendants in these bad acts.

177.    Through this conduct, Wellspring Capital aided and abetted the D&O Defendants' breaches of the fiduciary duties of care and loyalty, causing damage to the interests of the Debtors and their creditors in an amount to be determined at trial.

## COUNT FIVE
### (The Johnson Crosman Bonus Was An Actual Fraudulent Transfer Under Applicable State Law)

178.    Plaintiff repeats and re-alleges each of the allegations set forth above and below as if fully set forth herein.

179.    The Johnson Crosman Bonus paid to Defendant Johnson totaling not less than $112,500 was an actual fraudulent transfer within the meaning of applicable state law.

180.    The Debtors made the Johnson Crosman Bonus with the actual intent to hinder, delay, and defraud the Debtors' creditors.

181.    Wellspring Capital and the D&O Defendants, by exercising control over the Debtors, facilitated the Johnson Crosman Bonus with the actual intent to hinder, delay, and defraud the Debtors' creditors.

182.     Wellspring Capital and the D&O Defendants' intent is imputed to the Debtors because Wellspring Capital and the D&O Defendants were in a position of control, or did control, the disposition of the Debtors' property.

183.     The Debtors received less than reasonable equivalent value—or, in fact, no value—for the Johnson Crosman Bonus.

184.     The Debtors were insolvent at the time the Johnson Crosman Bonus facilitated the transfer of $112,500 to Defendant Johnson.

185.     To the extent that the Debtors were not already insolvent, the Debtors' transfer of the Johnson Crosman Bonus to Defendant Johnson without any payment or consideration rendered the Debtors insolvent.

186.     Defendant Johnson was an insider of the Debtors at the time the Johnson Crosman Bonus was paid.

187.     The Johnson Crosman Bonus was intentionally made to Defendant Johnson, an insider of the Debtors, for no consideration while the Debtors were insolvent, and while Defendant Johnson had reasonable cause to believe that the Debtors were insolvent.

188.     The Johnson Crosman Bonus is avoidable to the extent necessary to satisfy claims of creditors pursuant to applicable state law.

189.     Plaintiff may also recover the value of the Johnson Crosman Bonus from Defendant Johnson's immediate, mediate, and/or subsequent transferees, plus interest.

## COUNT SIX
### (The Johnson Crosman Bonus Was A Constructive Fraudulent Transfer Under Applicable State Law)

190.     Plaintiff repeats and re-alleges each of the allegations set forth above and below as if fully set forth herein.

191.    The Johnson Crosman Bonus paid to Defendant Johnson totaling not less than $112,500 was a constructive fraudulent transfer within the meaning of applicable state law.

192.    The Debtors received less than reasonably equivalent value—if any value—for the Johnson Crosman Bonus.

193.    At the time that Defendant Johnson received the funds from the Johnson Crosman Bonus, the Debtors were engaged, or about to engage, in a business or a transaction for which the remaining assets of the Debtors were unreasonably small in relation to the business or transaction.

194.    At the time that Defendant Johnson received the funds from the Johnson Crosman Bonus, the Debtors intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

195.    The Debtors were insolvent at the time the Johnson Crosman Bonus facilitated the transfer of $112,500 to Defendant Johnson.

196.    To the extent that the Debtors were not already insolvent, the payment of the Johnson Crosman Bonus to Defendant Johnson, without any payment or consideration, rendered the Debtors insolvent.

197.    Defendant Johnson was an insider of the Debtors when the Johnson Crosman Bonus was made.

198.    The Johnson Crosman Bonus was made to Defendant Johnson, an insider of the Debtors, for no consideration while the Debtors were insolvent, and while Defendant Johnson had reasonable cause to believe the Debtors were insolvent.

199.    The Johnson Crosman Bonus is avoidable to the extent necessary to satisfy claims of creditors pursuant to applicable state law.

200.    Plaintiff may also recover the value of the Johnson Crosman Bonus from Defendant Johnson's immediate, mediate, and/or subsequent transferees, plus interest.

### COUNT SEVEN
### (The Johnson Crosman Bonus Was An Actual Fraudulent Transfer Under 11 U.S.C. § 548 And Can Be Recovered Under 11 U.S.C. § 550)

201.    Plaintiff repeats and re-alleges each of the allegations set forth above and below as if fully set forth herein.

202.    The Johnson Crosman Bonus paid to Defendant Johnson prior to the Petition Date, totaling not less than $112,500, was an actual fraudulent transfer within the meaning of 11 U.S.C. § 548.

203.    The Debtors paid the Johnson Crosman Bonus with the actual intent to hinder, delay, and defraud the Debtors' creditors.

204.    Wellspring Capital and the D&O Defendants, by exercising control over the Debtors, facilitated the Johnson Crosman Bonus with the actual intent to hinder, delay, and defraud the Debtors' creditors.

205.    Wellspring Capital and the D&O Defendants' intent is imputed to the Debtors because Wellspring Capital and the D&O Defendants were in a position of control, or did control, the disposition of the Debtors' property.

206.    The Debtors received less than reasonable equivalent value—if any value—for the Johnson Crosman Bonus.

207.    The Debtors were insolvent at the time the Johnson Crosman Bonus facilitated the transfer of $112,500 to Defendant Johnson.

208.    To the extent that the Debtors were not already insolvent, the Debtors' transfer of the Johnson Crosman Bonus to Defendant Johnson without any payment or consideration rendered the Debtors' insolvent.

209.    At the time of the Johnson Crosman Bonus, Defendant Johnson was an insider of the Debtors.

210.    The Johnson Crosman Bonus was made to Defendant Johnson, an insider of the Debtors, for no consideration while the Debtors were insolvent, and while Defendant Johnson had reasonable cause to believe that the Debtors were insolvent.

211.    The Johnson Crosman Bonus is avoidable to the extent necessary to satisfy claims of creditors pursuant to 11 U.S.C. § 548.

212.    In accordance with 11 U.S.C. § 550, the Trustee may recover the full amount of the Johnson Crossman Bonus from Defendant Johnson, plus interest, for the benefit of general unsecured creditors.

213.    Plaintiff may also recover the value of the Johnson Crosman Bonus from Defendant Johnson's immediate, mediate, and/or subsequent transferees, plus interest.

**COUNT EIGHT**
**(The Johnson Crosman Bonus Was A Constructive Fraudulent**
**Transfer Under 11 U.S.C. § 548 And Can Be Recovered Under**
**11 U.S.C. § 550)**

214.    Plaintiff repeats and re-alleges each of the allegations set forth above and below as if fully set forth herein.

215.    The Johnson Crosman Bonus paid to Defendant Johnson prior to the Petition Date, totaling not less than $112,500, was a constructive fraudulent transfer within the meaning of 11 U.S.C. § 548.

216.    The Debtors received less than reasonably equivalent value for the Johnson Crosman Bonus.

217.    At the time Defendant Johnson received the funds from the Johnson Crosman Bonus, the Debtors were engaged, or about to engage in, a business or a transaction for which the remaining assets of the Debtors were unreasonably small in relation to the business or transaction.

218.    At the time that Defendant Johnson received the funds from the Johnson Crosman Bonus, the Debtors intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

219.    The Debtors were insolvent at the time the Johnson Crosman Bonus facilitated the transfer of $112,500 to Defendant Johnson.

220.    To the extent that the Debtors were not already insolvent, the Johnson Crosman Bonus paid to Defendant Johnson without any payment or consideration rendered the Debtors insolvent.

221.    Defendant Johnson was a director of the Debtors at the time of the Johnson Crosman Bonus and therefore was an insider of the Debtors when the Johnson Crosman Bonus was paid.

222.    The Johnson Crosman Bonus was paid to Defendant Johnson, an insider of the Debtors, for no consideration while the Debtors were insolvent, and while Defendant Johnson had reasonable cause to believe the Debtors were insolvent.

223.    The Johnson Crosman Bonus is avoidable to the extent necessary to satisfy claims of creditors pursuant to 11 U.S.C. § 548.

224.     In accordance with 11 U.S.C. § 550, the Trustee may recover the full amount of the Johnson Crossman Bonus from Defendant Johnson, plus interest, for the benefit of general unsecured creditors.

225.     Plaintiff may also recover the value of the Johnson Crosman Bonus from Defendant Johnson's immediate, mediate, and/or subsequent transferees, plus interest.

### COUNT NINE
**(The Johnson Salary Increase Was An Actual Fraudulent Transfer Under Applicable State Law)**

226.     Plaintiff repeats and re-alleges each of the allegations set forth above and below as if fully set forth herein.

227.     The Johnson Salary Increase paid to Defendant Johnson totaling not less than $500,000 was an actual fraudulent transfer within the meaning of applicable state law.

228.     The Debtors effectuated the Johnson Salary Increase with the actual intent to hinder, delay, and defraud the Debtors' creditors.

229.     Wellspring Capital and the D&O Defendants, by exercising control over the Debtors, facilitated the Johnson Salary Increase with the actual intent to hinder, delay, and defraud the Debtors' creditors.

230.     Wellspring Capital and the D&O Defendants' intent is imputed to the Debtors because Wellspring Capital and the D&O Defendants were in a position of control, or did in fact control, the disposition of the Debtors' property.

231.     The Debtors received less than reasonable equivalent value for the Johnson Salary Increase.

232.     The Debtors were insolvent at the time the Johnson Salary Increase facilitated the transfer of not less than $500,000 to Defendant Johnson.

233.    To the extent that the Debtors were not already insolvent, the Johnson Salary Increase to Defendant Johnson without any payment or consideration rendered the Debtors' insolvent.

234.    At the time of the Johnson Salary Increase, Defendant Johnson was an insider of the Debtors.

235.    The Johnson Salary Increase was made to Defendant Johnson, an insider of the Debtors, for no (or insufficient) consideration while the Debtors were insolvent, and while Defendant Johnson had reasonable cause to believe that the Debtors were insolvent.

236.    The Johnson Salary Increase is avoidable to the extent necessary to satisfy claims of creditors pursuant to applicable state law.

237.    Plaintiff may also recover the value of the Johnson Salary Increase from Defendant Johnson's immediate, mediate, and/or subsequent transferees, plus interest.

## COUNT TEN
### (The Johnson Salary Increase Was A Constructive Fraudulent Transfer Under Applicable State Law)

238.    Plaintiff repeats and re-alleges each of the allegations set forth above and below as if fully set forth herein.

239.    The Johnson Salary Increase paid to Defendant Johnson totaling not less than $500,000 was a constructive fraudulent transfer within the meaning of applicable state law.

240.    The Debtors received less than reasonably equivalent value for the Johnson Salary Increase.

241.    At the time of Defendant Johnson received the funds from the Johnson Salary Increase, the Debtors were engaged, or about to engage, in a business or a transaction for which the remaining assets of the Debtors were unreasonably small in relation to the business or transaction.

242.    At the time that Defendant Johnson received the funds from the Johnson Salary Increase, the Debtors intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

243.    The Debtors were insolvent at the time the Johnson Salary Increase facilitated the transfer of not less than $500,000 to Defendant Johnson.

244.    To the extent that the Debtors were not already insolvent, the Johnson Salary Increase to Defendant Johnson, without any payment or consideration, rendered the Debtors insolvent.

245.    Defendant Johnson was an insider of the Debtors when the Johnson Salary Increase occurred.

246.    The Johnson Salary Increase was made to Defendant Johnson, an insider of the Debtors, for no consideration while the Debtors were insolvent, and while Defendant Johnson had reasonable cause to believe the Debtors were insolvent.

247.    The Johnson Salary Increase is avoidable to the extent necessary to satisfy claims of creditors pursuant to applicable state law.

248.    Plaintiff may also recover the value of the Johnson Salary Increase from Defendant Johnson's immediate, mediate, and/or subsequent transferees, plus interest.

## COUNT ELEVEN
### (The Johnson Salary Increase Was An Actual Fraudulent Transfer Under 11 U.S.C. § 548 And Can Be Recovered Under 11 U.S.C. § 550)

249.    Plaintiff repeats and re-alleges each of the allegations set forth above and below as if fully set forth herein.

250.    The Johnson Salary Increase paid to Defendant Johnson during the two years prior to the Petition Date totaling not less than $500,000 was an actual fraudulent transfer within the meaning of 11 U.S.C. § 548.

251.    The Debtors effectuated the Johnson Salary Increase with the actual intent to hinder, delay, and defraud the Debtors' creditors.

252.    Wellspring Capital and the D&O Defendants, by exercising control over the Debtors, facilitated the Johnson Salary Increase with the actual intent to hinder, delay, and defraud the Debtors' creditors.

253.    Wellspring Capital and the D&O Defendants' intent is imputed to the Debtors because Wellspring Capital and the D&O Defendants were in a position of control, or did control, the disposition of the Debtors' property.

254.    The Debtors received less than reasonably equivalent value for the Johnson Salary Increase.

255.    The Debtors were insolvent at the time the Johnson Salary Increase facilitated the transfer of not less than $500,000 to Defendant Johnson.

256.    To the extent that the Debtors were not already insolvent, the Johnson Salary Increase to Defendant Johnson without any payment or consideration rendered the Debtors' insolvent.

257.    At the time of the Johnson Salary Increase, Defendant Johnson was an insider of the Debtors.

258.    The Johnson Salary Increase was made to Defendant Johnson, an insider of the Debtors, for no consideration while the Debtors were insolvent, and while Defendant Johnson had reasonable cause to believe that the Debtors were insolvent.

259.    The Johnson Salary Increase is avoidable to the extent necessary to satisfy claims of creditors pursuant to 11 U.S.C. § 548.

260.    In accordance with 11 U.S.C. § 550, the Trustee may recover the full amount of the Johnson Salary Increase from Defendant Johnson, plus interest, for the benefit of general unsecured creditors.

261.    Plaintiff may also recover the value of the Johnson Salary Increase from Defendant Johnson's immediate, mediate, and/or subsequent transferees, plus interest.

**COUNT TWELVE**
**(The Johnson Salary Increase Was A Constructive Fraudulent Transfer Under 11 U.S.C. § 548 And Can Be Recovered Under 11 U.S.C. § 550)**

262.    Plaintiff repeats and re-alleges each of the allegations set forth above and below as if fully set forth herein.

263.    The Johnson Salary Increase paid to Defendant Johnson during the two years prior to the Petition Date totaling not less than $500,000 was a constructive fraudulent transfer within the meaning of 11 U.S.C. § 548.

264.    The Debtors received less than reasonably equivalent value for the Johnson Salary Increase.

265.    At the time Defendant Johnson received the funds from the Johnson Salary Increase, the Debtors were engaged, or about to engage, in a business or a transaction for which the remaining assets of the Debtors were unreasonably small in relation to the business or transaction.

266.    At the time that Defendant Johnson received the funds from the Johnson Salary Increase, the Debtors intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

267.    The Debtors were insolvent at the time the Johnson Salary Increase facilitated the transfer of not less than $500,000 to Defendant Johnson.

268.    To the extent that the Debtors were not already insolvent, the Johnson Salary Increase to Defendant Johnson without any payment or consideration rendered the Debtors insolvent.

269.    Defendant Johnson was an insider of the Debtors at the time of the Johnson Salary Increase.

270.    The Johnson Salary Increase was made to Defendant Johnson, an insider of the Debtors, for no consideration while the Debtors were insolvent, and while Defendant Johnson had reasonable cause to believe the Debtors were insolvent.

271.    The Johnson Salary Increase is avoidable to the extent necessary to satisfy claims of creditors pursuant to 11 U.S.C. § 548.

272.    In accordance with 11 U.S.C. § 550, the Trustee may recover the full amount of the Johnson Salary Increase from Defendant Johnson, plus interest, for the benefit of general unsecured creditors.

273.    Plaintiff may also recover the value of the Johnson Salary Increase from Defendant Johnson's immediate, mediate, and/or subsequent transferees, plus interest.

### COUNT THIRTEEN
### (The Johnson Quarterly Bonuses Were An Actual Fraudulent Transfer Under Applicable State Law)

274.    Plaintiff repeats and re-alleges each of the allegations set forth above and below as if fully set forth herein.

275.    The Johnson Quarterly Bonuses paid to Defendant Johnson totaling not less than $500,000 were an actual fraudulent transfer within the meaning of applicable state law.

276.    The Debtors paid the Johnson Quarterly Bonuses with the actual intent to hinder, delay, and defraud the Debtors' creditors.

277. Wellspring Capital and the D&O Defendants, by exercising control over the Debtors, facilitated the Johnson Quarterly Bonuses with the actual intent to hinder, delay, and defraud the Debtors' creditors.

278. Wellspring Capital and the D&O Defendants' intent is imputed to the Debtors because Wellspring Capital and the D&O Defendants were in a position of control, or did in fact control, the disposition of the Debtors' property.

279. The Debtors received less than reasonably equivalent value for the Johnson Quarterly Bonuses.

280. The Debtors were insolvent at the time the Johnson Quarterly Bonuses facilitated the transfer of not less than $500,000 to Defendant Johnson.

281. To the extent that the Debtors were not already insolvent, the Johnson Quarterly Bonuses made to Defendant Johnson without any payment or other consideration rendered the Debtors insolvent.

282. At the time of the Johnson Quarterly Bonuses, Defendant Johnson was an insider of the Debtors.

283. The Johnson Quarterly Bonuses were made to Defendant Johnson, an insider of the Debtors, for no consideration while the Debtors were insolvent, and while Defendant Johnson had reasonable cause to believe that the Debtors were insolvent.

284. The Johnson Quarterly Bonuses are avoidable to the extent necessary to satisfy claims of creditors pursuant to applicable state law.

285. Plaintiff may also recover the value of the Johnson Quarterly Bonuses from Defendant Johnson's immediate, mediate, and/or subsequent transferees, plus interest.

## COUNT FOURTEEN
### (The Johnson Quarterly Bonuses Were A Constructive Fraudulent Transfer Under Applicable State Law)

286.    Plaintiff repeats and re-alleges each of the allegations set forth above and below as if fully set forth herein.

287.    The Johnson Quarterly Bonuses paid to Defendant Johnson totaling not less than $500,000 were a constructive fraudulent transfer within the meaning of applicable state law.

288.    The Debtors received less than reasonably equivalent value for the Johnson Quarterly Bonuses.

289.    At the time of Defendant Johnson received the funds from the Johnson Quarterly Bonuses, the Debtors were engaged, or about to engage, in a business or a transaction for which the remaining assets of the Debtors were unreasonably small in relation to the business or transaction.

290.    At the time that Defendant Johnson received the funds from the Johnson Quarterly Bonuses, the Debtors intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

291.    The Debtors were insolvent at the time the Johnson Quarterly Bonuses facilitated the transfer of not less than $500,000 to Defendant Johnson.

292.    To the extent that the Debtors were not already insolvent, the Johnson Quarterly Bonuses made to Defendant Johnson without any payment or consideration rendered the Debtors insolvent.

293.    Defendant Johnson was an insider of the Debtors when the Johnson Quarterly Bonuses were paid.

294.    The Johnson Quarterly Bonuses were paid to Defendant Johnson, an insider of the Debtors, for no consideration while the Debtors were insolvent, and while Defendant Johnson had reasonable cause to believe the Debtors were insolvent.

295.    The Johnson Quarterly Bonuses are avoidable to the extent necessary to satisfy claims of creditors pursuant to applicable state law.

296.    Plaintiff may also recover the value of the Johnson Quarterly Bonuses from Defendant Johnson's immediate, mediate, and/or subsequent transferees, plus interest.

**COUNT FIFTEEN**
**(The Johnson Quarterly Bonuses Were An Actual Fraudulent**
**Transfer Under 11 U.S.C. § 548 And Can Be Recovered Under**
**11 U.S.C. § 550)**

297.    Plaintiff repeats and re-alleges each of the allegations set forth above and below as if fully set forth herein.

298.    The Johnson Quarterly Bonuses paid to Defendant Johnson during the two years prior to the Petition Date totaling not less than $400,000 were an actual fraudulent transfer within the meaning of 11 U.S.C. § 548.

299.    The Debtors paid the Johnson Quarterly Bonuses with the actual intent to hinder, delay, and defraud the Debtors' creditors.

300.    Wellspring Capital and the D&O Defendants, by exercising control over the Debtors, facilitated the Johnson Quarterly Bonuses with the actual intent to hinder, delay, and defraud the Debtors' creditors.

301.    Wellspring Capital and the D&O Defendants' intent is imputed to the Debtors because Wellspring Capital and the D&O Defendants were in a position of control, or did in fact control, the disposition of the Debtors' property.

302.    The Debtors received less than reasonably equivalent value for the Johnson Quarterly Bonuses.

303.    The Debtors were insolvent at the time the Johnson Quarterly Bonuses facilitated the transfer of not less than $500,000 to Defendant Johnson.

304.    To the extent that the Debtors were not already insolvent, the Johnson Quarterly Bonuses paid to Defendant Johnson without any payment or consideration rendered the Debtors' insolvent.

305.    At the time of the Johnson Quarterly Bonuses, Defendant Johnson was an insider of the Debtors.

306.    The Johnson Quarterly Bonuses were paid to Defendant Johnson, an insider of the Debtors, for no consideration while the Debtors were insolvent, and while Defendant Johnson had reasonable cause to believe that the Debtors were insolvent.

307.    The Johnson Quarterly Bonuses are avoidable to the extent necessary to satisfy claims of creditors pursuant to 11 U.S.C. § 548.

308.    In accordance with 11 U.S.C. § 550, the Trustee may recover the full amount of the Johnson Quarterly Bonuses from Defendant Johnson, plus interest, for the benefit of general unsecured creditors.

309.    Plaintiff may also recover the value of the Johnson Quarterly Bonuses from Defendant Johnson's immediate, mediate, and/or subsequent transferees, plus interest.

## COUNT SIXTEEN
### (The Johnson Quarterly Bonuses Were A Constructive Fraudulent Transfer Under 11 U.S.C. § 548 And Can be Recovered Under 11 U.S.C. § 550)

310.    Plaintiff repeats and re-alleges each of the allegations set forth above and below as if fully set forth herein.

311.    The Johnson Quarterly Bonuses paid to Defendant Johnson during the two years prior to the Petition Date totaling not less than $500,000 were a constructive fraudulent transfer within the meaning of 11 U.S.C. § 548.

312.    The Debtors received less than reasonably equivalent value for the Johnson Quarterly Bonuses.

313.    At the times that Defendant Johnson received the Johnson Quarterly Bonuses, the Debtors were engaged or about to engage in a business or a transaction for which the remaining assets of the Debtors were unreasonably small in relation to the business or transaction.

314.    At the times that Defendant Johnson received the funds from the Johnson Quarterly Bonuses, the Debtors intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

315.    The Debtors were insolvent at the time the Johnson Quarterly Bonuses facilitated the transfer of not less than $500,000 to Defendant Johnson.

316.    To the extent that the Debtors were not already insolvent, the Johnson Quarterly Bonuses paid to Defendant Johnson without any payment or consideration rendered the Debtors insolvent.

317.    Defendant Johnson was an insider of the Debtors when the Johnson Quarterly Bonuses were paid.

318.    The Johnson Quarterly Bonuses were paid to Defendant Johnson, an insider of the Debtors, for no consideration while the Debtors were insolvent, and while Defendant Johnson had reasonable cause to believe the Debtors were insolvent.

319.    The Johnson Quarterly Bonuses are avoidable to the extent necessary to satisfy claims of creditors pursuant to 11 U.S.C. § 548.

320.     In accordance with 11 U.S.C. § 550, the Trustee may recover the full amount of the Johnson Quarterly Bonuses from Defendant Johnson, plus interest, for the benefit of general unsecured creditors.

321.     Plaintiff may also recover the value of the Johnson Quarterly Bonuses from Defendant Johnson's immediate, mediate, and/or subsequent transferees, plus interest.

### COUNT SEVENTEEN
### (Corporate Waste Based On The Various Trips The D&O Defendants Caused The Debtors To Pay For)

322.     Plaintiff repeats and re-alleges each of the allegations set forth above and below as if fully set forth herein.

323.     In or around April 2017, the D&O Defendants, at the direction of Wellspring Capital, caused the Debtors to spend an amount to be determined at trial on the Master's Trip.

324.     In paying for the Master's Trip, the Debtors received zero consideration whatsoever in return.

325.     The Debtors' payment for the Master's Trip, under the direction of the D&O Defendants, was so one-sided that no business person of ordinary, sound judgment could have agreed to pay for such trip.

326.     In or around December 2017, the D&O Defendants, at the direction of Wellspring Capital, caused the Debtors to spend an amount to be determined at trial on the Argentina Trip.

327.     In paying for the Argentina Trip, the Debtors received zero consideration whatsoever in return.

328.     The Debtors' payment for the Argentina Trip, under the direction of the D&O Defendants, was so one-sided that no business person of ordinary, sound judgment could have agreed to pay for such trip.

-47-

329.     In or around February 2018, the D&O Defendants, at the direction of Wellspring Capital, caused the Debtors to spend an amount to be determined at trial on the Ice Hotel Trip.

330.     In paying for the Ice Hotel Trip, the Debtors received zero consideration whatsoever in return.

331.     The Debtors' payment for the Ice Hotel Trip, under the direction of the D&O Defendants, was so one-sided that no business person of ordinary, sound judgment could have agreed to pay for such trip.

332.     In or around September 2018, the D&O Defendants, at the direction of Wellspring Capital, caused the Debtors to spend an amount to be determined at trial on the Bermuda Trip.

333.     In paying for the Bermuda Trip, the Debtors received zero consideration whatsoever in return.

334.     The Debtors' payment for the Bermuda Trip, under the direction of the D&O Defendants, was so one-sided that no business person of ordinary, sound judgment could have agreed to pay for such trip.

335.     Accordingly, the D&O Defendants and Wellspring Capital unlawfully wasted the Debtors' assets by forcing the Debtors to pay for the Master's Trip, the Argentina Trip, the Ice Hotel Trip, the Bermuda Trip, and potentially other trips.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff as follows:

a.      Entry of judgment against the D&O Defendants and Wellspring Capital in an amount to be determined at trial;

b.      Entry of a judgment that the Johnson Crosman Bonus, the Johnson Salary Increase, and the Johnson Quarterly Bonuses are avoidable as fraudulent transfers pursuant to applicable state law;

c.      Entry of a judgment that the Johnson Crosman Bonus, the Johnson Salary Increase, and the Johnson Quarterly Bonuses are avoidable as fraudulent transfers pursuant to 11 U.S.C. § 548 and 11 U.S.C. § 550;

d.      Entry of a judgment that the Debtors' payments for the Masters Trip, the Argentina Trip, the Ice Hotel Trip, and the Bermuda Trip constituted corporate waste;

e.      Awarding Plaintiff its attorneys' fees, costs, and other expenses incurred in this action;

f.      Awarding Plaintiff pre- and post-judgment interest at the maximum rate permitted by law; and

g.      Awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated:  April 2, 2020                          Respectfully submitted,

**MORRIS JAMES LLP**

*/s/ Eric J. Monzo*
Eric J. Monzo (DE Bar No. 5214)
Brya M. Keilson (DE Bar No. 4643)
Sarah M. Ennis (DE Bar No. 5745)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: emonzo@morrisjames.com
E-mail: bkeilson@morrisjames.com
E-mail: sennis@morrisjames.com

and

**LOWENSTEIN SANDLER LLP**

*/s/ Jeffrey Cohen*
Jeffrey L. Cohen (admitted *pro hac vice*)
Eric S. Chafetz (admitted *pro hac vice*)
Michael A. Kaplan (admitted pro hac vice)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 262-6700

Facsimile: (212) 262-7402
E-mail: jcohen@lowenstein.com
E-mail: echafetz@lowenstein.com
E-mail: mkaplan@lowenstein.com

and

**SILVERMANACAMPORA LLP**

*/s/ Anthony Acampora*
Anthony C. Acampora
100 Jericho Quadrangle, Suite 300
Jericho, NY 11753
Telephone: (516) 479-6330
Facsimile: (516) 479-6301
E-mail: aacampora@silvermanacampora.com

*Counsel to the SportCo. Creditors'
Liquidation Trust*